UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

United States of America,      )
                 Plaintiff,    )
                               )
                               )
vs.                            )    Criminal No. 05-40026-FDS
                               )
                               )
Muhamed Mubayyid, Emadeddin Z.)
Muntasser, and Samir Al-Monla,)
a/k/a Samir Almonla,           )
                 Defendants.   )

BEFORE:  The Honorable F. Dennis Saylor, IV

Jury Trial Day 1

United States District Court
Courtroom No. 22
One Courthouse Way
Boston, Massachusetts
November 13, 2007

Marianne Kusa-Ryll, RDR, CRR
Official Court Reporter
United States District Court
595 Main Street, Room 514A
Worcester, MA 01608-2093
Mechanical Steno - Transcript by Computer

APPEARANCES:

B. Stephanie Siegmann, Assistant U.S. Attorney
Aloke Chakravarty, Assistant U.S. Attorney
Donald L. Cabell, Assistant U.S. Attorney
United States Attorney's Office
United States District Court
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
for the Plaintiff

Law Offices of Michael C. Andrews
Michael C. Andrews, Esquire
21 Custom House Street
Suite 920
Boston, Massachusetts 02110
for the Defendant, Muhamed Mubayyid

Norman S. Zalkind, Esquire
Elizabeth A. Lunt, Esquire
David Duncan, Esquire
Zalkind, Rodriguez, Lunt & Duncan, LLP
65a Atlantic Avenue
Boston, Massachusetts 02110
for the Defendant, Emadeddin Z. Muntasser

Federal Defender's Office
Charles P. McGinty, Esquire
408 Atlantic Avenue
Third Floor
Boston, Massachusetts 02110
for the Defendant Samir Al-Monla, a/k/a Samir Almonla

P R O C E E D I N G S

1
2
3          THE CLERK:  All rise.

4          Court is now open.  You may be seated.

5          Case No. 05-40026, United States versus Mohammed

6     Mubayyid, Emaddedin Muntasser, and Samir Al-Monla.

7          Counsel, please note your appearance for the record.

8          MR. CABELL:  Good morning, your Honor.  Donald Cabell,

9     for the government.

10          MS. SIEGMANN:  Good morning, your Honor.  Stephanie

11     Siegmann, for the United States.

12          MR. CHAKRAVARTY:  Aloke Chakravarty, for the United

13     States.

14          THE COURT:  Good morning.

15          MS. LUNT:  Good morning, your Honor.  Elizabeth Lunt,

16     for Mr. Muntasser.

17          MR. DUNCAN:  Good morning, your Honor.  David Duncan,

18     for Mr. Muntasser.

19          MR. ZALKIND:  Good morning, your Honor.  Norman

20     Zalkind, for Mr. Muntasser.

21          We have a paralegal that's helping us.  Can she sit at

22     counsel table, your Honor?

23          THE COURT:  Yes, if there's room.

24          MR. McGINTY:  And, your Honor, for Mr. Al-Monla,

25     Charles McGinty, from the Federal Defender's office.  Good

1  morning.

2      Your Honor, I'm also going to be filing, and I'll

3  electronically file as well, a -- a motion regarding a limiting

4  instruction, which we request.

5      MR. ANDREWS:  Lastly, your Honor, for the record,

6  Michael Andrews for Mr. Mubayyid.

7      THE COURT:  All right.  Good morning.

8      MR. ANDREWS:  Good morning, your Honor.

9      THE COURT:  All right.  At the risk of seeming unduly

10  military, I do want to start on time every day, not five or ten

11  minutes late.  We have a lot to do today; and in the course of

12  the trial, and I expect counsel and clients to be here on time.

13      In no particular order, let me just kind of run

14  through what it is that we still have pending and need to

15  address at least before opening statements and thereafter.

16      We have the Petroziello coconspirator hearsay

17  statement issues; some further issues regarding expert

18  witnesses, in particular, whether we need to schedule Daubert

19  hearings with live testimonies -- testimony; the issue

20  regarding the Newsweek and New York Times article is still

21  unresolved.

22      I have received and read the oppositions to the

23  motions regarding Arabic notes and what's called wiretap

24  evidence, which we need to address.

25      I don't think we addressed the subject of U.S.

1   policies or support for the Mujahideen in Afghanistan.  There

2   are some odds and ends in the defendants' motion regarding

3   documentary evidence, another catchall motion that we have not

4   yet addressed; and there have been some supplemental filings

5   concerning other Muslim charities and other IRS filings.

6           Also, before I forget the thought, although I don't

7   spend a lot of time in the blogosphere, it was brought to my

8   attention that Ms. Estrich's column referenced the fact that

9   she had to stay over in Massachusetts and missed some school

10  event as a result.  Everyone should feel free to raise issues

11  of that nature with me.  I can't promise that I will be able to

12  accommodate them.  For example, I know Ms. Siegmann recently

13  had a baby, and there may be issues there.  I make no promises,

14  but you all ought to feel free at least to raise the issue, and

15  I'll try to accommodate you, if I can, if you have family

16  commitments, or other types of issues that need to be

17  addressed.

18          All right.  Let's start with the Petroziello issue.

19  Essentially, as I understand it, the -- the indictment charges

20  a Klein conspiracy, and the government intends to introduce

21  multiple statements by the three defendants and by two

22  unindicted coconspirators, Mohammed Akra and Waseem Yassin, if

23  I'm pronouncing that correctly; and the government has also

24  raised the possibility of -- which I'll get to in a

25  moment -- of an additional conspiracy involving individuals

1    named Hassoun, Jayyousi, Chehade, and Care International.

2          How I propose to handle the -- the principal

3    conspiracy issue is as follows:  Based on the government's

4    filing, which I read over the weekend, I think there is

5    sufficient -- a sufficient basis to admit, as a general

6    proposition, coconspirator hearsay statements by the three

7    defendants and by Mr. Akra and Mr. Yassin; and I will give the

8    defendants a standing general objection, that is, to the

9    existence of a conspiracy.

10         What I think probably makes sense -- and I'd like to

11   hear from counsel on the subject -- is make that ruling without

12   prejudice to the ability of counsel to make specific

13   objections; that is, even assuming the existence of such a

14   conspiracy that a particular statement was not during or in

15   furtherance of the conspiracy, or the speaker was not a member

16   of it, or there's a Rule 403 issue, or otherwise.  In other

17   words, the general proposition that there was a conspiracy and

18   that these five individuals were members of it, and therefore

19   statements that they made that would otherwise be hearsay may

20   be admitted against codefendants.  The defendants may have a

21   standing objection to the general proposition, but they will

22   need to make specific objections to specific statements that

23   for one reason or another pose different issues.

24         Who wants to take the lead on that for the defendants?

25         MS. LUNT:  Your Honor, do you want me to address now

1  all the specific objections, or do you want to do those one by

2  one as them come up?

3           THE COURT:  Well, are there specific objections?  In

4  other words --

5           MS. LUNT:  Oh, yeah.  Well, there are -- we filed the

6  motion about the wiretap.

7           THE COURT:  All right.

8           MS. LUNT:  And you go -- that's a sort of one-by-one

9  issue.

10          THE COURT:  All right.  Unless -- just in the interest

11  of time, what I want to do is resolve everything that needs to

12  be resolved prior to the opening statements; and if it's

13  something that we can put off until this afternoon or tomorrow

14  afternoon or some other point just because we're going to run

15  out of time.

16          MS. LUNT:  Right.  As far as the wiretaps are

17  concerned, provided the government's not going to get into

18  specifics of any of the wiretaps that we have objected to in

19  our motion.

20          THE COURT:  Well, let me ask you is there something

21  there that needs to be resolved?

22          Mr. Chakravarty, are you opening for the government?

23          MR. CHAKRAVARTY:  I'm actually not opening.

24  Mr. Cabell is going to do the opening for the government.

25          THE COURT:  All right.

1    MR. CHAKRAVARTY:  I do not anticipate, based on our

2  conversations, that any of these specific 12 calls will be

3  discussed in detail to the extent that it implicates any of the

4  objections, which counsel have raised.

5    The one that Ms. Siegmann points out to me is there

6  was a conversation on October 2nd of '01, between Mohammed

7  Chehade and Muhamed Mubayyid related to removing documents,

8  which we suggest are the documents, which were found or were

9  not found in the criminal search on April 7th of 2003, in the

10  storage locker of Care International.

11    I don't know that Mr. Cabell is specifically going to

12  refer to that communication in terms of its contents aside from

13  the fact that there was such a communication, but we do want to

14  preserve the ability to provide the jury with a -- the evidence

15  that they're expected to hear that leads to the conclusion that

16  documents were destroyed or removed.

17    THE COURT:  All right.  Mr. Cabell -- I mean, I'm

18  happy to take it up now, but, Mr. Cabell, do you expect to make

19  reference to it?

20    MR. CABELL:  I think I can probably accomplish it

21  without referring to the exact call, the exact date, the exact

22  time.  It was going to be more of a bleak reference, so -- but

23  the last part of what Mr. Chakravarty said, I think our main

24  interest is in being able to convey that you made your evidence

25  up; that evidence was removed or destroyed or something without

1 | necessarily referring to a specific claim.

2 | THE COURT:  All right.  This is Exhibit 540, an

3 | October 2, 2001 intercepted call between Mubayyid and Chehade,

4 | correct?

5 | And it's obviously -- Mr. Mubayyid's statements are

6 | admissible against himself, obviously.  Let's see.

7 | I'm not sure I see any hearsay statements here at all.

8 | Ms. Lunt.

9 | MS. LUNT:  Your Honor, this actually maybe should be

10 | addressed --

11 | THE COURT:  Mr. Andrews?

12 | MS. LUNT:  -- by Mr. Andrews --

13 | THE COURT:  Yes.  Right.

14 | MS. LUNT:  -- because it's his client's statements.

15 | MR. ANDREWS:  Well, we danced around this telephone

16 | conversation earlier in the earlier motion, your Honor, you

17 | might recall.

18 | We've objected to it primarily because the government

19 | suggests that Mr. Chehade, who is not a member of the

20 | conspiracy, urges Mr. Mubayyid to destroy items in the storage

21 | locker.  Mr. Mubayyid's clear response is -- he responds twice,

22 | not that he feared getting caught but that, in fact, he doesn't

23 | want to touch anything.  He doesn't want people to think he did

24 | anything wrong.  He rejects the idea out of hand.

25 | So we objected to it on a variety of bases:  (A) It's

1  guilt by association, because Mr. Chehade, who is not a member

2  of the conspiracy, whose statements cannot be -- come in

3  against Mr. Mubayyid or against the other defendants.

4          His statement shouldn't come in.  There's a serious

5  403(b) problem.  There's no adoption by Mr. Mubayyid of

6  Mr. Chehade's suggestion that the matter -- that evidence be

7  destroyed.  So that's -- that's the thrust of the argument

8  there.  It's -- Mr. Chehade's statements are not a

9  coconspirator statement.  Mr. Mubayyid's reply can't be said to

10  be in furtherance of the conspiracy, because he says, "I don't

11  want to touch anything."

12          THE COURT:  All right.  What I don't see here, taking

13  the hearsay objection first, is any statement here that is

14  offered for the truth of the matter asserted.  Chehade says,

15  Take the records out of storage, and Mubayyid says whatever it

16  is he says, yes or no or I don't want to touch anything or

17  whatever, but I don't see anything here that is an out-of-court

18  statement offered for its truth before we get to the Rule 403

19  issue.

20          In other words, Chehade is not saying, I have

21  destroyed the documents.  That would be hearsay.  He says, I

22  suggest that you, Mr. Mubayyid, destroy records.  It's an

23  instruction, or a direction, or whatever, not something offered

24  for its truth.

25          And -- and, frankly, in terms of the Rule 403 issue,

1    I'm -- I think that on balance that it's admissible.  I don't

2    think it's unduly or unfairly inflammatory or prejudicial under

3    the circumstances.

4         MR. ANDREWS:  The Court understands, of course, that

5    Mr. Chehade was the director or a principal of GRF.

6         THE COURT:  Yes.

7         MR. ANDREWS:  That Care sent significant sums of money

8    to GRF.

9         THE COURT:  Yes --

10        MR. ANDREWS:  And that --

11        THE COURT:  -- I understand that.

12        MR. ANDREWS:  And that Mr. Chehade's suggestion that

13   documents were removed, which is not adopted by Mr. Mubayyid or

14   by either of the conspirators, simply paints his guilt by his

15   association of Mr. Chehade, and it really adds -- it adds

16   nothing to it, because again there's a timeline of when this

17   conversation occurs.  There's a search, a FISA search, three

18   days later when apparently no documents were removed; and then

19   there's another search, almost 18 months later when apparently

20   documents are missing.  So this conversation occurs three or

21   four days before a secret search.

22        There's no evidence that anything was removed between

23   the time of the conversation and the FISA search, and only

24   18 months later when there's a subsequent search does the

25   government claim something is missing, and somehow that missing

1   document of the thousands and thousands of documents that were,

2   in fact, found in the storage locker, the fact that they can't

3   find it 18 months or 20 months later is somehow related to this

4   conversation with Mr. Chehade.  It's just -- it's such a

5   stretch, your Honor; so, if there's any prejudice, and I think

6   there's a lot of prejudice, because there's no probative value

7   whatsoever, it should be kept out.

8           THE COURT:  All right.  I think -- it seems to me that

9   whatever the limits are on how you describe Mr. Chehade or GRF

10  or the defendant's knowledge of him or his activities, which is

11  a separate, independent question, I think this conversation

12  standing alone is not -- it's not hearsay within the meaning of

13  Rule 801, and -- and does not present significant enough 403

14  issues to warrant its exclusion.  So I'm inclined to admit it.

15          MR. McGINTY:  Your Honor.

16          THE COURT:  Mr. McGinty.

17          MR. McGINTY:  Just so I understand what the government

18  is saying, just so we have some clarity here, the government

19  will not be making specific reference to the wiretaps that he

20  intends to offer.  If I understand that correctly, then I guess

21  we would be addressing these specifically as they would be

22  coming in in the context of the case.

23          THE COURT:  Well, we may have more time to talk about

24  this.  I'll just -- in light of how fast events are developing

25  here, I want to make sure that I have made sufficient rulings

1    in advance of the opening statements, so everyone knows what's

2    out of bounds and what is not; and it may be that this

3    afternoon, tomorrow afternoon, Thursday afternoon, we will take

4    up the wiretaps one by one.  I mean, I prefer at least to get

5    my thoughts in advance rather than rule at sidebar, although

6    they may be provisional rulings.  Obviously, sometimes things

7    change.

8         MR. McGINTY:  Which -- which is entirely appropriate.

9    I just wanted to make sure I understand the government's

10   position that it would not be making specific reference to

11   these wiretaps.

12        THE COURT:  Well, let me -- let me ask Mr. Cabell.  Is

13   there anything else I need to rule on now that would affect

14   what you can and can't say in your opening statement, in terms

15   of the wiretaps?

16        MR. CABELL:  I am reminded that there's one additional

17   conversation, but we don't think it's part of their motion.

18   It's a conversation that took place on May 7th of 1997.

19        THE COURT:  May 7th, '97?

20        MR. CABELL:  Yeah, and it involves Mr. Al-Monla.

21        THE COURT:  Okay.  And what is the -- I don't think I

22   have it in front of me.  What's -- what's the specific

23   conversation, or what do you expect to say in your opening?

24        MR. CABELL:  This is a conversation of which

25   Mr. Al-Monla muses that the government would contend to be

1    covert and using the word "apples" to mean something else, on

2    which we will have testimony; and as planned, we intended to

3    refer to that conversation in the opening.

4         THE COURT:  Okay.

5         MR. McGINTY:  And, your Honor, I do object to that.

6    It was not a statement made in furtherance of a conspiracy.

7    The participants in the conversation -- and this is true of a

8    number of these wiretaps from that period -- are persons who

9    independently of the case have garnered some adverse publicity

10   in connection with their own prosecution.

11        So introducing their names into this case introduces a

12   403 element here.  The government has hinted at, in its motion,

13   that it intends to offer evidence about other charities'

14   conduct, quote, checks, receipts, and records demonstrating

15   transfer of funds back and forth to organizations, which

16   engaged in some noncharitable activities.  The noncharitable

17   activities not described.

18        So, I would ask, your Honor, that in addressing this

19   particular tape, that it be done before they make reference in

20   the opening or that they not be permitted to reference it until

21   it's addressed fully at argument.

22        THE COURT:  Let's stop there.  What is -- what is the

23   May 7, '97 statement?  What is it that Al-Monla --

24        MS. SIEGMANN:  Your Honor, if I may?

25        THE COURT:  Yes.

1        MS. SIEGMANN:  This is not one of the calls that the

2   defendants have challenged in their motion to exclude wiretaps

3   prior to the -- to the trial, but May 7, 1997 was a call

4   between Mr. Al-Monla and Mr. Jayyousi, down in Miami -- in

5   Miami, and they're talking about what they are doing, and in

6   the -- and this is paraphrasing, because I don't have the call

7   in front of me, but Mr. Al-Monla says that we don't -- we're

8   not the ones on the front lines.  We are on the rear lines.

9   We're not the ones picking apples.  We're the ones that finance

10  the people that are picking apples.  And again, that's not the

11  exact words, verbatim language, because I don't have the call

12  in front of me.  Our experts will actually tell the jury what

13  picking apples is, that they're referring to fighters, and that

14  people -- and that they're not the ones that are on the front

15  lines fighting, but they are the ones that are supporting the

16  fighters, which is directly relevant to this case, because it

17  actually shows that, in fact, they are financing the Mujahideen

18  fighters that we contend that they solicited money for.

19        THE COURT:  And Jayyousi is affiliated with GRF; is

20  that right?

21        MS. SIEGMANN:  No, he's affiliated with American

22  Worldwide Relief.  There will be evidence that Care actually

23  sponsored him to come up to Massachusetts and other areas to

24  actually solicit funds for the -- and he talked about the jihad

25  going on in Chechnya.  He also -- there's going to

1    be -- actually, there's calls relating to the fact that when he

2    came up here, they actually were distributing the tape Badr al

3    Bosna, which is the promujahideen tape that he would make

4    available and people would purchase that at the time of his

5    lectures; and that actually defendants in this case,

6    Mr. Al-Monla specifically sent down the calculation guides to

7    Mr. Jayyousi when he was doing his fund-raising efforts on

8    behalf of Care.

9            THE COURT:  All right.  Yes.

10           MR. McGINTY:  Your Honor, this -- this implicates the

11   concern that I tried to address in a request for a limiting

12   instruction.  What the government's referring to is

13   conversations between Mr. Al-Monla, a number of conversations

14   between Mr. Al-Monla and Mr. Jayyousi relative to the -- to

15   visits, lecture visits that were going to be made by Jayyousi

16   up to Boston.

17           In effect, Care was funding or providing monies for

18   persons to travel for purposes of speech, of speaking, and the

19   government is referring to that and intends to make that part

20   of their proof that the use by a charity of its monies to

21   sponsor lectures, the distribution of videos and other forms of

22   plainly speech, here specifically distribution of Badr al

23   Bosnia [sic] videos constitutes part of their proof with

24   respect to what Care what was doing.

25           There is no allegation that Mr. Jayyousi was in a

1    conspiracy with Mr. Al-Monla.  There's no allegation that the

2    conversation was in furtherance of any conspiracy between

3    Mr. Al-Monla and Mr. Jayyousi; and the government plainly is

4    trying to leverage what amounts to communications relative to

5    speaking engagements for purposes of saying there was some sort

6    of unholy union between Mr. Al-Monla, Care, and these

7    gentlemen; and, your Honor, that's impermissible, and what I

8    tried to address in a request for a limiting instruction was

9    precisely the dangers of the government's use, which it has

10   told the Court as of last week when it said that its crown

11   jewels and its proof are going to be newsletters.  What the

12   government is saying is that the activities of Care that offend

13   against the statute are newsletters, are websites, are

14   sponsoring visits by persons --

15        THE COURT:  Okay.  Just in the interest of time, I

16   haven't read the memo yet.  I'm making no ruling on the

17   limiting instruction.  It's fairly clear to me that -- that the

18   right to -- the First Amendment right to free speech is not

19   perfectly congruent with the charitable application process, in

20   the sense that even if you have a right to engage in free

21   speech, you don't have the right to (A) make false statements

22   to the IRS; or (B) the IRS doesn't have to give you a

23   charitable exemption for free speech activities, as I

24   understand Bob Jones, for example.  Whatever the boundaries of

25   that rule are, there is not perfect congruence, so that this

1　prosecution does not violate the First Amendment, or at least

2　as I understand it.

3　　　　MR. McGINTY:  With one qualification, which is what

4　ingredient in addition to the speech, which offends the

5　government, what additional ingredient of proof is there

6　outside of speech?  And what the motion addresses is there is

7　none, and what the Court has learned over the course of these

8　hearings is that there is none, not a dollar going to fighters.

9　　　　THE COURT:  Okay.  I --

10　　　　MR. McGINTY:  Under the circumstances --

11　　　　THE COURT:  -- I understand the argument, but let me

12　stick for the moment on the Petroziello issues.  I would expect

13　that the -- I do not have the May 7th statement precisely in

14　front of me.  Based on what I've heard, I would expect

15　that -- to rule that the statement would -- would have been

16　made during the course of it and in furtherance of the

17　conspiracy, and therefore would be admitted under 801(d)(2)(E).

18　　　　MS. LUNT:  If I may, your Honor?

19　　　　THE COURT:  Yes.

20　　　　MS. LUNT:  There is another issue in terms of the

21　government referring to this in their opening, which is we have

22　filed a motion for a Daubert hearing on Mr. Valla, and I

23　understand that he is the witness who's going to say that

24　picking apples means fighters.

25　　　　As far as we can glean from the very small amounts of

1    information we've been given about Mr. Valla, he does not speak

2    Arabic, and I think there's a significant issue on the Daubert

3    hearing as to whether they're going to be able to get his

4    testimony in at all.

5            THE COURT:  All right.  Then the government will have

6    to take that risk that -- that -- I mean one option, of course,

7    is the statement comes in with no expert testimony explaining

8    it, leaving the parties free to argue what it means.  The other

9    is -- is -- I -- I will place that risk on the government.

10           By the way, I have not seen the Valla report yet.

11   Defendants filed, I think, it's document No. 349, a

12   supplemental filing that said the Valla report was attached as

13   Exhibit A, and it wasn't; and I would like to see that as

14   promptly as possible, because I think I need to read it,

15   but -- all right.

16           MR. ZALKIND:  Just one issue, your Honor.

17           THE COURT:  Yes.

18           MR. ZALKIND:  My intention is to mention something

19   about the wiretaps of my client.  I'm not going to go over it

20   in detail, but I do -- I believe that there's a number of

21   wiretaps we have not objected to, and I -- I am going to

22   comment on them.  I don't -- I don't want to, you know, because

23   it was talked about what the government was going to do and

24   what they weren't going to do.  I just want to make sure that

25   you know that I am going to say something.  At least my

1    intention is to say something.

2           THE COURT:  That's fine.  I mean you filed a motion to

3    suppress the wiretaps on the basis of FISA.  You know, to that

4    extent, your -- your rights are preserved.  I will give

5    everyone a standing objection, as I indicated, on the general

6    proposition that there was a conspiracy involving these five

7    individuals, and that statements are therefore admissible

8    against one another, but you're going to have to make specific

9    objections to specific items that present even the tiniest

10   wrinkle to that, if I'm making myself clear.  In other words,

11   if you say even assuming the existence of a conspiracy

12   involving these five people, this particular statement was not

13   in furtherance of it, not in the right time frame, present 403

14   issues, or whatever.  Okay.

15          MR. ZALKIND:  In opening them up, you're going into

16   some legalities issues; it's more the factual underpinnings.

17          THE COURT:  Okay.  Anything else on coconspirator

18   hearsay statements again for purposes of the opening?

19          All right.  Let me take up next the issue of the

20   Newsweek and New York Times articles.

21          At the --

22          MS. SIEGMANN:  Your Honor, I don't know if the

23   Court -- actually, yesterday we filed at 2:30 a reply to the

24   defendant's --

25          THE COURT:  Yes, I did.  I read it.

1          MS. SIEGMANN:  Thank you, your Honor.

2          THE COURT:  I read it this morning.  I believe that

3     the existence of the Times and Newsweek articles are relevant,

4     and their general subject matter is relevant, and I'm concerned

5     about the reference to the World Trade Center bombing of 1993,

6     which I think presents unique and specific Rule 403 issues.

7          What I had proposed to do to try to walk this

8     tightrope in terms of permitting the evidence without its

9     unduly inflammatory aspects is to permit a hearsay description

10    of the two articles along the lines that I have indicated here

11    and with a cautionary instruction along the lines that I have

12    indicated here.

13         I think the -- simply calling them unflattering or

14    unfavorable article is not quite enough to indicate its impact,

15    but I think we don't need to mention the World Trade Center

16    bombing or Osama bin Laden, or anyone like that either, and

17    this is my effort at permitting the government to -- to

18    reference the articles, which I think are relevant, and -- and

19    addressing the principal 403 issues.

20         Let me start with the government.  I know I just gave

21    this to you.  What is the government's reaction to this?

22         MR. CABELL:  Your Honor, this is fine with the

23    government.

24         THE COURT:  Okay.

25         MS. LUNT:  Your Honor, my concern about this is

1    however the jury are instructed and however they attempt to

2    follow the instructions, when they're given the name of the

3    newspaper and the dates, the risk of them going to look it up

4    is extremely high, and I don't think that the fact that it was

5    Newsweek and the date, the specific date, and the fact that

6    it's the New York Times and the specific date is necessary, so

7    I mean we object to this altogether in terms of the, you know,

8    the individuals alleged to have committed acts of violence

9    unfavorable and purported to connect with the Islamic groups.

10            I mean I understand your point about

11   flatter -- unflattering.  I mean our position is that none

12   of this should go in at all, but given that the Court is going

13   to give some sort of an instruction, to give the name

14   of -- given how outrageously inflammatory the articles

15   are -- but it's not just their inflammatory nature.  It's that

16   they're based on rumor, speculation, as well.  So it's, you

17   know, highly inappropriate that the jury should be, you know,

18   given that -- this reference, and so I would suggest that there

19   be simply a reference to publicity in March and April of

20   1999 --

21            MR. ZALKIND:  '93.

22            MS. LUNT:  -- '93.  Sorry.  And referring to the

23   un -- saying that it's unfavorable, and alleging, you know,

24   alleging connections -- I mean I would -- frankly, I would say,

25   you know, unfavorable to the -- to Al-Kifah I think is going

1   far --

2         THE COURT:  All right.

3         MS. LUNT:  -- is reasonable, but certainly to any

4   references to the articles is a -- is just inviting the jury to

5   find out all about this.

6         MS. SIEGMANN:  Your Honor.

7         THE COURT:  I --

8         MS. SIEGMANN:  I'm sorry.

9         THE COURT:  Let me, in the interest of saving time, I

10   think the dates are relevant given the allegations about when

11   Care was incorporated and so forth.  I cannot -- we cannot

12   proceed on the assumption that the jurors are going to go out

13   and Google articles and otherwise violate my instructions.

14         I mean, if that were true, any case involving even the

15   tiniest bit of publicity would be impossible to try.  I'm going

16   to instruct them, and in somewhat forceful terms, and I -- I

17   have to assume and believe that they're going to follow my

18   instructions; and in terms of the substance of the articles, I

19   certainly understand the point, but I think that the defense

20   suggestion does not go far enough.

21         I will -- in looking at this, which I edited quickly

22   this morning, but the last sentence of the second paragraph, it

23   says, The Times article reported that.  I'm going to change

24   that to -- to put in the words reportedly, or something to that

25   effect to make it seem not quite such a factual statement.

1      Yes.

2      MS. SIEGMANN:  Your Honor, because I was reading this

3  quickly as well, if I could just offer one other suggestion.

4      The reason why these articles, we believe, have such a

5  strong motive for Al-Kifah to change its name to Care was

6  because of an act of violence in the United States.  The fact

7  that they committed acts of violence, right now the way that

8  the -- your stipulation reads, or what we are allowed to say,

9  it doesn't have the same effect.  I mean a charity in the

10  United States, which is, you know, linked to -- that becomes

11  known that it was involved in an act of violence in the United

12  States obviously is a stronger motive to change to conceal that

13  connection than if it was an act of violence elsewhere in

14  Afghanistan, because that's what it's talking about, the

15  freedom fighters for a holy war in Afghanistan; so the jury

16  could conclude that it's just that it was linked to the fact

17  that they were involved in, again, the same type of activities,

18  but this was an act of violence in the United States would be

19  the language we would ask to --

20      THE COURT:  Wouldn't a juror with any sense of history

21  or current events -- and I won't presume that either, but if

22  they were thinking about what acts of violence occurred in

23  early 1993, wouldn't that immediately direct them to the World

24  Trade Center bombing.  I mean, there's really no other -- no

25  other relevant act, I don't think.  I think everything else

1    that was going on, the embassy bombs and the Cole and so forth

2    were all overseas.

3         Mr. McGinty.

4         MR. McGINTY:  Your Honor, I think the government's

5    argument highlighted precisely what the problem is.  Quote, The

6    fact that they committed acts of violence.  They who?

7    Inferentially, it's going to be these defendants.

8         Now, in the instruction it talks about the alleged

9    motive for the creation of Care, begging the question, alleged

10   by whom?  There is no evidence that it was alleged by anyone

11   that the government's calling as a witness in the case.  So, if

12   the jury were to look at this and say alleged motive, alleged

13   by whom?  No one has alleged it, and they -- they reach the

14   inference that the government wants them to reach, undisguisedly

15   that they committed the acts of violence contributing to a

16   linking between Al-Kifah headquarters in New York and a

17   breakaway branch office, and thereby contributing to a finding

18   with respect to an entirely separate issue, which is the

19   outgrowth or successor.

20        This is beginning the -- the beginning to aid the

21   government in substantively making a case for which they have

22   no evidence.

23        So, I object strongly, your Honor, to this

24   instruction.

25        THE COURT:  All right.  Anything else on the

1    instruction?

2         MR. ZALKIND:  One other thing, your Honor.  Our tax

3    expert will say the motive's irrelevant on the issue of

4    successor.  It's absolutely irrelevant.  They could have a

5    motive, because there was bad publicity about Al-Kifah.  It

6    would make no difference at all on the successor issue.  None

7    whatsoever.

8         So, I mean, it really -- successor is a tax issue.

9    It's not an issue in an ordinary case of a motive in a murder

10   or something like that.  It's a tax issue.  It would be

11   irrelevant.  It's not a bad motive to change, because it's bad

12   publicity.  That's perfectly reasonable, and it has nothing to

13   do with the tax -- for the Tax Code.  So that, why?

14        And -- and even in the articles themselves, the

15   articles are not one way.  I believe the Newsweek article -- I

16   haven't looked at it for awhile, but there's other things in

17   the article.  I mean I don't understand why we're dealing with

18   the -- with the World Trade issue, when you come to

19   April -- April of '93 it is overwhelmingly prejudicial.

20        THE COURT:  I'm keeping out the World Trade Center

21   bomb reference.

22        MR. ZALKIND:  I understand that.  When you say April

23   of '93, you don't think 16 jurors are going to be able to

24   discuss this, educated jurors in the Eastern District of

25   Massachusetts aren't going to know that that was the World

Trade bombing?

THE COURT:  Well, the alternative, it seems to me, is to -- I mean let me back up.  In any false statements case, the government is permitted -- or practically any case is permitted to introduce evidence of motive; otherwise, the jury has no idea what point there is to any of this.

This is the government's evidence of motive, and I -- I -- it seems to me that the alternative is not keeping it out altogether, and it just becomes a -- a corporate filing without reference to anything, but letting the articles in themselves, and the question is am I -- am I fairly describing the articles in a way that doesn't both unduly hobble the government and unfairly prejudice the defendants.  If it's unfair prejudice, it's -- it is the watch word here.  And it seems to me that I'm keeping out the reference to the World Trade Center bombing.  I'm specifically instructing them that there's no suggestion that the defendants engaged in wrongdoing of any kind in the article, and -- and the dates are relevant.  The dates are highly relevant, according to the government's theory of the case, so...

MS. LUNT:  Your Honor, with respect to the fact -- and Mr. Duncan can go after me.  The New York Times article, as I remember it, went on at considerable length as to the role of the United States in the war in Afghanistan.  When you say recruits for a holy war in Afghanistan, that's hardly fair in

1   terms of what the article said.  The article said that the

2   United States was funding this war to the tune of billions of

3   dollars, I believe; so, I feel that's an unfair representation,

4   and I do think that the naming of the articles -- I know that

5   we assume that jurors obey instructions; on the other hand,

6   human nature being what it is, there's no reason to invite a

7   problem for no good reason, and citing Newsweek and the New

8   York Times, I feel, is completely irrelevant to this

9   enterprise, even given the instruction that the Court is

10  wishing to take over our strong objection.

11          THE COURT:  All right.

12          MR. ANDREWS:  Your Honor.

13          THE COURT:  Yes.

14          MR. ANDREWS:  Keeping Time in mind, the proposed

15  instruction suggests that there's no suggestion in the

16  articles, either direct or indirect, that the defendants

17  engaged in wrongdoing of any kind, or participated in any acts

18  described.  I would ask that the -- if they had any knowledge,

19  you know, any knowledge of these acts, because when you're in a

20  conspiracy case, it's talked about what people know.

21          THE COURT:  All right.  I'll add that to it, had any

22  knowledge of or participated in any of the acts described.

23          MR. DUNCAN:  And if I could just make one last

24  suggestion.  I understand I'm picking up on what Ms. Lunt said.

25  I understand that you think it's highly relevant, the timing,

1    but it seems to me that the timing could be dealt with

2    without -- without specific dates by saying shortly before Care

3    filed its Articles of Incorporation with the Secretary of the

4    Commonwealth, something like that.  That would leave out the

5    dates and at least --

6            THE COURT:  Well, I -- I take the point, but I'm going

7    to overrule it.  I think the dates are specifically relevant

8    here.  I think the government's evidence suggests that it was

9    two days after the New York Times article, and I recognize that

10   the defendants have an argument and obviously will all be fair

11   game that you don't incorporate something in two days and that

12   this must have been in the works long before that, but I am

13   going to admit it in that form.

14           MR. CHAKRAVARTY:  Your Honor, I --

15           THE COURT:  Yes.

16           MR. CHAKRAVARTY:  -- hesitate to rise.  I'm sorry.

17           With regard to Mr. Andrews' point, with regards to the

18   articles not referring to knowledge.  The government concedes

19   that the articles don't refer to the defendants' knowledge of

20   any wrongdoing; however, my concern is that in couching it as

21   a -- as a cautionary instruction to the jury, the perception

22   and how you say it may imply that this cannot be imputed to

23   whether the defendants actually knew about the underlying

24   incidents, and even though they --

25           THE COURT:  Do you have any knowledge or do you have

1  any knowledge of the acts.  Okay.

2       All right.  What do you suggest?

3       MR. CHAKRAVARTY:  Our suggestion is leave it as you've

4  written it and not refer to this knowledge component, which I

5  think starts to get into, you know, fundamental issues the

6  jury's going to have to decide whether, in fact --

7       THE COURT:  Well, this is only referring to the

8  articles.  I mean --

9       MR. CHAKRAVARTY:  I understand.

10      THE COURT:  -- this is carefully only to talk about

11  the articles.

12      MR. CHAKRAVARTY:  I understand.  That would be

13  technically accurate.  My concern is that in giving them this,

14  you know, this blurb about what this article is and what they

15  are and what they are not to do with it, I think that's going

16  to be lost, your Honor.

17      THE COURT:  Well, you know.  I suppose we could say

18  had any advance knowledge, but that suggests -- all right.

19  Let's do this, in the interest of time.  I -- I take both

20  points, and let me try to play with that a little bit.  I don't

21  think you're going to need this for your openings, so let me do

22  that as an opening issue.

23      All right.  This was just referenced by, I think,

24  Ms. Lunt whether the U.S. support for mujahideen, that is, US

25  foreign policy, whether it is relevant.

1        I think we probably ought to have an argument on that,

2   and I don't think we have time for it now.  In terms of the

3   opening, my instinct is that it is not relevant; and,

4   therefore, I think it ought not to be referred to in the

5   openings.

6        Ms. -- who wants to take the lead on that?

7        MR. ZALKIND:  Let me just -- I'm intending in the

8   opening to talk about the tragedy that was going on, and the

9   nation --

10       THE COURT:  That's -- that's fair game, I think.

11       MR. ZALKIND:  And the nation states were supporting

12  the -- over -- the Russians in the war were supporting the

13  mujahideen in -- with enormous amounts of money.  America,

14  Saudi Arabia, and Pakistan, and it is part of the kind of

15  picture of this -- of this case.  I won't go into the words

16  "U.S. policy."

17       THE COURT:  Well, if you're going to say that the

18  U.S., along with Saudi Arabia and Pakistan, gave money to the

19  mujahideen, you're making the argument that the U.S. supported

20  the mujahideen.

21       MR. ZALKIND:  Well, they gave over $3 billion, your

22  Honor.  This is a fact.

23       THE COURT:  I know, but the question is what is it

24  relevant to?

25       MR. ZALKIND:  It's relevant to everything, your Honor,

1    because what -- the whole idea is there was such a tragedy in

2    Afghanistan and Pakistan, and -- and -- and there was enormous

3    charitable works happening, not just -- and there was enormous

4    arms going in there as well, and it's just part of the story

5    that has got to come out.  It's really -- I don't have to use

6    the word U.S. policy.  I don't have any problem with doing

7    that, but I really have to do it in the context of the history

8    of what happened.  It is just enormous amounts of funding went

9    in there to -- for both the humanitarian crisis and -- and

10    the -- the armaments, and it's really --

11         THE COURT:  Most of the money, the support was

12    essentially in the 1980s?

13         MR. ZALKIND:  No.  No.  No.  It went all the way into

14    '95, and we have clear evidence of that.  It went actually into

15    almost '96.

16         THE COURT:  All right.  And -- and -- and --

17         MR. ZALKIND:  I won't --

18         THE COURT:  I do not expect the defendants are going

19    to take the stand and say, in substance, I relied on this in

20    setting up our operations, so it doesn't go to the defendants'

21    knowledge.

22         MR. ZALKIND:  No.  No.

23         THE COURT:  It's simply the --

24         MR. ZALKIND:  It's just the general knowledge.

25         THE COURT:  -- context.

1          MR. ZALKIND:  The general knowledge, yes.  In context,

2     yes.

3          THE COURT:  And -- and -- and, obviously, there was a

4     war that triggered a humanitarian crisis.  There were refugees,

5     widows, orphans, devastation --

6          MR. ZALKIND:  Yes.

7          THE COURT:  -- et cetera, et cetera, et cetera, all of

8     which, I think, is fair game, but the fact that we were

9     funneling money to one group or another --

10         MR. ZALKIND:  I'm not talking about one group or

11    another, your Honor.

12         THE COURT:  Well, I -- it seems to me it's -- it's

13    relevant.

14         MR. ZALKIND:  It's absolutely relevant to the case.

15    It is so focal to this case, your Honor.

16         THE COURT:  All right.  Let me hear --

17         MR. ZALKIND:  It is part of the -- the -- the reason

18    that these charities went in there and gave money

19    to -- to -- for widows and orphans, those widows and orphans

20    were caused by war.

21         THE COURT:  All right.  And you can talk about the

22    war, but I don't understand --

23         MS. LUNT:  Your Honor, if I may?

24         THE COURT:  Yes.

25         MS. LUNT:  You know, if we're going to be

1    talking -- you know, I hope that the Court will change this,

2    but, you know, if there's a holy war in Afghanistan, it's

3    absolutely critical to see that this wasn't some Muslim

4    fundamentalist fighting that was going on in Afghanistan.

5    Rather, it was a war against the Russians.

6            THE COURT:  They were gone by 1993.  The Russians were

7    gone.

8            MR. ZALKIND:  No.

9            MS. LUNT:  No.  No, they were -- in fact, your Honor,

10    the Russian -- until 199 -- the end of '92, there was a Russian

11    public government.  After that, the United States was still

12    funding, through the CIA, money to the mujahideen groups that

13    were anticommunist, and we will have evidence about that, but

14    there's -- there's several aspects of this.  One aspect is

15    because the United States was funding, to the tune of billions

16    of dollars, this whole war; and, in fact, all the evidence

17    about how the United States got arms into Afghanistan, there

18    was absolutely -- we're talking about motive.  There's

19    absolutely no reason or motive for any Muslim charity to be

20    supporting fighters.  There was no need for it.  And I think we

21    saw somewhere about, you know, that it was like buying a

22    chicken to buy an AK-47 in Peshawar, in Pakistan.  So, that's

23    absolutely critical to what was being done by this charity.

24    Why they were -- there was no need whatsoever for money for

25    fighters or money for guns.  That's the first point.

1          The second point, it is part of the general gestalt of

2    what is going on in that era, and we're talking here about

3    young men in the '80s, who got involved in charitable

4    activities, which were, in many ways -- I mean, the war was

5    being supported by the United States.  They also got a lot of

6    positive reinforcement from the United States Government for

7    activities to help with the -- help the refugees, the widows,

8    and orphans; and it's critical to put this in the entire

9    context.  The government wants this to all be about, you know,

10   the Muslim holy war.

11         This is a war that the United States was totally

12   funding, and it was part of -- it was the end of the Cold War,

13   and some of the jurors will remember this, but some will not,

14   and it's totally critical.  We're not going to -- I don't think

15   Mr. Zalkind is going to dwell on it at length in his opening,

16   but it's absolutely fair to say -- to talk about how long the

17   war went on, how the United States funded it, together with

18   Saudi Arabia and Afghanistan, and the numbers --

19         MR. ZALKIND:  Pakistan.

20         MS. LUNT:  -- Pakistan, and the numbers of refugees,

21   millions of refugees, I think four or five million refugees in

22   Pakistan, over a million displaced persons within Afghanistan,

23   devastation everywhere.  They need to know about this.

24         THE COURT:  Well, I -- my concern is is not discussing

25   the war and the humanitarian crisis, which I think is all fair

1    game.  My concern is that the defense, in substance -- and you

2    really explicitly made this argument in some of your

3    filings -- look at these hypocrites, the U.S. Government, they

4    supported this war, and now they're prosecuting people, who

5    were on the same side, which I think is not fair game.

6              Who wants to respond from the government?

7              Mr. Chakravarty.

8              MR. CHAKRAVARTY:  I will, your Honor.

9              Your Honor, the government's concern is -- it's

10   precisely that, but it goes beyond that.  It's actually all of

11   the arguments that the defense are making with regards to its

12   utility for discussing the -- the American support for actors

13   over there over time are not only taken out of context

14   chronologically, but given the -- the global political sphere,

15   they're also being taken out of context in politics, which the

16   jury just simply will not be able to reconcile, nor should they

17   have to try to reconcile, whether, in fact, this was

18   appropriate and just for the government to have been supporting

19   the mujahideen through the '80s, whether, in fact, there should

20   have been any lingering support for people in Afghanistan

21   afterward, as is right on the papers every day with regards to

22   Iraq and Afghanistan even today.

23             I draw the parallel of discussing the risk of

24   offending some in this area, discussing Joseph Kennedy's

25   association with members of what turned out later to be the

1   Nazi regime and somehow then imputing Nazi war crimes to him,

2   because the circumstances changed after we entered World War

3   II.  It's anachronistic, and it's fundamentally misleading to

4   the jury as to what they're deciding -- what they have to

5   decide with regards to the propriety of whether they should

6   have been even involved at all; but more importantly, as to

7   what they're being asked to decide in this case.  They're not

8   being asked to decide anything about whether we should have

9   been funding the mujahideen, even during the time of the

10  charged conspiracy.  Rather, what they're being asked to decide

11  is whether the defendants concealed certain information; and in

12  one breath, the defense is heard to say that, yes, it's okay if

13  we gave to the -- the mujahideen in Afghanistan, because the

14  Americans, the American Government had allegedly done so during

15  the same time.  So, you know, the rationale is yes, we gave to

16  them, but it was okay.  It was justified, because the

17  government was doing it.  At the same time, they're saying we

18  didn't have to give any money to them, because the American

19  Government was doing it.

20       All of these permutations of this notion that the

21  Federal Government had some kind of foreign policy and that the

22  Department of Defense or the Central Intelligence Agency or

23  other components of the government were doing some activities

24  somewhere else would certainly not be admissible if the

25  government ever sought to introduce any of this evidence, and

1    apparently the defense is going to try to do this through their

2    expert witnesses.

3         All of this confusing, dense, frankly conspiracy

4    theory-type evidence will infect the jurors' appraisal of the

5    evidence that they will see to decide whether these defendants

6    disclosed or concealed their activities to the IRS or the FBI

7    and the INS and the government.  I think the risk is very

8    serious.

9         THE COURT:  All right.  Let's -- let's do this in

10   terms of for purposes of the opening statements only.  I -- and

11   some of this, if it's in the defense experts, I may have missed

12   it.  I read Mr. Shahrani's report rather quickly, but I don't

13   remember there being much about this.

14        MS. LUNT:  It's in Mr. Blackton's, your Honor.

15        THE COURT:  Mr. Blackton's, all right.  The defense

16   can refer to the war in Afghanistan, its magnitude, its

17   devastation.  It can talk about when it began, how long it

18   went, and -- and I will, for purposes of the opening, I will

19   permit some -- a statement to the effect that weapons and money

20   flooded in to the war zone from multiple sources, including

21   other nations, and leave it at that for the time being.

22        I am concerned that the specifics of the U.S. foreign

23   policy in this area is going to be a complicated sideshow

24   that's of marginal relevance and will be very confusing, but

25   the issue, I think, is the fact that there was a humanitarian

1    crisis in Afghanistan, caused by a war that had been waging for

2    14 or 15 years at that point, and that certainly the fact that

3    the area was flooded with -- with weapons and outside money,

4    without getting into the specifics of it, would be permissible,

5    but until and unless I have a more specific basis for -- for

6    concluding that the fact that the U.S. Government supported the

7    mujahideen militarily, beginning at some point and ending at

8    some unclear point to me, I'm going -- my inclination is to

9    exclude it, but for openings, I'm going to leave matters where

10   they are.

11          MS. LUNT:  Your Honor, I assume that the reference to

12   the war being against the Soviets --

13          THE COURT:  That's fine.

14          MS. LUNT:  -- who invaded in '79 is okay?

15          THE COURT:  Yes.

16          MR. ZALKIND:  And they were our enemies, your Honor.

17          THE COURT:  I remember that.

18          Although I tried a case representing an accused Soviet

19   spy in 1995, and there were four college freshman on the jury,

20   because it was a long trial in the summer, and those were the

21   only people we could impanel, and Kevin Cloherty for the

22   government had to change his opening statements and say that

23   there was once a country called the Soviet Union, because I

24   think otherwise those four wouldn't have been aware of it.

25          All right.  The motion regarding Arabic notes, I

1   think -- well, do I need -- is there anything I need to do with

2   that for the openings?  I've received and read the opposition.

3         Is there anything I need to rule on now, or can we put

4   that aside again for an afternoon?

5         Ms. Siegmann?

6         MS. SIEGMANN:  I believe Mr. Cabell may mention the

7   pledge of support to Hekmatayar.  It's referenced -- let me

8   tell you what exhibit it is, your Honor.  Sorry.  I know it's

9   around somewhere.  It's number -- Exhibit 66, CIF 332,

10  handwritten Arabic letter, and it's referenced in the

11  government's opposition on page 6.

12        THE COURT:  Okay.

13        MS. SIEGMANN:  I think that's the only -- is that the

14  only thing -- I think that's the only thing that may be

15  mentioned in Mr. Cabell's opening.

16        THE COURT:  Okay.  And remind me.  The authentication

17  here that you expect is this is found in the storage unit; is

18  that right?

19        MS. SIEGMANN:  Yes, your Honor.  It's actually -- if

20  you'd like for me to give a brief explanation of this.

21        THE COURT:  Yes.

22        MS. SIEGMANN:  Okay.  The documents that the defendant

23  is trying to exclude are -- there's ten pages of Arabic notes,

24  basically broken down to five sets of documents, and they're

25  all found in the same drawer, in the same section of a drawer,

1    in the filing cabinet, in the storage locker, in the October

2    2001 search, which is under the control of Mr. Mubayyid, who

3    opened the -- who rented the -- rented -- I'm sorry.  I'm

4    talking too fast for the court reporter.  Let me slow down.  In

5    the interest of time, I was speaking quickly.

6          It was rented by Mr. Mubayyid on behalf of Care; and

7    during this search, they found this what appeared -- a letter,

8    and it actually has signatories on the bottom of the letter,

9    including underneath the letter, it says to you -- it's written

10   to Engineer Hekmatayar, who is the Afghan mujahideen warlord in

11   the 1995 -- in approximately April of 1995.  That's what all

12   these documents are dated -- well, at least one of them is

13   dated, and they're all found together.

14         It has Muntasser's name on the bottom of the letter,

15   under his Abu name, Abu Abdel Rahman.  He admitted to using

16   that name to the FBI.  There's a Care contact list found during

17   that search, actually that cites that he uses that name Abu

18   Abdel Rahman, and it also identifies him as Abu Abdel Rahman,

19   the Libyan.

20         The testimony will be that there is no other person

21   from Libya that's associated with Care.  1995 was a period of

22   time when he was running Care.  These were in the storage

23   locker.  They were all Care documents.  There was testimony

24   that there was thousands of pages of stuff relating to Care

25   found in the storage locker.

1          The letter itself speaks about how Mr. Muntasser met

2     Mr. Hekmatayar two months ago, which corresponds with the time

3     frame that he was in Afghanistan; that he -- there will be

4     testimony about the fact that initially he denied ever

5     travelling to Afghanistan, but then in INS filings, he actually

6     amended that after being interviewed by the FBI and indicated

7     yes, in fact, that he had been in Afghanistan during the

8     January 1995 period of time, which actually would closely

9     correspond with the -- the date of this letter.

10          So -- and that -- and based upon the cases cited in

11    the government's opposition, United States versus Newton,

12    predominantly where there was a three-page, unsigned, undated

13    typed document that actually could be linked to the defendant,

14    and it inferred that the defendant offered it, that it was

15    found to be admissible; therefore, the government believes it

16    has a good faith basis to believe this will be also held

17    admissible, and we should be able to refer to it during the

18    opening.

19          THE COURT:  All right.  Your brief says something like

20    the handwriting in two documents are similar.

21          You don't have a handwriting expert, do you, Arabic

22    handwriting?

23          MS. SIEGMANN:  No, your Honor.  The two documents that

24    we actually said that, Exhibit 66 and then exhibit, I believe,

25    67 is actually a draft.  Yeah, 67.  Exhibit 67, CIF 323, is a

1  rough draft of Exhibit 66, and it refers to the same things,

2  and it has the same -- it's a shorter version of the longer

3  letter that actually has the names of individuals on the

4  bottom, including -- it also has Al-Monla's name on the bottom

5  as well as Akra's name on -- also as a signatory to the letter.

6        THE COURT:  All right.  Who wants to respond to that?

7        Ms. Lunt.

8        MS. LUNT:  Well, your Honor, in terms of

9  authentication, there's absolutely no authentication as to

10  wrote these documents; and all of them are replete with

11  confusing -- even there will be issues about the translations,

12  which are separate issues for cross-examining the translator,

13  but there's issues of cryptic language, confusion.  Even if it

14  was more written in English, it would be totally confusing.

15        The other thing is the government is talking about

16  this as a letter.  As I understand it, these were handwritten

17  notes.  It's not a copy -- it's not a copy of a letter.  It

18  might indicate that something was sent.  There's absolutely no

19  evidence that this was ever signed by anybody, ever sent to

20  anybody.  It appears that it must be another draft.

21        So, in terms of any implication this was a letter that

22  was sent, that would be highly inappropriate, but there is lack

23  of authentication as to -- as to who wrote it.  There were,

24  according to the government, the parties to the notes

25  were -- the notes of parties to a meeting, some from one

1    organization, some from Care.  It's not totally clear whether

2    this was written by anybody from Care, and it's not at all

3    clear that it's a letter rather than another draft.

4         So, I think without the -- this is not appropriate at

5    this time, and we should re -- we should revisit the entire

6    issue of the Arabic notes when we have more time; and there is

7    this issue, as they said, of confusion from the cryptic

8    language that's used.  It's very hard to make sense of what it

9    means.  There are multiple potential meanings for everything,

10   and this is something, I think, should be kept out at this

11   stage, and certainly any reference to describe this as a

12   letter, rather than a -- a handwritten document.

13        THE COURT:  All right.  What I'm going to do,

14   assuming -- first off, my understanding of the rules are that

15   authentication can be proved partly from the contents of the

16   document itself, and also with reference to where it's located;

17   and based on representations by the government, I think it's

18   likely that they can authenticate it.

19        I agree that it ought not to be referred to as a

20   letter without more; and without seeing the document or knowing

21   its format or anything, I think calling it a document or -- for

22   present purposes will probably be more appropriate, but I think

23   the document is likely to be admissible, both as a matter of

24   authentication and as a matter of coconspirator hearsay; and,

25   therefore, I see no problem with the government referring to it

1  in its opening statement.

2      All right.  I have the supplemental memoranda

3  regarding other Muslim charities, which I read this morning,

4  and I think we need to discuss further the same with other IRS

5  filings of other organizations.

6      Is there any other issue -- it's five minutes after

7  10:00 -- that I need to address prior to the openings?

8      I -- also before I forget, there was a Boston Globe

9  article this morning, which I read.  I did not see anything in

10  the Herald.

11      Is there any other media report this morning or

12  earlier that anyone wants to bring to my attention?

13      All right.  Anything else regarding opening

14  statements?

15      MS. SIEGMANN:  Your Honor.

16      THE COURT:  Yes.

17      MS. SIEGMANN:  Along the same lines is the -- the

18  other nonsimilarly-situated organizations and tax filings; and

19  on the subject of tax filings, we believe that the defense may

20  mention a Form 1023 application that was actually in use in

21  2006, after the revision process occurred, and the government

22  would contend that a form that was used 13 years after the

23  crime in question would not be relevant and would actually just

24  further confuse the jury along the lines with the other

25  nonsimilarly-situated charities.

1       THE COURT:  Well, that would ordinarily be true, of

2  course, but here I think they -- they -- and I won't put words

3  in their mouth, but they're arguing that the form was confusing

4  and redundant; and as evidence of that, the IRS got rid of the

5  question or modified it, correct?

6       Who wants to address this?

7       Mr. Duncan.

8       MR. DUNCAN:  That's part of it.  In addition, we have

9  what the Court has concluded are admissions from the IRS and

10 testimony of Cindy Westcott that goes to what the meaning of

11 successor is, and that it is no different in the 2006 forms

12 than it was in the 1993; and, therefore, they should have

13 relied on the meaning of that term with the 1993 form.

14      THE COURT:  All right.  Again, I think under the

15 highly unusual circumstances of this case, I think the 2006

16 form is -- is fair game for those purposes.

17      MS. SIEGMANN:  Your Honor, just -- the Cindy Westcott

18 reference that we just heard from defense, I didn't believe

19 that there was a ruling from this Court regarding whether that

20 constituted admission of a party opponent, and I thought it was

21 left open for argument at a later date.

22      THE COURT:  Well, I guess I have not formally ruled,

23 but if she was in charge of the -- well, let me back up.

24      I think evidence as to how the IRS made its decisions

25 is relevant on the issue of materiality.  The defendants'

1    knowledge of materiality is irrelevant, and I think it

2    necessarily follows that it is material if it could have

3    affected the IRS decision-making process; and, therefore, how

4    the IRS went about making that decision, either specifically or

5    generically is -- is fair game; and doesn't it, therefore,

6    follow that an IRS employee with relevant knowledge, who makes

7    an admission of some sort, it's -- whether it's an admission of

8    a party opponent or not, maybe it's not hearsay at all, but it

9    seems to me that her statements are relevant.  I mean, why

10   would they not be relevant in that framework?

11            MR. CABELL:  Your Honor.

12            THE COURT:  Yes.

13            MR. CABELL:  And I don't know if you've had an

14   opportunity to read the transcript of Ms. Westcott from that

15   hearing, but I think there are a couple of threshold issues

16   that you would need to resolve in the defendants' favor in

17   order to make this meaningful.  The first is did she have

18   authority to speak for the IRS?

19            THE COURT:  I made no ruling whether she's -- I don't

20   find it binding on the government in the sense of estoppel or

21   anything like that.  I mean I --

22            MR. CABELL:  Okay.

23            THE COURT:  -- it seems to me that clearly she does

24   not have the power in testimony before a magistrate judge to

25   bind the IRS permanently and for all purposes.

1          MR. CABELL:  And that --

2          THE COURT:  But is the statement itself relevant?

3          MR. CABELL:  Well, in actuality --

4          THE COURT:  And she can presumably take the stand and

5    say, well, I didn't mean that, or I didn't know what I was

6    saying, or whatever.

7          MR. CABELL:  Right.  It may very well be that again we

8    have to have this sideshow to point out, that at least from the

9    government's view, she didn't say what the defense is trying to

10   say she did say.  They never asked her to define these terms.

11   She never purported to define these terms; and so, I

12   think -- we don't have to resolve this for purposes of the

13   opening, but I think if the defense is signaling that they are

14   going to at some point want you to take judicial notice of what

15   she said for purposes of admissibility at this trial, I think

16   that's something you'd want to hear.

17         THE COURT:  I'm not going to take judicial notice of

18   her testimony.  You know, she can -- either side can call her

19   as a witness, and we can see where it goes from there,

20   but -- but it seems to me that her interpretation of the

21   question is relevant to the materiality issue, at least based

22   on what I know now about what she said, and as a provisional,

23   not a final ruling, obviously.

24         All right.  The other -- I don't know -- I suspect

25   that this jury impanelment is going to take a while, and so it

1    may be tomorrow afternoon before we get to any of this.  What I

2    would like to do is there are, by my count, five separate

3    requests for Daubert hearings.  Defense wants to challenge

4    Levitt, Kohlmann and Valla; and the government wants to

5    challenge Blackton and Shahrani.  If we're going to have

6    Daubert hearings in the sense of live testimony, as opposed to

7    simply oral argument on the subject, I think we need to

8    schedule those hearings forthwith, if we're going to bring

9    experts in and talk about them; and, you know, I don't need an

10   answer right now, but I think that's something that needs to be

11   put on our plate relatively quickly, because we're going to

12   need to get a hold of these people and fly them in.

13          It's not clear to me at all that we need live

14   hearings, and some of the things that are characterized as

15   Daubert-type objections really are more of a relevance 403-type

16   objection, and some of which I've indicated, at least my

17   tentative rulings on; but if we're going to have live

18   testimony, we need to schedule it and get it on the calendar

19   and get these people in here and talk about what we're going to

20   do and not do.  So, that's out there.

21          And also the defendants have contended that there are

22   documents regarding Vonge (phonetic) that they say they didn't

23   get.

24          MR. CHAKRAVARTY:  Your Honor, I believe that that's a

25   person named Bassam Kanj.

1        THE COURT:  Kanj.  I'm sorry.  I can't read my notes.

2        MR. CHAKRAVARTY:  In Mr. -- in Doctor Valla's report,

3  his -- the document that we produced last week to the defense,

4  which admittedly is -- this is from an FBI analyst, who had

5  never done an expert report; and at our request, he jotted down

6  some of the subject matters of his testimony, which was a

7  supplement to the quite detailed disclosures, which we had

8  previously provided to the defense.

9        We are, for your Honor's benefit, preparing a brief

10  opposition, less than five pages, to their supplement in

11  regards to Doctor Valla.  We can attach both the expert report

12  that your Honor has referred to as well as our previous

13  disclosures.  There are no additional documents related to

14  Bassam Kanj, which Doctor Valla is going to be testifying

15  about.

16        THE COURT:  All right.  There was a document

17  specifically referenced in my notes, if I can read them, as

18  BS 6778-OA.

19        MR. CHAKRAVARTY:  Right.

20        THE COURT:  And the immediate question was has it been

21  provided to the defense?

22        MR. CHAKRAVARTY:  That -- that -- the page should not

23  have been in the -- in the -- in that expert report.  It was

24  the fourth page -- it was a note essentially to the prosecution

25  team saying that there exists additional information related to

1    Bassam Kanj that he is not, explicitly not, including in his

2    expert report.  So, that underlying information has not been,

3    nor does the government believe it needs to be produced to the

4    defense.

5            THE COURT:  All right.  Anything else that we need to

6    raise now before we bring the jury panel in?

7            Marty, are they ready to be brought in?

8            (The Court conferred with the clerk.)

9            MS. LUNT:  Your Honor, in the catchall memo, as

10   you -- the motion, as you called it --

11           THE COURT:  Yes.

12           MS. LUNT:  -- the government is seeking to introduce

13   some audiotapes; and if they're not going to refer to them in

14   their opening, then that's fine.  We can leave it to later.

15           THE COURT:  These are the so-called --

16           MR. CABELL:  Yeah.

17           THE COURT:  -- recruitment tapes; is that right?

18           MR. CABELL:  These ones are the ones that Badr al

19   Bosna.

20           MS. LUNT:  It's the Badr al Bosna videotape, and then

21   there's some audiotapes, and I can get into what my problems

22   are with them, but I --

23           MR. CABELL:  I'm not --

24           MS. LUNT:  -- don't want to waste the Court's time

25   if --

1          MR. CABELL:  I'm not planning to refer directly to

2     those tapes --

3          THE COURT:  All right.

4          MR. CABELL:  -- unless my counsel here tell me I've

5     got it wrong, but I don't intend to.

6          MS. SIEGMANN:  Your Honor, I think the other

7     motion we didn't discuss was the supplemental filing by the

8     defense regarding what the government contends are

9     nonsimilarly-situated charities.  We got the response at 7:30

10    last night.  Although I was here, I haven't had a chance to

11    actually dissect exactly what their arguments are.  We would

12    ask that we be able to file a supplemental opposition.

13         THE COURT:  That's fine.  I think, again, the parties

14    should assume that other IRS filings by other charities are out

15    of bounds for openings, but I think we need to address that

16    quickly --

17         MS. SIEGMANN:  Thank you, your Honor.

18         THE COURT:  -- certainly before any witness takes the

19    stand that needs to be cross-examined on the subject.

20         And just so there's no mystery, I mean we're going to

21    shoehorn this in in the afternoons and as best we can; and, you

22    know, we had a lot of things filed at the last minute here, and

23    postponing the trial is not a realistic option, but I want to

24    make sure that we're staying ahead of the wave, so to speak.

25    In other words, if this is going to come up through witness

1   testimony every day, then we need to make time to resolve it.

2           MR. DUNCAN:  My understanding was that we had some

3   time, and I wanted -- and that you wanted the government to be

4   able to respond, so I tried to file it as quickly as I could.

5           THE COURT:  Yes.  I understand this is largely a

6   defense issue, but you may raise it in cross-examination, and

7   you need to --

8           MR. DUNCAN:  Correct.

9           THE COURT:  -- address it before that happens.

10          Yes.

11          MR. McGINTY:  Just, Your Honor, as a scheduling

12  matter.  I have a disposition scheduled tomorrow before Judge

13  Lindsay at three o'clock, which I would assume would chew up a

14  good part of the later afternoon, so if we are going to

15  be -- if we are going to be doing motions tomorrow, then I

16  would ask for intervention.

17          THE COURT:  We'll do the best we can.  I don't know

18  what else to say, except we need to get going on a bunch of

19  things, and we're going to have to -- every afternoon someone's

20  going to have something, including me, so we're going to make

21  the best use of our time as we can.

22          Again, my main concern is scheduling Daubert hearings

23  for out-of-town expert witnesses, getting that done if we have

24  to do it, and staying ahead of the wave in terms of what's

25  going to happen in the next few days.

1    MR. ZALKIND:  Regarding Daubert hearings, what we'll

2  do is get a hold of the experts and find out their available

3  dates and let the government and you know when they're

4  available besides trial -- actual trial time.

5    THE COURT:  All right.  And just, I mean, maybe to

6  state the obvious, I am wholly uninterested in simply giving

7  the other side a shot at your witness, you know, to have fun

8  with and to try to explore things.  I mean what I want to know

9  is do we need live testimony to supplement in some way the

10  record of the experts' reports, so that I can make the

11  appropriate ruling under Rule 702, if that's the right rule.  I

12  keep saying Daubert, and the rule has been changed now for many

13  years, and I don't know how to pronounce Daubert.  I'm going to

14  stop mispronouncing it, so I think it's Rule 702, but anyway,

15  it's the Rule 700 series.

16    Do we need live testimony?  Because if we don't, you

17  know, I'll make time for argument, and we can talk about the

18  issues.

19    MS. SIEGMANN:  Your Honor.

20    THE COURT:  Yes.

21    MS. SIEGMANN:  Just so that -- in the interest of

22  time, the government's contention is it only needs a Rule 702

23  hearing as to Mr. Blackton.

24    The -- Professor Shahrani, I believe the expert

25  disclosure we obtained, there is one section of expert

1    disclosure that we don't believe that Professor Shahrani should

2    have to discuss.

3            THE COURT:  Is this some training in the social

4    sciences?

5            MS. SIEGMANN:  Yes, basically to actually undercut our

6    experts, I assume, but I don't believe that Professor Shahrani

7    is an expert in that area or has written on that subject on how

8    an expert becomes an expert essentially.

9            THE COURT:  Okay.  I have my doubts on that score, but

10   we'll take that up at an appropriate time, so -- and it may

11   flow out obviously of whatever happens with Mr. Kohlmann, who I

12   assume is who they're attacking there; and, of course, the

13   government -- we're not going to have cumulative testimony, and

14   the government may have to choose obviously which expert they

15   want on certain subjects, which may, you know, narrow the focus

16   as well.

17           MR. ZALKIND:  Your Honor, if that's the case on

18   Mr. Shahrani, may I make a simple suggestion.  I'm not

19   intending to say something about political science in my

20   opening for sure, and it's -- it is -- it won't take very long.

21   My -- our original plan was to have Mr. Shahrani come up the

22   day before just to testify, and even if you needed to have a 20

23   minute Daubert hearing before he testified.  He is a professor.

24   He has a very active life, you know.  It is an inconvenience

25   for him to come up here, so that if that's all the government

1    wants to go into, I don't think it's going to take very long.

2         THE COURT:  All right.  Let's -- let's talk about that

3    at a -- at the appropriate time.  I mean, here's my feeling

4    generally about experts on the topics that they've been

5    designated.  I have relevance and 403 concerns, obviously, but

6    this is not quite like having experts on medical malpractice

7    issues.

8         I mean, by definition, the experts in these types of

9    issues are going to acquire their knowledge in ways that are

10   perhaps a little different than they might in other fields.  I

11   mean we need to explore that perhaps with some of these

12   witnesses, but it doesn't seem to me to be per se problematic

13   that experts have acquired their expertise by interviewing

14   people, reading articles, being present in the country and so

15   forth.  I don't know how else the expertise would be acquired

16   in some of these areas, but that's a general statement, and we

17   can talk about the specifics and -- and -- and Doctor Shahrani,

18   it certainly would not surprise me, if he were an expert on the

19   various expertise -- aspects of Afghanistan and the Afghan

20   crisis.

21        All right.  Marty, what do you know?

22        (The Court conferred with the clerk.)

23        THE COURT:  All right.  What we're going to do is

24   we're going to take a break, see where the jury panel is.

25   The -- I don't know how crowded things are going to be, but we

1    don't really have any extra chairs here, do we?  Well, we'll

2    see what happens, and we'll proceed.  I think we're going to

3    have about 100 people to squeeze them into this room.  Okay.

4              MR. ZALKIND:  Thank you, your Honor.

5              MS. SIEGMANN:  Thank you, your Honor.

6              (Recess from 10:24 p.m. until 11:02 p.m.)

7              (The Jury pool entered the courtroom at 11:02 p.m.)

8              THE CLERK:  All rise.  The United States District

9    Court for the District of Massachusetts with the Honorable

10   F. Dennis Saylor, IV, presiding.

11             Court is now open.  You may be seated.

12             Case No. 05-40026, United States of America versus

13   Muhamed Mubayyid, Emadeddin Muntasser, and Samir Al-Monla.

14             Counsel, please note your appearance for the record.

15             MR. CABELL:  Good morning, your Honor.  Donald Cabell,

16   for the government.

17             MS. SIEGMANN:  Good morning, your Honor.  Stephanie

18   Siegmann, for the United States.

19             MR. CHAKRAVARTY:  Good morning, your Honor, and ladies

20   and gentlemen.  Aloke Chakravarty, also for the United States.

21             THE COURT:  Good morning.

22             MS. LUNT:  Good morning, your Honor, ladies and

23   gentlemen.  Elizabeth Lunt, for Mr. Muntasser.

24             MR. ZALKIND:  Good morning, your Honor, and ladies and

25   gentlemen.  Norman Zalkind, for Mr. Muntasser.

1      MR. DUNCAN:  Good morning, your Honor, ladies and

2  gentlemen.  David Duncan, also for Mr. Muntasser.

3      THE COURT:  Good morning.

4      MR. ZALKIND:  This lady sitting over here is our

5  paralegal.  She can announce herself.

6      MS. PETRI:  Sonya Petri, for the defendant.

7      THE COURT:  Good morning.

8      MS. PETRI:  Good morning.

9      MR. ANDREWS:  Good morning, your Honor.  Michael

10  Andrews, for Mr. Mubayyid.

11      MR. McGINTY:  And, your Honor, good morning.  Ladies

12  and gentlemen, my name's Charles McGinty, from the Federal

13  Defender's office.  I'll be representing Mr. Samir Al-Monla.

14      Won't you please stand.

15      And with me is Allyson Fortier -- kindly stand --

16  who's a paralegal in our office.

17      MR. ZALKIND:  Mr. Muntasser's sitting here.  Why don't

18  you stand.

19      THE COURT:  All right.  Thank you.  Good morning,

20  everyone.

21      Good morning, ladies and gentlemen.  My name is Dennis

22  Saylor.  I am the judge assigned to preside over this session

23  of the United States District Court for the District of

24  Massachusetts.

25      It's a pleasure to welcome you on behalf of the Court

1    as potential members of the jury.  I understand that you've

2    already been through an orientation that explains something of

3    the process that we're going to go through today and what's

4    expected of you, if you're selected to serve on this jury.

5            In a moment, I'm going to add some words of

6    explanation of my own, and I apologize if I repeat things that

7    you may have already heard, or that you may already know.

8            Also, I want to thank you not for the last time for

9    your patience.  It's taken a while to organize all of you this

10   morning, and those benches are very hard and uncomfortable, and

11   your patience may wear a little thin as this process goes on,

12   so I want to thank you in advance.

13           Let me start by telling you what kind of a case this

14   is, which you may have some inkling of, because of the

15   questionnaire that you filled out.

16           This is a criminal case.  There are three defendants:

17   Muhamed Mubayyid, Emaddedin Muntasser, and Samir Al-Monla, who

18   are here in the courtroom with their counsel.  They are charged

19   with various crimes involving the tax laws and the making of

20   false statements to the United States.

21           Briefly, the indictment alleges that the defendants

22   created an organization called Care International, which

23   applied to the Internal Revenue Service, to the IRS, to become

24   a tax-exempt charity.  The IRS decides who gets tax-exempt

25   status.  You have to apply.  An organization has to apply and

1    be approved.

2          According to the government, in the application that

3    Care filed with the IRS, and in tax filings for some years

4    afterward, the defendants concealed certain facts that they

5    were obliged to disclose.  Among other things, again, according

6    to the government, defendants concealed the fact that Care was

7    engaged in noncharitable activities.  Specifically, they allege

8    that Care solicited and distributed funds to support and

9    promote jihad, which the government describes as Islamic holy

10   war; and mujahideen, which the government describes as Islamic

11   holy warriors, and they're also to have alleged -- alleged to

12   have made other false statements as well.

13         Those of you who are chosen as jurors, of course, will

14   be told later what the precise charges are and what the

15   government has to prove beyond a reasonable doubt in order to

16   convict any of the defendants.

17         Many of you are also probably somewhat anxious about

18   the possible commitment of time that may be required of you if

19   you're selected, so let me talk about that next.

20         I do not expect that this case is going to be

21   particularly short.  The lawyers expect that the case will take

22   approximately six weeks to try from beginning to end.  That

23   means that this case is likely to last right up until the week

24   before Christmas.

25         We will not sit, of course, on Thanksgiving or the day

after Thanksgiving.  The plan is to sit for the remainder of
this week for two or three days next week and five days a week
after that.

It's hard to predict how long a trial will last.  I
will make every effort to make sure that this trial is
completed in the amount of time that the lawyers have asked
for.  If necessary, we may have a little bit longer days
sometime to stay on track, but sometimes we guess wrong, and
things take longer than we hoped.  If that happens, and I don't
anticipate it's going to happen, but if it does happen, here's
what we will do.

This year, both Christmas and New Year's are on a
Tuesday, and if the trial, for some reason is not completed in
that week before Christmas, we're going to stop on Friday,
December the 21st, and we're not going to resume again until
after New Year's, until Wednesday, January the 2nd; and so if
any of you have plans for the holidays or school vacation or
whatever, you ought to be able to keep those plans.

Again, this is -- we're only going to do this if it's
absolutely necessary, and we have no other realistic choice,
but I need to raise it now.  And I will again make every effort
to ensure that the trial concludes on schedule.

Our trial day will be from nine o'clock in the morning
until one o'clock in the afternoon, with two very short breaks.
I'll explain later to those of you, who are impaneled, why we

1  do that.  Again, it's possible that we'll have afternoon

2  sessions if we need to do that to keep the case on track, but

3  I'm hoping and expecting that we won't need to do that.

4       All right.  You've probably heard something already

5  about the importance of jury service.  I want to add just a few

6  quick thoughts of my own before we get started.  The jury

7  system goes back at least 800 years to England at the time of

8  the Middle Ages.  Although much has changed in the world since

9  then, the same -- the idea is essentially the same, and that is

10 that no person can be convicted of a serious crime, except upon

11 the unanimous vote of a jury made up of ordinary citizens.

12      The founders of our nation believed that the right to

13 a jury was so important that they put it in the United States

14 Constitution and the Bill of Rights.

15      Juries have always been composed of ordinary citizens,

16 taken from all walks of life, each of whom brings their own

17 individual perspective and life experience to the table.  You

18 do not have to have any particular education or experience.

19 What is truly important is that you take your responsibility

20 seriously and that you exercise your authority to the best of

21 your ability.

22      The quality of justice in the United States depends on

23 the good judgment and common sense of ordinary citizens.

24      It is a great system.  It is not a perfect system.  No

25 system created by human beings will ever be perfect, but it's a

1    great system nonetheless.

2         Trial by jury is not necessarily the most efficient

3    way to decide whether someone should be convicted of a crime.

4    There are many things about it that are old-fashioned, but the

5    founders of our nation believed that there were things that

6    were more important than efficiency, and protection of our

7    rights as citizens is one of those things.

8         We enjoy a great many rights and freedoms.  Probably

9    all of us, including myself, take them for granted from time to

10   time.  Sometimes we have to be reminded of what they are and

11   what they're important -- why they're important.

12        The jury is one of the most basic protectors of our

13   freedom.  It's fundamental to our system of justice.  It's an

14   obligation of citizenship and an honor and a privilege to

15   serve; and if you are selected to serve, I hope that each of

16   you will exercise your duties responsibly and solemnly and in

17   accordance with the law.

18        You should not, however, assume that your service will

19   be entirely burdensome.  Many jurors find that it is one of the

20   most interesting and rewarding experiences of their lives.

21        Let me tell you now how we're going to go about

22   selecting a jury.  The parties in this case have a right to a

23   jury that is fair and impartial, which means one that is not

24   biased or prejudiced one way or the other.

25        In order to obtain a fair jury, we're going to have a

1    selection process that we go through.  The first thing I'm

2    going to do is ask you whether you know the lawyers or the

3    defendants or have any connection with them.  I'm going to list

4    the witnesses one by one again to see if any of you know them,

5    and I'll ask a number of additional questions on other topics.

6            The purpose of these questions is to determine whether

7    or not any of you should be excused for cause, what we call an

8    excuse for cause.

9            Once we have gone through that whole process and we've

10   eliminated people who can't or shouldn't serve on the jury for

11   one reason or another, we're going to put a number of people

12   into the jury box.  By law, the lawyers will have the

13   opportunity to challenge a small number of those prospective

14   jurors.  Those are what we call peremptory challenges where the

15   lawyers don't have to give a reason.

16           When the lawyers are both satisfied with the jury, or

17   they've run out of challenges, we will -- the people who will

18   remain will constitute the jury.

19           Because of the length of the trial, we're going to

20   impanel 16 jurors.  Four of you will serve as alternate jurors,

21   and that way if something happens to one or more of the jurors,

22   we don't have to start the trial all over again.

23           Only 12 jurors, however, will deliberate and vote, and

24   that means if we have not lost anyone, we'll have to take four

25   of you off the jury.  That will not happen until the time has

1    come to deliberate.

2         If you're not chosen to sit on the jury, you should

3    not think it reflects upon you personally or your ability to be

4    a good juror.  It's not a scientific process.  This is not a

5    merit selection process, and you should not be the least

6    concerned if for some reason you're not chosen.

7         As I indicated, I'm going to ask you some questions.

8    Your questions must be under oath.  In other words, you must

9    swear that your answers are truthful.  It's very important that

10   you give truthful responses.  So, the first thing I'm going to

11   do is to ask the deputy clerk, Mr. Castles, to please swear in

12   the jury pool.

13         THE CLERK:  Please stand and raise your right hand.

14         (Jury pool, sworn.)

15         THE CLERK:  You may be seated.

16         THE COURT:  All right.  Now, when I ask a question, if

17   your answer is "yes" or you think your answer would be "yes,"

18   please raise your hand; and if you raise your hand, what I'm

19   going to do is I'm going to ask you to come over here to the

20   sidebar, over at the side of the bench, one by one, and I'll

21   find out what the issue is and maybe explore it a little bit

22   with you.  I might excuse you or I might not.

23         For certain of my questions, more than one of you are

24   going to raise your hand.  When that happens, I'd like you to

25   line up in an orderly fashion just inside the bar enclosure

1  here, right at that entryway to the bar, and I'll take you one

2  at a time.

3          We have a special issue in this case.  You were asked

4  to fill out a questionnaire earlier today about whether you

5  would be affected by the fact that the defendants are Muslims

6  and are Arabs and are from certain countries.  I'm going to ask

7  some further questions on those subjects as a part of this

8  process.  When I do, if there are people who raise their hand,

9  or if people answered the questionnaire in a certain way, I'm

10  going to take those people into the jury room behind the

11  courtroom and talk about it outside the courtroom setting.

12          It's only going to be for those questions, that is,

13  questions concerning any possible affect on the trial due to

14  the fact that the defendants are Muslims or Arabs or from

15  certain countries; otherwise, we're going to do all of this at

16  the sidebar in the courtroom.

17          Again, because of the nature of the case, and because

18  it's expected to be longer than a normal case, I expect this

19  impanelment process is going to take a little bit longer than

20  usual.

21          Again, I ask for your patience sitting on those hard,

22  wooden benches.  It may seem cumbersome and inefficient to you

23  at times, I'm afraid, but it's -- it's important, and it's the

24  best way we can ensure that the trial will be fair.

25          Let me emphasize something right up front.  Do not be

1   shy.  Okay.  Do not hesitate to raise your hand if you're not

2   sure what to do.  The time to ask questions, the time to raise

3   issues, to express doubts is now, not partway through the

4   trial.

5         I will not be upset with you if you raise your hand to

6   come up to the sidebar, because you weren't sure what to do or

7   how to handle it.  Okay.  If in doubt, raise your hand, and

8   let's talk about it.

9         All right.  Before we get into our questions, I'm

10  going to quickly see the lawyers at sidebar.

11        (Sidebar as follows:

12        THE COURT:  All right.  What I propose to do first

13  is -- I've looked at the questionnaires.  There were 18 jurors,

14  who gave something other than an unqualified no to the

15  questions and three who didn't fill out the questionnaire

16  completely.

17        Based on my quick scan through them, there are 11 of

18  the 18 that I think should be excused at once.  They've openly

19  expressed bias; and in the interest of efficiency, what I'd

20  propose to do is simply excuse those jurors right now, which

21  are jurors 9, 13, 14, 27, 28, 54, 56, 68, 75, 93, and 95.

22        There are seven others, who answered the question yes,

23  but I think the one further question -- I may excuse them; I

24  may not, but I think it's at least not immediately obvious that

25  they're going to be biased.

1          All right.  Any objection to that?

2          MS. SIEGMANN:  No, your Honor.

3          MR. ANDREWS:  No, your Honor.

4          MR. McGINTY:  Those numbers are?

5          THE COURT:  Those numbers are 6, 12, 41, 57, 58, 78,

6     and 82.  I my wind up excusing all of them, but I think those

7     people are at least arguably salvageable.

8          MR. McGINTY:  Your Honor, on the three that didn't

9     answer question number two, would they simply be given the form

10    in the courtroom, or are they going to be called in the back?

11         THE COURT:  That's actually a good question.

12    I -- this is number 45, 71, and 87.  I think what I'll do is

13    I'll --

14         MS. SIEGMANN:  Sorry.  I missed 45 --

15         THE COURT:  45, 71 and 87.  I think it's a good idea

16    to give them the instructions and see how they answer them to

17    save time.  Okay?

18              ...end of sidebar.)

19         THE COURT:  All right.  In the interest of efficiency,

20    the questionnaire that we had people fill out has produced a

21    number of responses that I think are going to cause me to

22    discharge a certain number of jurors for cause without any

23    further questioning.

24              Mr. Castles is going to read off the name of the

25    jurors, who are excused for cause based on the questionnaire.

1          THE CLERK:  Juror No. 9, Levandi Rossi.

2          THE COURT:  All right.  You all are free to leave and

3    return to the jury room.

4          THE CLERK:  Juror No. 13, Keith Moreau.

5          Juror No. 14, Steven Berger.

6          Juror No. 27, Kathleen Reed.

7          Juror No. 28, Deborah Gordon.

8          Juror No. 54, Jeffrey Squillante.

9          Juror No. 56, Sherri Johnson.

10         Juror No. 68, George Silver.

11         Juror No. 75, Kathleen Scully.

12         Juror No. 93, Warren Morss.

13         Juror No. 95, Alan Duro.

14         THE COURT:  All right.  And then there are three

15   additional jurors, who didn't answer the question on the second

16   page, I think, by mistake.

17         I'm going to have Mr. Castles redistribute the

18   questionnaire to you so you can answer the question on the

19   back.

20         THE CLERK:  Jeffrey King.

21         THE COURT:  And let me know if you need a pen or a

22   pencil to fill that out.

23         THE CLERK:  Danny Caron (phonetic).  Does that say

24   Caron (phonetic)?

25         Danny Kam.  Danny Kam.

1     Brian Draves.  Draves.  Brian Draves.

2          THE COURT:  All right.  As I've indicated, the case on

3     which you've been called to sit as jurors is a criminal case.

4     There are three defendants:  Muhamed Mubayyid, Emadeddin

5     Muntasser, and Samir Al-Monla.  They are charged with crimes

6     concerning the making of false tax returns, making false

7     statements to the government, and conspiring to commit tax

8     fraud.

9          Again, Stephanie Siegmann, Aloke Chakravarty, and Don

10    Cabell are the Assistant U.S. Attorneys, the prosecutors in

11    this case.  They represent the government.

12         Michael Andrews represents Mr. Mubayyid.

13         Mr. Charles McGinty represents Mr. Al-Monla.

14         And Norman Zalkind, Elizabeth Lunt, and David Duncan

15    represent Mr. Muntasser, and they may be assisted in this case

16    by two lawyers, who are not present in the courtroom:  Susan

17    Estrich and Harvey Silverglate.

18         Do any of you know or are any of you related to or

19    acquainted with the three defendants:  Mr. Mubayyid,

20    Mr. Muntasser, or Mr. Al-Monla?

21         I see no hands.

22         To your knowledge, does any member of your family or

23    any close friend know, or is any member of your family or any

24    close friend related to or acquainted with Mr. Mubayyid,

25    Mr. Muntasser, or Mr. Al-Monla?

1          I see no hands.

2          Do any of you have any experience with a store known

3     as Logan Furniture?

4          Okay.  I see some hands.  I'll see you one by one at

5     sidebar.

6          (Sidebar as follows:

7          THE COURT:  Could you all line up.  I'm sorry.  Line

8     up just inside the bar enclosure, and I'll take you one by one.

9          I didn't expect this.

10          MS. SIEGMANN:  Yeah.

11          THE COURT:  Okay.

12          MR. ZALKIND:  Could we have the juror's number, your

13     Honor?

14          THE COURT:  I will ask.

15          Hi.  Can you stand right up here.

16          What's your name and juror number?

17          MS. BELLOWS:  Kellie Bellows.

18          THE COURT:  Do you know your number?

19          MS. BELLOWS:  No.

20          MR. McGINTY:  I'm sorry.

21          THE COURT:  No. 34, Kellie Bellows.

22          MS. SIEGMANN:  Thirty-four.

23          THE COURT:  Yes, ma'am.  What's --

24          MS. BELLOWS:  Is -- this is in Raynham?

25          THE COURT:  Is it in Raynham, Logan Furniture?  Where

1    is it located?

2           MR. CHAKRAVARTY:  There are several locations.

3           THE COURT:  Oh, there's several locations.

4           MS. BELLOWS:  Raynham and Avon?

5           THE COURT:  Okay.  What's your experience?

6           MS. BELLOWS:  I've just been in it.

7           THE COURT:  You've been in it.

8           MS. BELLOWS:  Oh, thank you.

9           MS. SIEGMANN:  The Judge said "Logan" not Jordan's.

10          MS. BELLOWS:  Yeah.  No.

11          MS. SIEGMANN:  Did you think Jordan?

12          THE COURT:  Logan.

13          MS. SIEGMANN:  Sorry.

14          MS. BELLOWS:  I've definitely been in it.  I don't

15   know.

16          THE COURT:  Okay.

17          MS. BELLOWS:  There's one in Raynham, I think --

18          THE COURT:  Okay.

19          MS. BELLOWS:  -- and one in Avon.

20          THE COURT:  Okay.  You've been in, but no good or bad

21   experience one way or --

22          MS. BELLOWS:  No.

23          THE COURT:  Okay.  Thank you.

24          Next.

25          Hi.  What's your name and jury number?

1          MS. SANDERS:  I'm Dora Sanders.  I don't know my jury

2     number.

3          THE COURT:  Sanders?

4          MS. SANDERS:  Yes.

5          THE COURT:  No. 89.

6          Yes, ma'am.  How do you know Logan Furniture?

7          MS. SANDERS:  On commercials.  I bought furniture from

8     there years ago.

9          THE COURT:  Okay.  And did you have a good or a bad

10    experience or anything worth remarking about?

11         MS. SANDERS:  Not really, no.

12         THE COURT:  Okay.  Is there anything about that

13    experience that -- one of the defendants owns Logan Furniture.

14         Is there anything about that experience that --

15         MS. SANDERS:  No.

16         THE COURT:  -- would create a problem for you in this

17    case?

18         MS. SANDERS:  No.

19         THE COURT:  Okay.  Thank you.  Yes.

20         MS. SANDERS:  At the time -- can I talk about my

21    hardship, or should I wait?

22         THE COURT:  As long as I have you here, what's your

23    hardship?

24         MS. SANDERS:  I have three children, and two of them

25    have disabilities.  My youngest one I have to take to therapy

1    during the week --

2            THE COURT:  Okay.  When do you have to take them?

3            MS. SANDERS:  To school, around 11:00.

4            THE COURT:  Okay.  Who's watching them today?

5            MS. SANDERS:  He's in day care.

6            THE COURT:  In day care?

7            MS. SANDERS:  But during the day I -- the days he has

8    the therapy, I go and get him and take him to the therapy.

9            THE COURT:  Okay.  Can you stand just out of earshot.

10   Let me talk to the lawyers for a second.

11           MS. SANDERS:  Sure.

12           THE COURT:  Thank you.

13           Any objection to excusing her for cause?

14           MR. ZALKIND:  No, your Honor.

15           MR. CHAKRAVARTY:  No, your Honor.

16           THE COURT:  Okay.  Ma'am.

17           Okay.  I'm going to let you go, but you're going to

18   have to go back to the jury room downstairs.

19           MS. SANDERS:  Okay.

20           THE COURT:  Thank you.

21           Okay.  Next.

22           MR. ZALKIND:  What was that number again?

23           THE COURT:  Eighty-nine.

24           MR. ZALKIND:  Eighty-nine is the next one.

25           MR. ARCHDEACON:  Good morning.

1        THE COURT:  I'm sorry.  Your name and jury number, if

2   you know it.

3        MR. ARCHDEACON:  I don't have the jury number.  My

4   name is Kevin Archdeacon.

5        MR. ZALKIND:  What number is that, your Honor?

6        THE COURT:  Eighty-one.

7        Yes, sir.  How do you know Logan Furniture?

8        MR. ARCHDEACON:  I know where it is, and my wife and I

9   spent an enjoyable hour in there one time just looking at the

10  incredibly bad taste furniture, and we left.  Remarkable.

11       THE COURT:  Okay.  There's a connection between one of

12  the defendants and Logan Furniture.  Anything about that

13  experience that would affect your ability to serve as a fair

14  juror in this case?

15       MR. ARCHDEACON:  Outside of their good taste, no.

16       THE COURT:  Okay.  All right.  Thank you, sir.

17       Next.

18       MS. LUNT:  What was the number of that juror?

19       THE COURT:  Eighty-one.

20       MS. SIEGMANN:  Eighty-one.

21       MS. LUNT:  Eighty-one.

22       THE COURT:  Hi.  What's your name and jury number, if

23  you know it?

24       MS. MARKO:  Dawn Marko.  I don't know my number.

25       THE COURT:  What's your last name?

1    MS. MARKO:  Marko.

2    THE COURT:  No. 66.

3    MS. MARKO:  Okay.

4    THE COURT:  How do you know Logan Furniture?

5    MS. MARKO:  I've heard of them.  I don't know if that

6    counts.

7    THE COURT:  Okay.  Nothing good or bad one way or the

8    other?

9    MS. MARKO:  No.

10   THE COURT:  Okay.  Good enough.  Thank you.

11   Next.

12   Hi.  What's your name and jury number, if you know it?

13   MR. CRONIN:  Stephen Cronin.

14   THE COURT:  Cronin.

15   MR. CRONIN:  I don't know the jury number.

16   THE COURT:  Okay.  Then let's find you.  No. 88.

17   Yes, sir.

18   MR. CRONIN:  I just shopped in the store and bought

19   furniture from them.  I don't know them.

20   THE COURT:  Okay.  One of the defendants has a

21   connection with the store.  Is there anything about that

22   experience that would affect your ability to be --

23   MR. CRONIN:  No.

24   THE COURT:  -- a fair juror in this case?

25   MR. CRONIN:  No, sir.

1          THE COURT:  Okay.  Thank you.

2          .... end of sidebar.)

3          THE COURT:  All right.  Do any of you know or are you

4     related to or acquainted with any of the lawyers in this case?

5          Okay.  A hand.

6          Let me ask another question, and I'll see you in a

7     moment.  To your knowledge, does any member of your family or

8     any close friend know, or is any member of your family or any

9     close friend related to or acquainted with any of the lawyers

10    in this case?

11         Okay.  Again, just, I think, the one hand.  Oh, two

12    hands.  All right.

13         And have any of you -- have any of you or any member

14    of your family or any close friend ever worked for any of the

15    lawyers in this case or their law offices or had any dealings

16    with them?

17         Okay.  Everyone who raised their hand on those last

18    three questions, I'll see you one by one at sidebar.

19         (Sidebar as follows:

20         THE COURT:  Hi.  What's your name?

21         MR. NOONAN:  Sean Noonan.

22         THE COURT:  Sean Noonan.  Do you know your number?

23         MR. NOONAN:  No, I don't.

24         THE CLERK:  Twenty-five.

25         THE COURT:  Twenty-five.

1          MR. NOONAN:  My father is a former Assistant District

2    Attorney.

3          THE COURT:  Okay.

4          MR. NOONAN:  He's tried cases here.

5          THE COURT:  Okay.  Do you know any of these lawyers

6    yourself?

7          MR. NOONAN:  I don't quite remember the names of all

8    the lawyers.

9          THE COURT:  Okay.  Is your father now in private

10   practice?

11         MR. NOONAN:  Yes.  Yes.

12         THE COURT:  What kind of a practice does he have?

13         MR. NOONAN:  He does criminal.

14         THE COURT:  Criminal defense?

15         MR. NOONAN:  (Nods.)

16         THE COURT:  Okay.  How long has he been doing that?

17         MR. NOONAN:  About 15 years.

18         THE COURT:  About 15 years?

19         MR. NOONAN:  And he was Assistant District Attorney

20   for awhile.

21         THE COURT:  Before that?

22         MR. NOONAN:  Yeah.

23         THE COURT:  Is there anything about that experience

24   and your relationship with your father that would make it

25   difficult for you to serve as a juror in this case?

1    MR. NOONAN:  I think so.

2    THE COURT:  Why is that?

3    MR. NOONAN:  Just -- just the bias from just having a

4  father, who worked as an Assistant District Attorney.

5    THE COURT:  Biased which way?

6    MR. NOONAN:  Biased sort of against my dad actually.

7    THE COURT:  Biased against your dad --

8    MR. NOONAN:  Yeah.

9    THE COURT:  -- meaning in favor of whom?  Or against

10  whom?

11    MR. NOONAN:  Just against the whole ideology of it.

12    THE COURT:  All right.  Can you just step over out of

13  earshot for a second here so I can talk to the lawyers.

14    MR. McGINTY:  I'm not sure what he means, but he is --

15    THE COURT:  Okay.  I'm inclined to excuse him for

16  cause.

17    Any objection.

18    MS. SIEGMANN:  No, your Honor.

19    MR. ZALKIND:  No objection.

20    THE COURT:  All right.  Mr. Noonan.

21    I'm going to excuse you, but you have to go back to

22  the jury room.  Okay?

23    MR. NOONAN:  Okay.  So where do I go?

24    THE COURT:  Back to the jury room.

25    MR. NOONAN:  Okay.

1          THE COURT:  Next.

2          Hi.  What's your name and number?

3          MS. ADAMS:  Sandra Adams.

4          THE COURT:  No. 21.  Okay.

5          MS. ADAMS:  Yes.

6          THE COURT:  What's your connection here?

7          MS. ADAMS:  Attorney McGinty both by face and name was

8    familiar to me, but I'm not sure in what capacity I know him.

9          THE COURT:  You're a probation officer?

10          MS. ADAMS:  I am.

11          THE COURT:  Has he ever been one of your supervisees,

12   something like that?

13          (Laughter.)

14          MS. ADAMS:  No.  No, I'm in Attleboro.  I don't know

15   if he's been there at all in the last ten years, but he did

16   look familiar to me.

17          THE COURT:  Okay.  Let me ask Mr. McGinty.  Do you

18   know of any connection with Ms. Adams?

19          MR. McGINTY:  I don't.

20          THE COURT:  Okay.

21          MS. ADAMS:  Okay.

22          THE COURT:  Let me ask just long as I have you here --

23          MS. ADAMS:  Okay.

24          THE COURT:  -- because you work in a probation office.

25          MS. ADAMS:  Uh-huh.

1   THE COURT:  How long have you been there?

2   MS. ADAMS:  About nine years.

3   THE COURT:  About nine years?

4   MS. ADAMS:  Uh-huh.

5   THE COURT:  And do you have a MSW, or what's your

6 education?

7   MS. ADAMS:  A BA in sociology and an MPA.

8   THE COURT:  MPA.  Okay.  Is there anything about that

9 experience that would make it difficult for you to be a fair

10 and impartial juror in this case, serving as a probation

11 officer?

12   MS. ADAMS:  I don't think so, but...

13   THE COURT:  Well, is there any doubt in your mind?  In

14 other words, you're exposed to a certain aspect of the criminal

15 justice system.

16   MS. ADAMS:  Yes.

17   THE COURT:  These defendants are entitled to be tried

18 according to the evidence and the law in this case and not have

19 jurors who have a thumb on the scale one way or the other --

20   MS. ADAMS:  Uh-huh.

21   THE COURT:  -- either for the defendants or for the

22 government.

23   MS. ADAMS:  Uh-huh.

24   THE COURT:  And is there anything about that

25 experience that gives you doubt about whether you could be

1  fair?

2          MS. ADAMS:  I think I would be a fair juror.

3          THE COURT:  Okay.  I -- I -- I just want to know --

4          MS. ADAMS:  I may also want to say that my father

5  works for the Attorney General's office and has for through

6  six -- over 16 years now, not as an attorney, however --

7          THE COURT:  What does he do?

8          MS. ADAMS:  -- but I just want to make that.

9          In operations.

10          THE COURT:  Okay.  Okay.  All right.  Any quick

11  follow-up from any of the lawyers?

12          MS. SIEGMANN:  No, your Honor.

13          THE COURT:  Okay.  Thank you.

14          MR. ZALKIND:  I wonder if I could as about the

15  Attorney General's office, does he work for which division?

16          MS. ADAMS:  In administration.

17          THE COURT:  Okay.  Thank you, Ms. Adams.

18          MS. ADAMS:  Thank you.

19          THE COURT:  Next.

20          MR. CHAKRAVARTY:  Your Honor.

21          THE COURT:  What's your name?

22          MS. PETERSON:  Rose Peterson.

23          THE COURT:  Okay.  No. 61.

24          Yes, ma'am.

25          MS. PETERSON:  I know Mr. Cabell.  I live in the same

1    town.  My son is friends with his son.

2                THE COURT:  Okay.

3                MS. PETERSON:  And I think Mr. Duncan, is it?  His

4    name sounds familiar.  I've worked in law firms in Boston many

5    years ago, so --

6                THE COURT:  Okay.

7                MS. PETERSON:  -- I'm not sure, but it just sounds

8    familiar.

9                THE COURT:  Okay.  Mr. Cabell's son is friends with

10   your son?

11               MS. PETERSON:  Yeah.  They're in the same grade.

12               THE COURT:  Okay.

13               MS. PETERSON:  And I've actually taught in the same

14   classroom as his youngest.

15               THE COURT:  Okay.  Is he well behaved?

16               MS. PETERSON:  Yes.  He's awesome.  He's awesome.

17   He's wonderful.

18               THE COURT:  I think this is probably not the best case

19   for you to sit on then --

20               MS. PETERSON:  Right.

21               THE COURT:  -- if you know one of the prosecutors, so

22   I'm going to have to excuse you, but you have to go down to the

23   jury room.

24               MS. PETERSON:  Okay.  All right.

25               MR. ZALKIND:  What number was that?

1          THE COURT:  That was 61.

2          MR. CHAKRAVARTY:  Just for the record --

3          THE COURT:  Pardon.

4          MR. CHAKRAVARTY:  Just for the record, with regard to

5    Ms. Adams, I think I'm the only one here who has previously

6    worked for the Attorney General's office in the time frame her

7    father was there, and I don't know who he is.

8          THE COURT:  Okay.  While I have you here, the three

9    blanks on the form that jurors checked off, no on all three, so

10   there's nothing to add in that respect.

11          ...end of sidebar.)

12          THE COURT:  All right.  Have you or any member of your

13   family or any close friend ever worked for the United States

14   Attorney's Office?

15          I see no hands.

16          Have you or any member of your family or any close

17   friend ever worked for the FBI, the Federal Bureau of

18   Investigation, the IRS, which is the Internal Revenue Service,

19   the Department of Homeland Security, the Immigration and

20   Customs Enforcement Service, or the old Immigration and

21   Naturalization Service?

22          Okay.  I see a couple hands.  I'll see you at sidebar.

23          (Sidebar as follows:

24          THE COURT:  Okay.

25          MR. DUNCAN:  Your Honor, could I sit on -- stand on

1   this side, because I can't hear back there.

2           THE COURT:  All right.

3           Okay.  Ma'am, what's your name?

4           MS. BARRY:  Nancy Barry.  This could be a little

5   crazy.

6           THE COURT:  All right.

7           MR. ZALKIND:  What number?

8           MS. BARRY:  Because he's --

9           THE COURT:  Forty-six.  Try me out.

10          MS. BARRY:  Well, he's an older man.

11          THE COURT:  Okay.

12          MS. BARRY:  He's former FBI.  He's about 78 years old,

13  and that's all.

14          THE COURT:  And who is that now?

15          MS. BARRY:  He works with my husband.

16          THE COURT:  Okay.  What's his name?

17          MS. BARRY:  I'm so nervous, my God.  Farrell, John.  I

18  think, it's J. Farrell.

19          THE COURT:  Okay.  And is he friends with your

20  husband?

21          MS. BARRY:  Yes.  They're close friends.

22          THE COURT:  Close friends.

23          MS. BARRY:  Uh-huh.

24          THE COURT:  Is there anything about that connection or

25  relationship that would make it difficult for you to serve --

1          MS. BARRY:  No.

2          THE COURT:  -- as a juror in this case?  Okay.

3          MS. BARRY:  No.

4          THE COURT:  You're confident of that?

5          MS. BARRY:  Yeah --

6          THE COURT:  Okay.

7          MS. BARRY:  -- I am.

8          THE COURT:  Okay.  Thank you.

9          MS. BARRY:  Okay.  Yep.

10         THE COURT:  Next.

11         Yes, sir, what's your name?

12         MR. EDWARDS:  Roger Edwards.

13         THE COURT:  No. 12.

14         Yes, sir.

15         MR. EDWARDS:  I -- through my work, I work with

16  Home -- the Department of Homeland Security, Beyond avian flu,

17  I know several individuals there, and we have meetings there,

18  and we have ongoing research projects with them.

19         THE COURT:  Okay.

20         MR. EDWARDS:  I thought that was relevant to say.

21         THE COURT:  Sure.  And that's like people getting off

22  airplanes and so forth who may have been on farms?

23         MR. EDWARDS:  Well, not -- avian flu specifically,

24  pandemic planning and disaster planning, that kind of thing.

25         THE COURT:  All right.  Is there anything about that

1   work and your relationships with people in that department that

2   would make it difficult for you to serve as a juror in this

3   case or affect your service?

4           MR. EDWARDS:  I've worked with them.  It's

5   just -- it's a business relationship, you know, that aspect.

6           I also have done work in the past, though not

7   currently, with USAMRU, United States Army Medical Research

8   Unit around bioterrorism --

9           THE COURT:  Okay.

10          MR. EDWARDS:  -- and biological agents and, you know,

11  developing research projects and those kinds of things as well,

12  so...

13          THE COURT:  Okay.  Well, again, the important issue is

14  whether you can be fair in this case both to the defendants and

15  the government; that is, decide the case according to the

16  evidence and the law without any favoritism toward one side or

17  the other or toward a particular witness.

18          Do you think you can do that?

19          MR. EDWARDS:  Well, one would like to think that, but

20  I do have business relationships through my employer, so...

21          THE COURT:  Well, let's talk about that.  I mean you

22  have a business relationship.  Are you prepared to say it will

23  affect your judgement as a juror, that is, in deciding whether

24  someone is guilty beyond a reasonable doubt that your business

25  relationship would affect your judgement?

1    MR. EDWARDS:  Yeah.  I have ongoing research grants

2  submitted to these departments, so, I don't know what to say.

3  I'd like to say it would not, but...

4    THE COURT:  All right.  Can you just step out of

5  earshot for a moment, please.

6    MR. EDWARDS:  Uh-huh.

7    MS. LUNT:  Your Honor, my notes on him

8  said -- No. 12 -- that he said something to the effect of

9  anti-Muslim feeling.

10    THE COURT:  Do you have that?

11    MS. SIEGMANN:  Your Honor, is he Lebanese?

12    THE COURT:  Pardon.

13    MS. SIEGMANN:  He said his family's been persecuted.

14    THE COURT:  Oh, yes.  Okay.  He was one.

15    Mr. Edwards, can I get you back.

16    I think you had also indicated in your questionnaire

17  that your family is Lebanese --

18    MR. EDWARDS:  Yes.

19    THE COURT:  -- Christian and left Lebanon at some

20  time?

21    MR. EDWARDS:  My grandparents, but, yeah, both my

22  mother and my father's side.

23    THE COURT:  Okay.  And let me ask you about that.  Is

24  that something you think would affect your service?

25    MR. EDWARDS:  Oh, yeah, I heard growing up all the

1  antagonism towards the Lebanese and more specifically the

2  Lebanese Christians and came to the -- and came to the United

3  States because of persecution and so forth.

4      THE COURT:  All right.  I think perhaps this is not

5  the right case for you to sit on, so I'm going to discharge you

6  for cause, and you should report back to the jury room.  Okay?

7      MR. EDWARDS:  Okay.  Thank you.

8      THE COURT:  Next.

9      Hi.  What's your name?

10      MS. MURPHY:  Margaret Murphy.

11      THE COURT:  Okay.  No. 26.

12      Yes, ma'am.

13      MS. MURPHY:  My sister works for the IRS in the

14  International Division.

15      THE COURT:  Okay.  Whereabouts?

16      MS. MURPHY:  I believe she works at Stamford.  She

17  lives in Connecticut.

18      THE COURT:  Okay.  And what does she do for them?

19      MS. MURPHY:  She investigates companies that originate

20  offshore and do business in the United States as to whether or

21  not they pay their proper taxes.

22      THE COURT:  Okay.  Are you close to your sister?

23      MS. MURPHY:  Yes.

24      THE COURT:  Okay.  Would her employment and your

25  relationship with her affect your ability to be a fair juror in

1    this case?

2              MS. MURPHY:  It might.

3              THE COURT:  Okay.  Why do you think it might?

4              MS. MURPHY:  Well, she's -- she never mentions names,

5    but she just talks extensively about, you know, people -- just

6    companies not paying their correct amount of taxes that

7    originate offshore.

8              THE COURT:  Okay.  Well, this is -- this case doesn't

9    involve offshore companies, although it does, as I indicated,

10   involve a tax-exempt designation, and -- and are you saying

11   that when the time comes, if you're selected as a juror, that

12   would affect the decision you make whether these defendants are

13   guilty beyond a reasonable doubt or not, because of the fact

14   that your sister works for the IRS?

15             MS. MURPHY:  I think it -- I think it does prejudice

16   me.  I'd like to think that I would be fair, but I think it

17   definitely -- and the fact that I'm an accountant as well.

18   I -- I don't know how to say this frankly.  I think I would be

19   more inclined than not to -- I'm also a former auditor.  I

20   just -- anyway, I think it might.

21             THE COURT:  All right.  I'm going to discharge you for

22   cause then.  Please report down to the jury room, please.

23             MS. MURPHY:  Thank you.

24             THE COURT:  Next.

25             MS. LUNT:  Your Honor?

1          THE COURT:  Yes.

2          MS. LUNT:  Respectfully, I would ask that you not ask

3    people whether this would affect their ability to be a fair and

4    impartial juror.  It's a real leading question.  It doesn't

5    tease out what the problem might be.

6          THE COURT:  Well, I'm teasing out all kinds of things

7    here.

8          How would you prefer that I ask the question?

9          MS. LUNT:  Would that affect you, if you were to serve

10   as a juror on this case in any way, and then let them --

11         THE COURT:  All right.

12         Okay.  Next.

13         What's your name?

14         MS. MARKO:  Marko.  No. 60.

15         THE COURT:  Yes, I'm sorry.

16         MS. MARKO:  That's okay.

17         MS. SIEGMANN:  No. 66.

18         THE COURT:  No. 66.

19         MS. MARKO:  Oh, 66.  Sorry.

20         THE COURT:  Yes.  Okay.

21         MS. MARKO:  Both my husband and my father-in-law are

22   part of some kind of security clearance.  They work for the

23   government.  I can't honestly tell you what, because they're

24   not authorized to tell me.

25         THE COURT:  Okay.  This is your husband and your --

1          MS. MARKO:  My father-in-law.

2          THE COURT:  What company do they work for or agency?

3          MS. MARKO:  My husband works for SoundBite.

4          THE COURT:  Okay.

5          MS. MARKO:  And I don't know the name of my

6     father-in-law's company.

7          THE COURT:  Okay.  Okay.  And is there anything about

8     that that would affect your ability to serve as a juror in this

9     case?

10          MS. MARKO:  I believe so, yes.

11          THE COURT:  Why is that?

12          MS. MARKO:  Because I just don't feel I can be

13    impartial knowing what my husband and father-in-law do.

14          THE COURT:  Well, I thought you told us you didn't

15    even know what they did, so.

16          MS. MARKO:  I know they work for the government, and

17    that they have a security clearance.

18          THE COURT:  And just the fact that they have a

19    security clearance is -- is going to affect your judgment about

20    the guilt or innocence of these three individuals?

21          MS. MARKO:  Unfortunately, your Honor, I believe so.

22          THE COURT:  All right.  I'm going to discharge you for

23    cause, and please report to the jury room.

24          MS. MARKO:  Thank you.

25          THE COURT:  It's ugly when people are in --

1    MR. ZALKIND:  They want off.

2    THE COURT:  -- they want off, and are willing to say

3    anything.

4    Next, please.

5    I don't know if there's anything I can do about it

6    here.  I don't think it's a solution that's...

7    Yes, sir.  What's your name?

8    MR. SAYWARD:  Kevin Sayward.

9    THE COURT:  Okay.  No. 4.  It's like a low license

10   number; you've got a low juror number.

11   What's your --

12   MR. SAYWARD:  A friend of mine I play soccer with,

13   Tony Dillon (phonetic) works for the FBI.

14   THE COURT:  Okay.  Do you know what he does there?

15   MR. SAYWARD:  He talks about drugs from time to time,

16   maybe Homeland Security, but we don't get into any specifics.

17   THE COURT:  Okay.  Drugs in his work, I hope not --

18   MR. SAYWARD:  Yeah.

19   THE COURT:  -- not like they're doing after the game.

20   Okay.  Is he a close friend of yours?

21   MR. SAYWARD:  I wouldn't say close.  I know his

22   children.  I've coached them and...

23   THE COURT:  Okay.  Would that affect your ability to

24   serve as a juror in this case in any way?

25   MR. SAYWARD:  I would -- I hope not.

1       THE COURT:  Well, I'm hearing a little bit of doubt

2  here.  Would you feel uncomfortable, for example, if you voted

3  to acquit the defendants, playing soccer with him the next

4  week?

5       MR. SAYWARD:  I'm sorry.  I don't understand your

6  question.

7       THE COURT:  Well, suppose that you decided, as a

8  juror, that these three individuals should be acquitted, that

9  there was not evidence sufficient to prove them guilty beyond a

10  reasonable doubt, and the next weekend you're going to play

11  soccer with the fellow from the FBI.  Would you feel

12  comfortable doing that?  In other words, the question is

13  whether your judgment would be affected by your friendship or

14  whether you would do your duty, so to speak, and --

15       MR. SAYWARD:  I -- again, I'd like to think that I can

16  do my duty and be objective.

17       THE COURT:  Okay.  Do you have any doubt on that

18  score?

19       MR. SAYWARD:  That I am aware of, no, but I don't know

20  in and of itself is --

21       THE COURT:  Well, it's very important that this case

22  be tried, you know, according to the evidence and according to

23  the law that these three individuals get a fair trial, and --

24       MR. SAYWARD:  Absolutely.

25       THE COURT:  -- and the jury has the -- they might

1    convict.  They might acquit.  They, you know, will do what

2    they're going to do.  The question really is only whether these

3    extraneous things like a friendship with someone is going to

4    affect your judgment.

5             MR. SAYWARD:  I would think not.

6             THE COURT:  Okay.  Any quick follow-up?

7             MR. CHAKRAVARTY:  No.

8             THE COURT:  Okay.  Thank you, sir.

9             All right.  Next.

10            MR. HOLMES:  Good morning, your Honor.

11            THE COURT:  What's your name?

12            MR. HOLMES:  Clyde Holmes.

13            MS. SIEGMANN:  Twenty-three.

14            THE COURT:  I'm sorry.  What is it?  Twenty-three.

15            MR. HOLMES:  Holmes, H-O-L-M-E-S.

16            THE COURT:  There you are.

17            Okay.  Yes, sir.

18            MR. HOLMES:  One of my oldest friends back to college

19   was a senior treasury officer here for many years, now retired.

20            THE COURT:  Okay.

21            MR. HOLMES:  And as a result of that relationship, I

22   spent quite a bit of time with various treasury officers.  I

23   suppose I got some casual idea of how they viewed these sorts

24   of situations, though all of these fellows are now all retired,

25   I'm sure.  I'm not sure that that would affect my ability to be

1    impartial.

2          THE COURT:  Well, let me ask do you have some doubts

3    in that regard?

4          MR. HOLMES:  Well, I'm not really a law and order kind

5    of guy, a Vietnam veteran.  Maybe I would be leaning on that

6    side of things, but I think that I'm intellectual enough to

7    sort of be impartial.

8          THE COURT:  Well, it's very important that these three

9    defendants be tried as individuals and -- and -- and that the

10   jury makes its judgment based on the evidence as put forth in

11   this court and --

12         MR. HOLMES:  I understand that.

13         THE COURT:  -- and the law as I instruct it, and you

14   can be prolaw and order or on the other side of that --

15         MR. HOLMES:  Absolutely.  Sure.

16         THE COURT:  -- politically, and it has no impact or

17   should have no impact at all on this case --

18         MR. HOLMES:  Right.

19         THE COURT:  -- because this case has to be decided on

20   its merits.  I have no idea whether these three defendants are

21   guilty or not guilty.  That's the jury's job, not mine, but

22   it's very important that the case be decided on that basis.

23         MR. HOLMES:  Sure.

24         THE COURT:  Do you think you can do that?

25         MR. HOLMES:  I think I can.

1       THE COURT:  Is there any doubt in that regard in your

2   mind?

3       MR. HOLMES:  No, I don't believe so.

4       THE COURT:  Okay.  Any follow-up?

5       MR. CHAKRAVARTY:  The only thing I notice, your Honor,

6   it's unrelated to that, but there's a PO box for an address.  I

7   didn't know if that was -- if you have an address, physical

8   address, and/or if it's just the PO box.

9       THE COURT:  What's your physical address?

10      MR. HOLMES:  14 Thissell, T-H-I-S-S-E-L-L, Street.

11      THE COURT:  Okay.  Okay.

12      MR. ZALKIND:  Your Honor, I have a question.

13      THE COURT:  Yes.

14      MR. ZALKIND:  Could you -- could you ask him if he

15  would believe a law enforcement officer just more than a

16  civilian witness.

17      THE COURT:  Do you understand the question?

18      MR. HOLMES:  I do.  Um, I think I might.

19      THE COURT:  Meaning you're more likely to find a law

20  enforcement officer credible, give more credence to the

21  testimony?

22      MR. HOLMES:  I think so.  I think that one would

23  expect that they have more background.

24      THE COURT:  Okay.  All right.  On that basis, sir, I'm

25  going to let you go.  I'm going to excuse you for cause, and

1    you should report to the jury room.

2             MR. HOLMES:  All right.  Thank you, your Honor.

3             THE COURT:  Next.

4             Hi.  What's your name?

5             MS. CORBETT:  Emma Corbett, but I think it's spelled

6    wrong, but it's C-O-R.

7             THE COURT:  Emma Corrett, is that it?

8             MS. CORBETT:  C-O-R-B.

9             THE COURT:  From Bigelow Street, Boston?

10            MS. CORBETT:  Yes.

11            THE COURT:  Okay.  What's your actual name?

12            MR. CHAKRAVARTY:  Thirty-nine.

13            MS. CORBETT:  C-O-R-B-E-T-T.

14            THE COURT:  Oh, B.  Corbett.  Okay.

15            No. 39.

16            Yes, ma'am.

17            MS. CORBETT:  And I didn't know whether -- I just

18   thought I'd check I have a friend that works for the CIA.

19            THE COURT:  Okay.  And what does your friend do?

20            MS. CORBETT:  I'm not too sure what he does, but he's

21   been to Iraq --

22            THE COURT:  Okay.

23            MS. CORBETT:  -- twice, and he lives in

24   Washington, D.C.

25            THE COURT:  Okay.  And is -- is this a close friend?

1          MS. CORBETT:  Like I'll be going to the wedding next

2     May, so I'm friends with him, his fiancee more so.

3          THE COURT:  Okay.  And is there anything about that

4     relationship that would affect your jury service?

5          MS. CORBETT:  I don't think so.

6          THE COURT:  Okay.  Any doubt in your mind on that?

7          MS. CORBETT:  No, not -- no.

8          THE COURT:  Okay.  All right.  Thank you.

9          Yes.

10          MR. ZALKIND:  Could you ask her the question again

11     about the law enforcement, whether or not she would believe a

12     law enforcement officer more than a civilian witness.

13          THE COURT:  Okay.  We expect that we're going to have

14     law enforcement officers testifying in this trial, and all

15     witnesses -- it's the role of the jury to decide which

16     witnesses to believe and which to disbelieve --

17          MS. CORBETT:  Uh-huh.

18          THE COURT:  -- and sometimes people have a thumb on

19     the scale for law enforcement witnesses.

20          Would you do that?  Would you -- are you more likely

21     to believe a law enforcement witness than another kind of

22     witness, that is?

23          MS. CORBETT:  No.

24          THE COURT:  Okay.  Okay.  Thank you.

25          MS. CORBETT:  Okay.

1          THE COURT:  Next.

2          MS. ADAMS:  Back again.

3          THE COURT:  Ms. Adams, is it?  No. 21?

4          MS. ADAMS:  Yeah.

5          THE COURT:  Okay.

6          MR. ZALKIND:  What number is it?

7          MR. CABELL:  Twenty-one.

8          MS. ADAMS:  A person -- ah, Craig Larribee (phonetic),

9     who used to be my partner left the office to go work for

10    Customs in San Diego.  I've had limited contact with him since

11    that.  Also, Gerry Leone, who was a fellow prosecutor before he

12    became Middlesex DA is a close friend of the family's.  Okay.

13          THE COURT:  A close friend of yours?

14          MS. ADAMS:  Well, a friend of the family's.  My father

15    worked with him in the Attorney General's office, and both my

16    father and I had done a lot of work for him in his bid for

17    Middlesex DA.

18          THE COURT:  Okay.  Again, is there anything about

19    either of those relationships that would affect your jury

20    service here?

21          MS. ADAMS:  I'd like to say no, but, you know, I'm

22    not --

23          THE COURT:  Well -- go ahead.

24          MS. ADAMS:  I'd like to believe that I could put it

25    all aside, but I'm not 100 percent confident.

1      THE COURT:  Are you telling us that as you would

2  listen to the evidence and go back to deliberate, you would be

3  affected by the fact that Gerry Leone is a friend of your

4  father's that that would affect your judgment?

5      MS. ADAMS:  It might, yes.  I know.

6      THE COURT:  All right.  I mean I have no choice.  If

7  you say you're going to be biased, I have to let you go.

8      MS. ADAMS:  Okay.

9      THE COURT:  But as an employee of the trial court, and

10  I appreciate your candor, but I -- I can't say I'm happy with

11  the response.  I mean I just -- you -- we both work in a system

12  that is premised on the presumption of innocence and people

13  getting fair trials and fair hearings; and I think it's

14  important that everyone who works in it has to have an

15  appropriate, open mind, but I'm going to let you go.  I have no

16  choice based on your responses.

17      MS. ADAMS:  I -- I -- I think so, but it's also the

18  appearance of, and I think that others, even if I felt, I think

19  that other people, who might know me or associations --

20      THE COURT:  Well, I'm less concerned about that, but

21  anyway I'm going to let you go, so report to the jury room.

22      MS. ADAMS:  Thank you.

23      THE COURT:  Next.

24      What's your name?

25      MR. ARCHDEACON:  Kevin Archdeacon, No. 81.

1          THE COURT:  Oh, yes.  I'm sorry.  Eighty-one.

2          MS. LUNT:  Eighty-one.

3          MR. ZALKIND:  Eighty-one.

4          THE COURT:  Yes, sir.

5          MR. ARCHDEACON:  The company I work for is licensed by

6    U.S. Customs.  We work with the U.S. Customs, the INS, Homeland

7    Security, seven days a week.

8          THE COURT:  Okay.  And what does your company do?

9          MR. ARCHDEACON:  We work on oil tankers, petroleum

10   imports.

11         THE COURT:  Okay.

12         MR. ARCHDEACON:  We do inspection and laboratory

13   testing.

14         THE COURT:  And what kinds of inspections?

15         MR. ARCHDEACON:  We board the vessels.  We have our

16   inspectors go on board.  They measure them for volume,

17   temperature, water content.  They draw samples, bring them back

18   to my laboratory where we test them, make sure they meet

19   government specs.

20         THE COURT:  Okay.  And is it safety, environmental

21   quality, that sort of thing, I mean as opposed to security

22   or --

23         MR. ARCHDEACON:  Yes.

24         THE COURT:  Okay.  Is there anything about that

25   relationship or those connections that would affect your

1   service here as a juror?

2   MR. ARCHDEACON:  It's a more difficult question than

3   the first one you asked me, but, no, I guess not if it's

4   presented with the evidence, I would consider the evidence.

5   THE COURT:  And you're willing to do that, again, to

6   listen to the evidence and decide the case on its own merits

7   and not because your company has contracts with Customs and

8   Immigration and so forth or Homeland Security?

9   MR. ARCHDEACON:  I'd like to think I could do that,

10  yeah.

11  THE COURT:  Is there any doubt in your mind that you

12  can do that?

13  MR. ARCHDEACON:  Ah, you know, I don't have a high

14  opinion about a lot of my customers, to be honest with you.

15  THE COURT:  Well, you don't have any patent on that --

16  MR. ARCHDEACON:  Yeah.

17  THE COURT:  -- sentiment.

18  MR. ARCHDEACON:  I'm sure.

19  THE COURT:  But again, let me just emphasize as

20  strongly as I can, if you wind up on this jury, you're to

21  decide this case on the evidence and not because you like

22  Customs or don't like Customs.

23  It's -- it's based on the evidence in this case and

24  your evaluation of it and whether the government has proved

25  these gentlemen guilty beyond a reasonable doubt as to a

1   particular charge.

2           MR. ARCHDEACON:  I believe I could do that, yeah.

3           THE COURT:  Okay.

4           MR. ZALKIND:  Could you ask him the law enforcement

5   question.

6           THE COURT:  All right.  We expect that we're going to

7   have law enforcement witnesses in this trial, and sometimes as

8   people listen to the testimony of law enforcement officers,

9   they put a thumb on the scale; that is, they're more likely to

10  believe them just because they're in law enforcement than not.

11          Do you think you would do that, or would you treat the

12  testimony of a law enforcement officer like any other witness;

13  that is, take it as it comes, and believe it or not believe it,

14  as it comes?

15          MR. ARCHDEACON:  If anything, I might go in the other

16  direction, to be honest with you.

17          THE COURT:  Okay.  Any other follow-up?

18          MR. CABELL:  I'm just not sure what that means.

19          THE COURT:  When you say "go in the other direction,"

20  meaning that you're less likely to believe law enforcement?

21  Okay.

22          MR. ARCHDEACON:  Right.

23          THE COURT:  Okay.  Thank you, sir.

24          MR. ARCHDEACON:  And just to clarify.

25          THE COURT:  Yeah.

1          MR. ARCHDEACON:  When I said I didn't like -- I meant

2     my clients, my customers, not U.S. Customs.

3          THE COURT:  Okay.

4          MR. ARCHDEACON:  I just --

5          THE COURT:  Okay.  Thank you.

6     Next.

7          MR. CABELL:  Your Honor.

8          THE COURT:  Yes.

9          MR. CABELL:  Sorry.  I would ask that he be stricken

10    for cause to the extent that he has implied he's likely to

11    believe law enforcement less than a civilian, if I understood

12    the answer to that question correctly.

13         THE COURT:  Okay.

14         MR. CABELL:  I mean we've already stricken two

15    prospective jurors for saying in favor of law enforcement.  I

16    think under the same rationale, we should be striking him.

17         THE COURT:  All right.  Let me, um -- Mr. Archdeacon.

18    I'm sorry.  Can I see you again?

19         I'm sorry.  We had a follow-up question to your last

20    comment.  You said, if anything, you'd be less likely, I think,

21    to believe law enforcement.

22         What do you mean by that?

23         MR. ARCHDEACON:  Well, I've been on -- peripherally

24    involved in a federal investigation related to my job, and I

25    wasn't always pleased with the way they conducted themselves.

1    THE COURT:  Okay.  And do you think that would affect

2  you here as a juror today?  In other words, whatever

3  feelings --

4    MR. ARCHDEACON:  It's difficult to say until

5  I -- until it unfolds in front of me.  I don't know how to

6  answer that, you know.

7    THE COURT:  Well, you're entitled to bring your life

8  experience to bear on your analysis of the evidence, but you're

9  not allowed to be prejudiced.  You're not allowed to say, for

10  example, well, the cops always lie, or the cops always tell the

11  truth, or anything close to that.  You have to sort of look at

12  each person, each witness, each piece of evidence as neutrally

13  as you can under the circumstances and make your best judgment

14  accordingly.

15    Do you think you can do that, or do you think you're

16  going to have a thumb on the scale against law enforcement?

17    MR. ARCHDEACON:  No.  I think I can assess the people

18  one at a time as they come and the evidence that's before me.

19    THE COURT:  Mr. Cabell, any follow-up?

20    MR. CABELL:  No follow-up, your Honor.

21    THE COURT:  Anyone else?

22    MR. ZALKIND:  No, your Honor.

23    THE COURT:  Okay.  Thank you, Mr. Archdeacon.

24    I'm going to overrule the objection and leave him on.

25    MR. CABELL:  Okay.

1          THE COURT:  Okay.  Next.

2          Your name, sir?

3          MR. GARDNER:  Robert Gardner.

4          THE COURT:  Okay.  No. 41.

5          And were you one of the people who answered something

6   on the questionnaire?

7          Does someone have --

8          MR. McGINTY:  Judge.  Judge.

9          THE COURT:  Okay.  All right.  Mr. Gardner, let's

10  first talk about the questions I raised about connections to --

11         MR. GARDNER:  Well, I have a friend that works for

12  Homeland Security.

13         THE COURT:  Okay.  What does he do?

14         MR. GARDNER:  It's a woman.

15         THE COURT:  I'm sorry.

16         MR. GARDNER:  Her name is Anne Marie Doherty.

17         THE COURT:  Okay.

18         MR. GARDNER:  She -- prior to that, she was the

19  Superintendent of the Boston Police Department.

20         THE COURT:  Okay.  And what are her duties at Homeland

21  Security; do you know?

22         MR. GARDNER:  I don't know.

23         THE COURT:  Is she a close friend?

24         MR. GARDNER:  Yes.

25         THE COURT:  Do you talk to her about her work?

1     MR. GARDNER:  No.

2     THE COURT:  Is there anything in that friendship or

3 that relationship that would affect your jury service in any

4 way?

5     MR. GARDNER:  I don't think so.

6     THE COURT:  Okay.  You also filled out the

7 questionnaire.  You said, in response to question 2, you said

8 it was a difficult question to answer after what happened on

9 9/11 --

10     MR. GARDNER:  Uh-huh.

11     THE COURT:  -- and all that's going on in the

12 Middle East today.

13     Do you think you could be -- well, how do you think

14 you would be affected, if at all, as a juror in this case,

15 given the fact that the defendants are Muslims and Arabs and

16 from Middle Eastern countries?

17     MR. GARDNER:  I'm not sure.  It is a tough question.

18 I think it's -- you know, to have a little bias, I guess,

19 towards Arab-Muslims.  I don't -- it is a difficult question.

20     THE COURT:  Okay.  What I need to know is the answer

21 to the following:  A little bit of bias is -- is not a good

22 thing in a jury trial.  In other words, these three defendants

23 are on trial.  They're entitled to a jury --

24     MR. GARDNER:  Uh-huh.

25     THE COURT:  -- that is completely and totally fair;

1     that's not going to judge them as Muslims or Arabs or Middle

2     Easterners.

3           MR. GARDNER:  Right.

4           THE COURT:  There will be evidence about things that

5     may be connected with that, but the jurors are not allowed to

6     bring any bias or prejudice about that to the table, but to

7     decide the case on the merits and be prepared to acquit if

8     that's what the evidence, you know, in their judgment requires.

9           And there -- the issue is, you know, can you be fair?

10    Are you going to be a little bit biased, or will you be fair to

11    all three defendants, as you listen to the evidence?

12          MR. GARDNER:  I would -- I would try to be.

13          THE COURT:  Okay.  I think I'm hearing some doubt

14    about whether you could be.

15          MR. GARDNER:  Well --

16          THE COURT:  You have some concerns about it, I guess.

17          MR. GARDNER:  -- I'm just answering as truthfully as I

18    can.

19          THE COURT:  No.  I appreciate that.  It's really very

20    important to be truthful.  You know, to -- to make it extreme,

21    it's obviously not this case, but if these gentlemen were

22    accused of the September 11th terrorist attack that it doesn't

23    mean they committed it.

24          MR. GARDNER:  No, I understand.

25          THE COURT:  In other words, just because they're

1    Muslims or Arabs --

2            MR. GARDNER:  Right.

3            THE COURT:  -- does not mean in any way, shape, or

4    form that they are either guilty or more likely to be guilty.

5    You know, you have to listen to the evidence and decide the

6    case on that basis.  They're presumed innocent --

7            MR. GARDNER:  Right.

8            THE COURT:  -- and there's no information in front of

9    you otherwise, but -- but I appreciate your honesty.  You need

10   to be honest; and if you have some doubts, if you think you

11   can't be fair, or it's going to affect you in some way, then I

12   think I need to know that.

13           MR. GARDNER:  Um, well, I'll try.  I'll do my best.  I

14   would listen to the merits of the case.

15           THE COURT:  Okay.  And -- and judge it based on its

16   merits?

17           MR. GARDNER:  Yes.

18           THE COURT:  Okay.  Okay.  And despite whatever doubts

19   you may have expressed, do you feel at the end of the day you

20   can do that and decide the case on the merits?

21           MR. GARDNER:  Uh-huh.

22           THE COURT:  Would you be prepared to acquit them if

23   that's what the evidence required?

24           MR. GARDNER:  Ah, yeah.

25           THE COURT:  Okay.  Any follow-up?

1          MR. ZALKIND:  First, the law enforcement question.

2          THE COURT:  Mr. Gardner, the -- I expect that we're

3     going to have law enforcement witnesses in this case.

4     Sometimes people have feelings about law enforcement.  They put

5     a thumb on the scale.  They think that law enforcement officers

6     are more likely to be believable than -- than people who are

7     not, and the question is would you have a similar sort of

8     reaction to a law enforcement witness, or would you assess

9     their credibility like any other witness?

10          MR. GARDNER:  Um, well, yeah, assess their

11    credibility --

12          THE COURT:  Okay.

13          MR. GARDNER:  -- as any other.

14          THE COURT:  Okay.  You're confident you can do that?

15          MR. GARDNER:  Sure.

16          THE COURT:  Okay.  Okay.

17          MR. ZALKIND:  I'd like to be heard, your Honor?

18          THE COURT:  Could you just step out of earshot,

19    Mr. Gardner.

20          Thank you.

21          MR. ZALKIND:  I would challenge this juror for cause,

22    your Honor.  I think you rehabilitated him.  I think he said he

23    had bias.  You were pushing him.  He's connected with friends

24    of Homeland Security.  He fills out the form that shows that

25    he's biased.  I don't think there's any way he should be

1   sitting on this jury.  I think you rehabilitated him.

2           THE COURT:  What's the government's response?

3           MR. CABELL:  I don't see any difference between this

4   gentleman and Mr. Archdeacon in terms of the essence of the

5   answers they gave.

6           MR. McGINTY:  May I suggest the difference?  When your

7   Honor said the bias is not a good thing, any chance of getting

8   candor from him was lost, and so when the questions were next

9   asked him, he understood that if he answered them candidly, it

10  might have opened himself up to questions about whether he was

11  unduly biased, and he didn't do that.  So, I think the

12  opportunity for candor is lost by telling him that being biased

13  or a little bias is not a good thing, so I would join in Mr.

14  Zalkind's objection.

15          MS. LUNT:  And, your Honor, if I may.  Mr.

16  Archdeacon --

17          THE COURT:  All right.

18          MR. ZALKIND:  You can't.

19          MS. LUNT:  Okay.

20          THE COURT:  All right.  Mr. Gardner.  Just to be sure,

21  I think I'm going to strike you for cause, just because I'm not

22  completely confident that you're able to do this; so, I'm going

23  to let you go, but you have to report to the jury room.

24          Okay?  Thank you, sir.

25          MR. McGINTY:  Thank you.

1          THE COURT:  Sir.

2          Hi.  What's your name?

3          MR. MELANSON:  Stephen Melanson.

4          MR. CABELL:  Eighty-six.

5          THE COURT:  Eighty-six.

6          Yes, sir.

7          MR. MELANSON:  My son dates Kelly Sullivan, who is

8    Michael Sullivan's daughter, the U.S. Attorney.

9          THE COURT:  Okay.  I'm thinking that perhaps this is

10   not the right case for you to sit on.

11         Is there any objection to that?

12         MR. ZALKIND:  No.

13         MS. SIEGMANN:  No.

14         THE COURT:  Okay.  I'm going to let you go then.

15         MR. MELANSON:  Thank you, sir.

16         MR. McGINTY:  I was hoping there was some follow-up

17   questions.

18         THE COURT:  Yes, sir.  What's your name?

19         MR. O'NEILL:  Michael O'Neill.

20         MR. ZALKIND:  What number?

21         MR. O'NEILL:  I'm near the end.

22         THE COURT:  Eighty-three.

23         Yes, sir.

24         MR. O'NEILL:  The reason I --

25         MS. SIEGMANN:  What number?

1          THE COURT:  Eighty-three.

2          MR. O'NEILL:  The reason I got up is twofold.  My

3    roommate worked -- he just passed the bar, and he worked as a

4    summer intern at the DA office.

5          And secondly, I lost my best friend in Iraq, and I

6    thought I was over it, but there's still some emotional stuff

7    there and other shit sitting in the jury pool, so I just wanted

8    to bring it up.  I didn't know when was a good time to do it.

9    I wanted to come now.

10         THE COURT:  Do you think the fact that you -- let me

11   take the second one first.

12         MR. O'NEILL:  Okay.

13         THE COURT:  You lost your best friend in service in

14   Iraq --

15         MR. O'NEILL:  Yeah.

16         THE COURT:  -- in the military?

17         Okay.  And do you think that's going to affect your

18   service here as a juror?

19         MR. O'NEILL:  I think so just because of the Muslim

20   and preconceived notions, you know, having him killed.  It's

21   just that I thought I was over it, but it's still hard for me

22   to...

23         THE COURT:  All right.  I'm going to let you go then,

24   but you're going to have to report down to the jury room.

25         Okay.

1          ...end of sidebar.)

2          THE COURT:  All right.  Ladies and gentlemen, I'm

3     going to ask some questions now about disabilities and -- and

4     the anticipated trial schedule.

5          Do any of you have any physical or mental disability

6     or physical or mental problem that would make serving as a

7     member of the jury difficult or impossible or otherwise might

8     interfere with or affect your service as a juror?

9          Okay.  Why don't I see you at sidebar.

10         (Sidebar as follows:

11         THE COURT:  All right.  Sir.

12         Hello.  What's your name?

13         MR. LAFAUCI:  Lafauci, Nick.

14         MR. CABELL:  Seventy-three.

15         MR. ZALKIND:  Seventy-three.

16         THE COURT:  Seventy-three.

17         Yes, sir.

18         MR. LAFAUCI:  Well, I do have an overactive bladder,

19    and I'm on prescription drugs for that, and sometimes it

20    doesn't work as well as I'd like it to, so I have to urinate a

21    lot.

22         THE COURT:  Okay.  I think the longest stretch that

23    you would ever have would be one hour and 50 minutes, 5-0.

24         Do you think you could handle that?

25         MR. LAFAUCI:  I do -- you know, I probably could.

1          THE COURT:  Okay.

2          MR. LAFAUCI:  I worked as a mailman, and so I have to

3    go out on long stretches, walking out in rural areas where

4    there's only a tree, so...

5          THE COURT:  Okay.  We can do better than that.

6          MR. LAFAUCI:  Thank you.

7          (Laughter.)

8          THE COURT:  All right.

9          MR. LAFAUCI:  The trees don't appreciate me coming

10   back, so, yeah, I think I --

11         THE COURT:  It would be an hour and 50 minutes, and an

12   hour and then 50 minutes, so there would just be one stretch

13   from 9:00 to 10:50.

14         MR. LAFAUCI:  I think I'd be fine --

15         THE COURT:  Okay.

16         MR. LAFAUCI:  -- but I just wanted to let you know

17   that.

18         THE COURT:  Thank you.  I appreciate that.

19         What I'm going to do is I'm going to leave you on; and

20   if you wind up being impaneled, I'll say this to you again, if

21   you ever need to stop, raise your hand, and we'll stop, and we

22   can take a five-minute break --

23         MR. LAFAUCI:  Thank you.  I appreciate that.

24         THE COURT:  -- in this case.  It's no problem at all.

25   Okay.  Thank you, sir.

1          MR. LAFAUCI:  Thank you.

2          THE COURT:  Next.

3          MR. CABELL:  I don't think he heard you.  He came in

4     at the end.

5          THE COURT:  Hi.  What's your name?

6          MR. KAM:  Danny Kam, K-A-M.

7          THE COURT:  Yes.  No. 71.

8          Yes, sir.

9          MR. KAM:  Recently, I have -- for the last few weeks,

10    I've been having constant abdominal pain, and I have like a

11    diarrhea, and I have two medical procedures coming up in

12    12 days with an endoscopy and a colonoscopy, because I told the

13    doctor that I have a lot of pain, constant pain.

14         THE COURT:  Okay.

15         MR. KAM:  So I will have like a five-day preparation

16    before that procedure also --

17         THE COURT:  Okay.

18         MR. KAM:  -- so the length of the trial, I am not too

19    sure if I'll be able to do that.

20         THE COURT:  Okay.  And this is coming up this week?

21         MR. KAM:  Coming up -- yeah, in 12 days.

22         THE COURT:  In 12 days?

23         MR. KAM:  Yeah.

24         THE COURT:  Okay.  All right.  I'm -- unless there's

25    an objection, I'm inclined to let you go.  I think --

1      MR. KAM:  Thank you, sir.

2      THE COURT:  -- probably this is going to be a problem,

3   and the best of luck to you.

4      MR. KAM:  Thank you very much, sir.  Otherwise, it

5   would be an honor for me to serve as a juror.

6      THE COURT:  Well, thank you for saying that.

7      MR. KAM:  Thank you.

8      THE COURT:  Best of luck to you.

9      MR. KAM:  Bye-bye.

10      THE COURT:  Next.

11      MR. TURNER:  Good afternoon.

12      THE COURT:  Yes, sir.  What's your name?

13      MR. TURNER:  Richard Turner.

14      THE COURT:  Okay.  No. 63.

15      Yes, sir.

16      MR. TURNER:  I've had two surgeries on my neck.  I've

17   sat on a jury before, but the problem I have with this is can I

18   sit that length of time.

19      THE COURT:  Okay.  The way the schedule will be, we're

20   going to go an hour and 50 minutes, 50, from 9:00 to 10:50; and

21   then we'll take a ten-minute break and then go 11:00 to 12:00,

22   and then take a ten-minute break and go 12:10 to 1:00, so the

23   longest stretch would be an hour and 50 minutes, and the whole

24   day will be 9:00 to 1:00.

25      MR. TURNER:  Uh-huh.

1          THE COURT:  Do you think you can handle that?  And you

2    can always feel --

3          MR. TURNER:  As long as I'm getting some breaks here,

4    that's okay.  I can -- I can endure, I think.

5          THE COURT:  Okay.  The longest stretch would be, like

6    I said, an hour and 50 minutes.

7          MR. TURNER:  Okay.  Fine.

8          THE COURT:  Okay.  How are you doing back there on

9    those benches?

10         MR. TURNER:  Like everybody else, I would imagine.

11         THE COURT:  Okay.  All right.  Thanks.

12         MR. TURNER:  Okay.  Thank you.

13         THE COURT:  Next.

14         MR. SOOHOO:  My name is Richard Soohoo, S-O --

15         THE COURT:  What's your name?

16         MR. SOOHOO:  Richard Soohoo, S-O-O-H-O-O.

17         THE COURT:  All right.  No. 36.

18         Yes, sir.

19         MR. SOOHOO:  Hi.  I have a -- I have like trouble

20   seeing, because one thing, I don't have glasses, and number

21   two -- number two, I see like -- I see like a hard a few times,

22   a couple of times, and this is not really -- I'm at school, so

23   I go to college.

24         THE COURT:  Okay.

25         MR. SOOHOO:  So -- and I know this is a long, long

1    trial.  I have finals like before Christmas.

2              THE COURT:  Okay.  Okay.  You're a full-time student?

3              MR. SOOHOO:  Yes.

4              THE COURT:  Okay.

5              MR. SOOHOO:  Engineering student, full-time, yeah.

6              THE COURT:  Engineering student?

7              MR. SOOHOO:  Yeah.

8              THE COURT:  Okay.  And you're going to have finals in

9    December?

10             MR. SOOHOO:  Yes.

11             THE COURT:  Okay.  All right.  And -- and you also

12   have a vision problem?

13             MR. SOOHOO:  Yes.

14             THE COURT:  Okay.  All right.  Can you just stand over

15   there, just out of earshot for a moment.

16             I'm inclined to let him go.

17             MR. ZALKIND:  I agree.

18             VOICES:  Yes.

19             THE COURT:  Mr. Soohoo.

20             Okay.  I'm going to let you go then.  You'll have to

21   report to the jury room again downstairs.  Okay?

22             MR. SOOHOO:  Thank you.

23             THE COURT:  Thank you.

24             Next.

25             Hi.  What's your name?

1          MS. RIDOLFI:  Ridolfi, Roberta.

2          THE COURT:  Okay.  No. 78.

3          Yes, ma'am.

4          MS. RIDOLFI:  I'm under a lot -- sorry -- my lips are

5    feeling numb.  I've been under a lot of stress, and I thought I

6    could handle it.  I'm dealing with an 87-year-old mother, and

7    right now I'm having heart palpitations.  My hands and my lips

8    are numb, and I'm getting migraines.  I'm just feeling for five

9    weeks I don't know if I could deal with that.

10          THE COURT:  Okay.  Are you the primary caregiver for

11   your mother?

12          MS. RIDOLFI:  No, she's -- I -- I do not -- I'm not

13   her primary caregiver, but I do provide her a lot of care.  She

14   lives on her own, but I am up there a couple of times a week

15   with her.

16          THE COURT:  Okay.  And the stress you're -- you're

17   undergoing is -- is the stress of --

18          MS. RIDOLFI:  Well, I've been being treated for

19   stress, and I thought I could handle this, because I was

20   feeling better, but it's bringing on all the physical stuff

21   that I've been going through.

22          MR. McGINTY:  Your Honor.

23          THE COURT:  Okay.  And do you think that would

24   continue during the trial?  In other words, it's four hours a

25   day.

1          MS. RIDOLFI:  I can't see this going on for five weeks

2     without me getting physically ill again.

3          THE COURT:  Okay.

4          MS. RIDOLFI:  I thought I could handle it, you know,

5     for like three weeks, or a couple days, but I just don't think

6     if I'm dealing with this on the first day, I can't.

7          THE COURT:  Okay.  Can I get you to stand over just

8     out of earshot.

9          MS. RIDOLFI:  Yes.  Thank you.

10         THE COURT:  Thank you.

11         MR. McGINTY:  The questionnaire.

12         THE COURT:  Sorry.  Oh.

13         Okay.  Before we even get to the questionnaire, what's

14    people's reaction?  Any --

15         MS. SIEGMANN:  I think you should strike.

16         MR. ZALKIND:  I think we have to excuse her.

17         THE COURT:  Okay.  All right.  I'm going to let you

18    go, Ms. Ridolfi.  Maybe a shorter trial would be better for

19    you.

20         MS. RIDOLFI:  Okay.

21         THE COURT:  You'll have to report down to the jury

22    room.

23         MS. RIDOLFI:  Thank you.  I'm -- I'm sorry.

24         THE COURT:  That's okay.  Thank you.

25         Next.

1          MS. PROUTY:  Hello.

2          THE COURT:  Hi.  What's your name?

3          MS. PROUTY:  Elizabeth Prouty, P-R.

4          THE COURT:  Okay.  There used to be a Vermont Senator

5     with that name.

6          MS. PROUTY:  Yes.

7          THE COURT:  Okay.  What number?  Forty-eight.

8          Yes, ma'am.

9          MS. PROUTY:  I have 30 percent hearing loss in both

10    ears.

11         THE COURT:  Okay.  Were you having trouble hearing me

12    out there?

13         MS. PROUTY:  No, I actually can hear you.  I was in

14    the back.  It's important that I sit closer, rather than

15    further away, and it's quiet surroundings, but...

16         THE COURT:  Okay.  What do you think?  Do you think

17    you're able to sit on a jury and hear all the evidence?

18         MS. PROUTY:  Yes.

19         THE COURT:  Okay.  We do have microphones --

20         MS. PROUTY:  Yes.

21         THE COURT:  -- and we can turn things up a little

22    louder.

23         MS. PROUTY:  Uh-huh.

24         THE COURT:  I mumble sometimes.  You can feel free to

25    say "speak up."

1    MS. PROUTY:  Yeah.  It's mostly the kids upstairs with

2  their back turned, and they don't want you to hear them

3  anyways, so...

4    THE COURT:  It doesn't happen in my family.

5    MS. PROUTY:  I know.  I can't hear you.

6    THE COURT:  My kids don't hear me when I'm two feet

7  away.

8    MS. PROUTY:  Right.

9    THE COURT:  Okay.  So you think you can do this then?

10    MS. PROUTY:  Uh-huh.

11    MS. SIEGMANN:  Your Honor.

12    MR. CABELL:  Would you ask the employment status.

13    THE COURT:  Oh, yeah.  While I have you here, what's

14  your -- do you have an occupation?

15    MS. PROUTY:  I'm on leave of absence from a real

16  estate job.

17    THE COURT:  Okay.  And I don't ask this to pry, but

18  just to --

19    MS. PROUTY:  That's okay.

20    THE COURT:  -- ask about your spouse.  Are you

21  married?

22    MS. PROUTY:  Yes.

23    THE COURT:  Okay.  And what does your spouse do?

24    MS. PROUTY:  What does -- what does he do?

25    THE COURT:  What does he do?

1          MS. PROUTY:  I thought what is his name.  He is a

2    business consultant and a CEO of an insurance company --

3          THE COURT:  Okay.

4          MS. PROUTY:  -- in Austin, Texas.

5          THE COURT:  Okay.  Okay.  Thank, you ma'am.

6          MS. PROUTY:  Okay.  Should I talk about my schedule

7    now that I'm here?

8          THE COURT:  Sure.  What do you got?

9          MS. PROUTY:  I was supposed to -- I have reservations

10   to fly to San Francisco next week for a week to be with some of

11   my children and my husband.

12         THE COURT:  Okay.  This is Thanksgiving week?

13         MS. PROUTY:  Yep.  I'm supposed to leave Monday and

14   return on the 26th.

15         THE COURT:  Okay.

16         MS. PROUTY:  I could change that and leave later, but

17   I don't know.

18         THE COURT:  Let me -- can you stand out of earshot for

19   just a moment.  Thanks.

20         MS. PROUTY:  Uh-huh.  That won't be hard.

21         MR. CABELL:  Touché.

22         THE COURT:  I was about to ask the question about

23   whether people have prepaid vacation plans, and I was going to,

24   if the number wasn't gigantic, I was going to excuse all of

25   them.  I'm inclined to just say I'll probably excuse you.  Let

1    me see, because if 40 people raise their hand, I may have to do

2    some picking and choosing.

3            MR. ZALKIND:  She said that she could change her

4    reservation.

5            THE COURT:  Well, I --

6            MR. ZALKIND:  A lot of the trials that I've been in,

7    the very best jurors have said that they have busy lives.  They

8    have lots of things to do; and since she volunteered that she

9    could change it -- if she said there is no way, I've got

10   nonrefundable tickets, I would take a different position, but I

11   would object to not -- to excusing her.

12           THE COURT:  Well --

13           MR. ZALKIND:  If she -- if she did say that she had

14   nonrefundable, there was no way to change it, that would be a

15   different story.

16           MS. SIEGMANN:  Your Honor, the problem is 90 percent

17   of airlines, I mean they're at 90 percent capacity.  I'm not

18   sure she can actually change her flight.

19           THE COURT:  Well, let's -- again, that's easy to say

20   and hard to do.  Let me bring her back and...

21           Ms. Prouty, I'm about to ask everyone --

22           MS. PROUTY:  Yes.

23           THE COURT:  -- this question about --

24           MS. PROUTY:  Right.

25           THE COURT:  -- vacation, and so what I'm going to do,

1    I think, is -- is get the information from you, and I'm going

2    to wait and see --

3              MS. PROUTY:  Okay.

4              THE COURT:  -- what the response is.

5              MS. PROUTY:  Okay.

6              THE COURT:  But in San Francisco, you'd be out Monday,

7    Tuesday, Wednesday of next week would be the --

8              MS. PROUTY:  I'm supposed to leave the 19th, and I

9    return on the red eye, the -- Monday the 26th.

10             THE COURT:  Okay.

11             MS. PROUTY:  And I called the court when I saw the

12   dates, and they said go ahead -- before I made the

13   reservations, they said go ahead and make the reservations.

14   They would call me after Thanksgiving.

15             THE COURT:  Okay.  Are they nonrefundable or

16   refundable, or do you know?

17             MS. PROUTY:  Well, there'd probably be a fee to change

18   them, but, you know, I think they're refundable.

19             THE COURT:  Okay.  Thank you, ma'am.

20             MS. PROUTY:  Okay.

21             MR. CABELL:  Your Honor.

22             THE COURT:  Yes.

23             MR. CABELL:  In that regard, this morning, you said to

24   the jury we might sit two or three days next week, and

25   previously you had indicated three.

1      THE COURT:  Well, what I'm going to say to them is I

2  expect to sit on the Monday before Thanksgiving.  If there are

3  people, who can make it till noon, for example, on Wednesday, I

4  would consider, without promising, breaking early to

5  accommodate some same, you know --

6      MR. CABELL:  On Wednesday?

7      THE COURT:  In other words, if that's the only reason

8  someone can't serve is they need to leave at noon on Wednesday,

9  I'd have no trouble putting them in the pool.

10      MR. McGINTY:  But not you.

11      (Laughter.)

12      MR. CABELL:  It was actually the two- or three-day

13  reference.

14      THE COURT:  Well, I was speaking shorthand for I

15  expect to sit the third day.  I'll listen to a juror issue.

16      MR. CABELL:  Okay.

17      THE COURT:  I'm sorry.  I've forgotten your name.

18      MR. CRONIN:  Steve Cronin.  No. 88.

19      THE COURT:  Eighty-eight.

20      MR. CRONIN:  Excuse my voice.

21      THE COURT:  That's okay.  Eighty-eight.

22      Yes, sir.

23      MR. CRONIN:  I have -- well, I'm waiting to find out

24  if I need back surgery number seven.  I haven't worked in the

25  last two and a half years.  I went back to work for a month.

1    They gave me a no standing, no siting more than an hour, and I

2    lasted about three weeks, and I'm back out again.

3         THE COURT:  Okay.  The longest stretch that we would

4    have would be one hour and 50 minutes, 5-0, from 9:00 to 10:50.

5    Then we take a ten-minute break, and we'd have an hour, another

6    ten-minute break, and then 50 minutes, so it would be four

7    hours with two breaks.

8         Do you think --

9         MR. CRONIN:  Okay.  Yeah.

10        THE COURT:  Do you think you could handle that?

11        MR. CRONIN:  Yeah.  Yep.

12        THE COURT:  And you're always free to raise your hand

13   and say, I need to stretch or stand up.

14        MR. CRONIN:  Okay.

15        THE COURT:  Do you think you can do that?

16        MR. CRONIN:  Yep.

17        THE COURT:  Okay.

18        MR. CRONIN:  Thank you.

19        THE COURT:  Okay.  Thanks.  Okay.

20        ...end of sidebar.)

21        THE COURT:  All right.  Ladies and gentlemen, let me

22   talk about the -- again, about the trial schedule.  As I

23   indicated, we expect this case will take about six weeks to

24   try.  In all probability, we'll be on trial until the week

25   before Christmas.

1          As I indicated, if for any reason, and God forbid, but

2     if the trial is not concluded by then, we will take a break

3     between Friday, December 21st, and Wednesday, January 2nd.

4          The normal trial day will be nine o'clock to one

5     o'clock, with two breaks of about five or ten minutes each.

6          It's at least possible that we may have one or more

7     afternoon sessions, if we need to to stay on track, although I

8     won't do that without asking the jury whether they can do it or

9     if there's a problem.  I expect to sit on the Wednesday morning

10    before Thanksgiving, but I would be willing to accommodate

11    someone, who, you know, if someone needed to leave 15 minutes

12    early, or half an hour early, or something and otherwise could

13    serve, I'd be willing to accommodate something along those

14    lines.

15         So with that schedule and expected timetable, let me

16    ask whether any of you have any prepaid vacation or travel

17    plans during any period that we expect to be on trial?

18         Okay.  And let me ask the same people how many of

19    those are not refundable; that is, you've paid for your ticket,

20    and you can't get the money back?

21         Okay.  Let me -- I'm going to see some of you at

22    sidebar, but let me talk to the lawyers first.

23         (Sidebar as follows:

24         THE COURT:  All right.  It looked to me like we had

25    about four or five people, who had nonrefundable tickets.  What

1  I'm inclined to do is excuse all of them and talk to the

2  remaining two or three and see what their situation is.

3          MR. ZALKIND:  I agree.

4          THE COURT:  Okay.

5          MR. McGINTY:  And that's irrespective of when they're

6  nonrefundable, sort of the tail end of the six weeks.

7          THE COURT:  I don't -- do you want me to examine them,

8  each one?

9          MR. McGINTY:  Actually, I don't.

10          (Laughter.)

11          MR. McGINTY:  -- on reflection.

12          ...end of sidebar.)

13          THE COURT:  All right.  I'm going to ask the people

14  who said that they have nonrefundable tickets to come up.  What

15  I'm going to do is I'm going to excuse the people with

16  nonrefundable tickets, and I want to talk to you about the

17  prepaid vacation plans.  I may excuse you as well, but I want

18  to talk to you first, so the ones who had nonrefundable

19  tickets, please come forward.

20          Yes, sir.

21          FROM THE VENIRE:  Is it only through Christmastime

22  that you're concerned about right now?

23          THE COURT:  Yes.  Okay.

24          Christmas and Thanksgiving, obviously, but if you're

25  unsure about January, come up, and we'll talk about it, but

1  right now just the nonrefundable during the expected period of

2  trial.  Okay.

3         (Sidebar as follows:

4         THE COURT:  Let me just get your name and number.

5         MR. BEARDSLEE:  My name is William Beardslee.

6         THE COURT:  Beardslee?

7         MR. BEARDSLEE:  B-E-A-R-D-S-L-E-E, and I fall towards

8  the end.

9         THE COURT:  Okay.  Where are you going?

10        MR. BEARDSLEE:  I have several things that are going

11  on, and I don't know if you want to hear about all of them, or

12  the most immediate one.

13        MR. CABELL:  Sixty-five.

14        THE COURT:  Tell me your most immediate one.

15        MR. BEARDSLEE:  The most immediate one is I'm a child

16  psychiatrist, who works with Head Start.  I've been

17  doing -- I'm at Children's Hospital in Boston.  I've been doing

18  a project with the Blackfeet nation in Browning, Montana, which

19  is right at the entrance to Glacial National Park.  My

20  colleague and I go there twice a year and work at the center.

21  We have purchased --

22        MR. ANDREWS:  Sixty-five.

23        MR. BEARDSLEE:  Sixty-five?

24        THE COURT:  You're juror No. 65.

25        Yes, sir.

1        MR. BEARDSLEE:  We are scheduled to go Sunday and

2   return next Tuesday.

3        THE COURT:  Excused.

4        MR. BEARDSLEE:  Okay.

5        THE COURT:  Okay.  Good luck.

6        Next.

7        Hi.  What's your name?

8        MR. SILVA:  Hi.  Dana Silva.

9        THE COURT:  Okay.  No. 69.

10       MR. SILVA:  Yes.

11       THE COURT:  And --

12       MR. SILVA:  Well, it's kind of a hardship business

13   thing, too, so I don't know if I should discuss it all now.

14       THE COURT:  Sure.

15       MR. SILVA:  I have a small game development company,

16   and these two months are critical to my business for 2008.  I'm

17   also booked on January 1st to go to China for three weeks,

18   which is another -- it's Hong Kong Toy Fair, so it's critical

19   to my business.

20       THE COURT:  Okay.  So I think that's --

21       MR. SILVA:  It's a nonrefundable flight.

22       THE COURT:  -- too great a risk.  I'm going to excuse

23   you then.  Okay?

24       MR. SILVA:  Okay.  Thank you.

25       THE COURT:  All right.

1          MR. CABELL:  That's 69, your Honor?

2          THE COURT:  Sixty-nine.

3          MR. CABELL:  Okay.

4          THE COURT:  Next.

5          What's your name?

6          MS. NEWTON:  Anne Newton.

7          THE COURT:  Okay.  No. 18.

8          Yes, ma'am.

9          MS. NEWTON:  And I have a flight to Ohio on the 20th

10   of December.

11          THE COURT:  Do you want to get out of going to Ohio?

12          MS. NEWTON:  No.  No.

13          THE COURT:  That's a joke.  Both my law clerks were

14   from Ohio.

15          MS. NEWTON:  Actually, no.  My mom was 89 in '92, and

16   she fractured her neck, and no, I don't want to get out of

17   doing that.

18          THE COURT:  Sorry to hear that.  I'm going to excuse

19   you.  Thank you then.  Best of luck.

20          MS. NEWTON:  Thank you.

21          THE COURT:  That's something I couldn't help.

22          Next.

23          What's your name, sir?

24          MR. MOSS:  Robert Moss, M-O-S-S.

25          MR. CABELL:  No. 40.

1          THE COURT:  No. 40.

2          Yes, sir.

3          No. 40.

4          MR. MOSS:  I do not know my number.

5          THE COURT:  Yeah, I'm telling you it's No. 40.

6          MR. MOSS:  Oh, okay.  Good.  I'm glad to know that.

7          THE COURT:  What are your plans?

8          MR. MOSS:  I have tickets to go to Memphis, Tennessee,

9    leaving on December 14th, and coming back on -- it's the Monday

10   after New Year's, which I think is around January the 6th or

11   the 5th.

12         THE COURT:  Okay.

13         MR. MOSS:  Yeah.

14         THE COURT:  Okay.

15         MR. MOSS:  I just made them a couple of days ago with

16   AirTran out of Logan.

17         THE COURT:  Okay.  And that's nonrefundable?

18         MR. MOSS:  It is nonrefundable.

19         THE COURT:  All right.  I will excuse you then, sir.

20   Have a good trip.

21         MR. MOSS:  Thank you, your Honor.  Thank you.

22         THE COURT:  Are you going to Graceland?

23         Are you going to go to Graceland?

24         MR. MOSS:  I've already been twice.  I think that's

25   enough.

1          (Laughter.)

2          THE COURT:  Next.

3          Hi.  What's your name?

4          MS. BOUVRIE:  My name is Alice Bouvrie.

5          THE COURT:  Okay.  No. 17.

6          Yes.

7          MS. BOUVRIE:  And I have tickets for a trip beginning

8   December 25th through January 11th.

9          THE COURT:  Okay.  Where are you going?

10          MS. BOUVRIE:  Thailand.  My son is getting married.

11          THE COURT:  Okay.

12          MS. BOUVRIE:  I can't change that.

13          THE COURT:  You don't have a better excuse than that?

14   No, I'll let you go.

15          Is it in Bangkok or --

16          MS. BOUVRIE:  Well, it be south in Surat Thani.

17          THE COURT:  Oh, okay.

18          MS. BOUVRIE:  The Surat Thani province.

19          THE COURT:  That's where you get the ferry to Ko

20   Samui, is that right?

21          MS. BOUVRIE:  Exactly.

22          THE COURT:  Okay.  All right.  Have a great trip.

23          MS. BOUVRIE:  Thank you.

24          THE COURT:  Next.

25          What's your name?

1          MR. RILEY:  Jayson Riley.

2          MR. ZALKIND:  What number?

3          MR. RILEY:  I don't know.

4          THE COURT:  Forty-three.

5          Yes, sir.

6          MR. RILEY:  I am a United Airlines flight attendant,

7     and I don't know if it has any relevance, but I mean I do have

8     to go back to Chicago tonight to go back to work tomorrow --

9          THE COURT:  Okay.

10          MR. RILEY:  -- so --

11          THE COURT:  Well, I -- you're -- this is your work

12     schedule; that is, are you -- you're Boston based?

13          MR. RILEY:  No, I'm Chicago based.

14          THE COURT:  Chicago based.  Okay.

15          All right.  Let me -- can you just step out of earshot

16     here for a moment.

17          What's -- what's counsel's reaction to this?

18          Again, it's a big organization.  Obviously, he can --

19          MR. CABELL:  We need mean to defer to the Court.  He's

20     a Massachusetts resident.  He simply happens to work out of

21     Chicago.

22          MR. ZALKIND:  Ordinarily, I wouldn't, Judge, but

23     because he's Chicago based, I -- I think that it's different

24     than somebody that this is where they're working out of, and,

25     you know, I would excuse him.

1          THE COURT:  Well, either way he's not -- he's not

2    going to be travelling for five or six weeks if he's impaneled.

3          MR. ZALKIND:  Right.  He won't be able to work at all,

4    no afternoons.

5          THE COURT:  Right.

6          MS. SIEGMANN:  That's no reason to excuse him though.

7          MR. CABELL:  For purposes of this, he wouldn't be able

8    to work is what we're talking about.

9          THE COURT:  Although he's not self-employed.

10         MS. SIEGMANN:  Right.

11         THE COURT:  And presumably United has other flight

12   attendants who could fill in.  All right.

13         All right.  I guess I'm inclined to leave him on for

14   now, despite my reluctance.

15         Mr. Riley.  I know this is going to be an

16   inconvenience, but I'm going to have to leave you on, because

17   you're not self-employed, so we'll wait and see.  There may be

18   another reason that you don't end up being a part of this jury.

19         MR. RILEY:  Thank you.

20         THE COURT:  Okay.

21         MS. ALEXANDER:  I'm Mary Alexander.

22         THE COURT:  Alexander?

23         MS. ALEXANDER:  Yes.

24         THE COURT:  And my family has reservations in Canada

25   for a ski vacation starting December 21st to the 30th.  We were

1    planning to drive, so that means we have to leave early in the

2    morning of the 21st.

3              Also, my husband is a college president, which

4    requires him to travel a lot; and we have a small horse farm,

5    so it would be difficult if I'm gone for a long time.

6              THE COURT:  What college is he president of?

7              MS. ALEXANDER:  LaSalle College.

8              THE COURT:  Okay.  All right.  So your plans are

9    December 21st --

10             MS. ALEXANDER:  The 21st to the 30th.

11             THE COURT:  -- to December 30th.

12             MS. ALEXANDER:  In Canada.

13             THE COURT:  Okay.  And you're driving?

14             Okay.  What I'm going to do is I'm going to leave you

15   in the jury pool for now.

16             MS. ALEXANDER:  Okay.

17             THE COURT:  If it comes to it, and you're impaneled,

18   and we get to December 21st, you may not be the only person

19   that doesn't want to sit that day.  The trial may not go that

20   long, so we'll see how it -- how it goes --

21             MS. ALEXANDER:  Okay.

22             THE COURT:  -- okay?

23             MS. ALEXANDER:  Yep.

24             THE COURT:  Thank you.

25             MS. ALEXANDER:  Thank you.

1          MR. ZALKIND:  What number was she?  What number was

2    she?

3          MR. CABELL:  Twenty-two.

4          THE COURT:  Twenty-two.

5          Next.

6          MS. CORBETT:  Hi.  Emma Corbett.

7          THE COURT:  Okay.  No. 39.

8          Yes, ma'am.

9          MS. CORBETT:  So I'm moving to Ireland in the new

10   year, and I'm leaving -- I'm finishing my job on December 14th,

11   but I'm more concerned that I won't have anywhere to live

12   December 31st, so if the trial goes --

13         THE COURT:  Are you leaving for Ireland permanently

14   or --

15         MS. CORBETT:  Yes.

16         THE COURT:  Okay.

17         MS. CORBETT:  So if the trial goes over December 31st,

18   I don't really know how I would deal with this.

19         THE COURT:  Okay.  It seems to me if you're moving to

20   Ireland on December 31st that probably you ought not to sit on

21   this jury.

22         Are you -- are you a U.S. citizen or --

23         MS. CORBETT:  I am.

24         THE COURT:  Okay.  All right.  I'm going to let you go

25   then, and -- but you'll have to report again to the jury room

1    downstairs.  Okay?

2              MS. CORBETT:  Okay.

3              THE COURT:  Thanks.

4              MS. CORBETT:  Thanks.

5              THE COURT:  Next.

6              Is it about 110 degrees in here?  I know I'm wearing a

7    robe.

8              MR. YALLA:  My name is Yalla, Y-A-L-L-A.  Yalla.

9              MR. CHAKRAVARTY:  Nineteen.

10             MS. SIEGMANN:  Nineteen.

11             THE COURT:  Nineteen.  Yes.  Okay.

12             Yes, sir.

13             MR. YALLA:  Your Honor, I made a commitment to Prowar

14   Kabra (phonetic), my urologist, working at the VA hospital.

15   Based on my commitment, two of my colleagues are taking

16   vacations --

17             THE COURT:  Okay.

18             MR. YALLA:  -- during the time, and so I don't know

19   about vacations or not, but I made a strong commitment to

20   advocate for my colleagues during their two weeks of vacations.

21             THE COURT:  Okay.  And which are the two weeks?

22             MR. YALLA:  They were going to go periodically the day

23   after -- the day after Thanksgiving and then December 1st week.

24   They also want me to cover -- provide coverage, because they're

25   short of help at the time.

1          THE COURT:  Okay.  So, you need to be there the -- the

2    day after Thanksgiving, we're not sitting.

3          MR. YALLA:  The day after Thanksgiving.

4          THE COURT:  And the first week of December.

5          MR. YALLA:  The first week of December.

6          THE COURT:  So that they'll have coverage so that

7    other people can go.

8          MR. YALLA:  Yeah.  They probably have no coverage at

9    all, yeah.

10          And also a problem, who will cover every Wednesday

11    under the schedule for the next few months.

12          THE COURT:  Okay.

13          MR. YALLA:  And the problem is they already have a

14    backlog of more than six months, I believe.

15          THE COURT:  Okay.

16          MR. YALLA:  So it's up to your consideration whether

17    they should do it his schedule and all that.

18          THE COURT:  Can I get you to stand out of earshot

19    there.

20          MR. YALLA:  Yeah.

21          THE COURT:  Thank you.

22          I guess I'm inclined to let him go.  Is there any

23    objection to that?

24          MS. LUNT:  No.

25          MR. CABELL:  No.

1      THE COURT:  Okay.  Mr. Yalla.

2      All right.  I'm going to let you go then, but you'll

3  still have to report downstairs to the jury room.  Okay.

4      MR. YALLA:  Thank you, sir.

5      THE COURT:  Thank you.

6      Next.

7      Hi.  What's your name?

8      MS. THOMSON:  Ann Thomson.

9      MS. SIEGMANN:  Fifteen.

10      THE COURT:  Fifteen.

11      Yes, ma'am.

12      MS. THOMSON:  If -- if the trial does go after

13  Christmas, I have plans to travel and won't be returning to

14  Boston until the 3rd of January.  I'm not sure if the tickets

15  are nonrefundable.

16      THE COURT:  Okay.  When were you planning to leave?

17      MS. THOMSON:  The 23rd.

18      THE COURT:  The 23rd and return January --

19      MS. THOMSON:  The 3rd.

20      THE COURT:  January 3rd.

21      Okay.  Where are you going?

22      MS. THOMSON:  Colorado.

23      THE COURT:  Okay.  Here's what I'm going to do.  I'm

24  going to leave you in the pool.  I said we would come back

25  January 2nd, but there may be -- it's possible if you wind up

1    on the jury that there might be other people in the same

2    position as you, and it wouldn't be the end of the world to

3    move a day or two.  So for now, I'm going to leave you in the

4    pool.  Okay?

5              MS. THOMSON:  Okay.

6              THE COURT:  Thanks.

7              ...end of sidebar.)

8              THE COURT:  Now, I had asked for people, who had

9    nonrefundable plans.  Is there someone else, who raised their

10   hand about travel plans that I haven't seen who needs to speak

11   to me about it?

12             Okay.  Can you come up.

13             (Sidebar as follows:

14             THE COURT:  Hi.  Can you come up.

15             What's your name?

16             MS. GRIFFIN-RYDER:  Abigail Griffin-Ryder.

17             MR. CABELL:  Sixty-seven.

18             THE COURT:  Sixty-seven.  Okay.

19             MS. GRIFFIN-RYDER:  I don't know if the tickets are

20   refundable.  In January 4th, I have a flight to Florida,

21   because the 6th, 7th, and 8th, I have a conference for work.

22             THE COURT:  Okay.  What do you do?

23             MS. GRIFFIN-RYDER:  Accountant.

24             THE COURT:  Okay.  And what kind of a conference is

25   it?

1          MS. GRIFFIN-RYDER:  It's for everyone at my level, a

2     seniors conference.

3          THE COURT:  Okay.  And is this one of these mandatory

4     in-house training-type conferences?

5          MS. GRIFFIN-RYDER:  Yeah.

6          THE COURT:  Okay.  And so your work is -- is -- would

7     be paying for the flight to Florida; is that the idea?

8          MS. GRIFFIN-RYDER:  Yes.

9          THE COURT:  Okay.  Can I get you to step out of

10    earshot just a minute, please.

11         MS. GRIFFIN-RYDER:  Sure.

12         THE COURT:  My inclination would be to leave her on.

13    What's people's reaction?

14         MR. CABELL:  I think the risk that we're still going

15    to be seated at that time is probably pretty low.

16         MR. ZALKIND:  I think she should be left on.

17         THE COURT:  Okay.

18         Okay.  Ma'am.

19         What I'm going to do is I'm going to leave you on.  I

20    think the risk that we're going to wind up --

21         MS. GRIFFIN-RYDER:  If it goes late.

22         THE COURT:  -- go that late is pretty low --

23         MS. GRIFFIN-RYDER:  Okay.

24         THE COURT:  -- and even if it does, it might only be a

25    day or two, so it might not even affect it; so, I'm going to

1  leave you on.

2          MS. GRIFFIN-RYDER:  Okay.

3          THE COURT:  Okay.  Thank you.

4          Next.

5          MS. PROUTY:  You said don't be shy.  Now I feel like a

6  pest.  Was I supposed to come back now or not?

7          THE COURT:  No.  Well, was there anything you hadn't

8  already told us about the San Francisco trip?

9          MS. PROUTY:  Well, I --

10         THE COURT:  I was impressed you were taking the red

11  eye, by the way, but go on.

12         MS. PROUTY:  I have rented an apartment for the week,

13  so that would not be refundable, but other people in my family

14  could use it.  I'm not using that as an excuse, just -- but

15  that's the plan.

16         THE COURT:  Okay.

17         MS. PROUTY:  Okay?

18         THE COURT:  Okay.

19         MS. PROUTY:  All right.

20         THE COURT:  Thank you.

21         Next.

22         MS. MEADS:  Hello.  I'm a little confused.  Is this

23  just travelling plans through Thanksgiving?

24         THE COURT:  Well, what you got?  Let me have your name

25  first.

1           MS. MEADS:  My name is Nancyann Meads.  I have --

2           THE COURT:  Let me find you for a second.  Okay.

3    Eighty-four.

4           MS. MEADS:  I have three issues actually.  I'm leaving

5    for New Jersey Friday for ten days, and my future husband is

6    celebrating his 75th birthday with his family, and we're going

7    to be there for Thanksgiving.

8           And I'm also coming all the way up from Provincetown

9    every day, which would be a hardship for me travelling six

10   weeks during that.

11          My third issue, which I didn't quite understand the

12   first page the questionnaire, but I do have a small business, a

13   restaurant, and I pay taxes, of course, and I'm hoping that I

14   wouldn't be objective to someone that is not doing the same.

15   That's -- that was my...

16          THE COURT:  Okay.  And is there some doubt in your

17   mind about whether you would be objective?

18          MS. MEADS:  Well, I just would hope that they would

19   want to pay taxes, too, you know, and that would be with --

20          THE COURT:  Well, the issue really is whether you

21   could be fair.  Just because someone's accused --

22          MS. MEADS:  Uh-huh.

23          THE COURT:  -- of something on taxes doesn't mean they

24   did it.

25          MS. MEADS:  Right.  Yeah.

1          THE COURT:  And you have to decide the case on the

2    evidence and according to the law and -- and not because of --

3          MS. MEADS:  Of course.

4          THE COURT:  -- prejudice or bias.

5          MS. MEADS:  Of course.

6          THE COURT:  And you're not permitted to say, oh, these

7    kinds of people don't pay taxes --

8          MS. MEADS:  Of course.

9          THE COURT:  -- or we need to get these tax deadbeats.

10         MS. MEADS:  Uh-huh.

11         THE COURT:  You have to decide is this --

12         MS. MEADS:  Uh-huh.  Fair.

13         THE COURT:  You know, what is the right result here in

14   this case?

15         MS. MEADS:  Okay.

16         THE COURT:  Let me -- can you -- can I ask you to step

17   out of earshot for just a moment.

18         MS. MEADS:  Sure.

19         THE COURT:  I'm actually more concerned about the

20   second issue.  This is -- obviously, I haven't impaneled in the

21   Eastern Division before, but it includes the Vineyard,

22   Nantucket, and the outer Cape, and it's an incredible hardship

23   for people to come in every day, but they're part of the jury.

24         MR. ANDREWS:  Your Honor, the only thing is if we get

25   any winter weather, somebody who's driving from Provincetown,

1   and we're not sitting that day.

2          THE COURT:  Right.  It's two hours --

3          MR. ANDREWS:  Two hours in the sunshine.  No traffic.

4          THE COURT:  -- in clear weather, in the sunshine, not

5   traffic, to say nothing of getting home on Friday, you know, so

6   I -- putting aside the other two issues, I'd be inclined to

7   strike her.

8          Is there an objection?

9          MR. CHAKRAVARTY:  No objection.

10         THE COURT:  To have mercy.  Okay.

11         All right.  Ms. Meads.

12         I'm going to have mercy on you, because you're from

13  Provincetown, and I'm going to let you go.

14         MS. MEADS:  Thank you.  Thank you.

15         THE COURT:  But you still have to report downstairs.

16  There may be another short trial that maybe would be more

17  appropriate for you to sit.

18         MS. MEADS:  Okay.  Thanks.

19         THE COURT:  Thanks.

20         MS. MEADS:  Thank you.

21         ...end of sidebar.)

22         THE COURT:  All right.  I've asked about physical and

23  mental disabilities and so on and vacation and travel plans.

24  Obviously, any person who serves on -- on the jury will be

25  inconvenienced to some extent, but do any of you have any

1    unusual hardship that I haven't already addressed that's caused

2    by the daily trial schedule or the length of the trial and you

3    wish to be heard on?

4             Okay.  Just as I expected.

5             All right.  What I'll do is I'm going to start to hear

6    people, and we're probably going to be breaking for lunch

7    before I get through all of you, but let me start talking to

8    you one at a time.

9             (Sidebar as follows:

10            THE COURT:  What are -- the peremptories are eight and

11   twelve; is that right?  So 20 and 16, so we need 36 people

12   left.

13            VOICE:  Your Honor, part of the jury has been secluded

14   while we were approaching.

15            MS. SIEGMANN:  We're calling 60 more tomorrow.

16            THE COURT:  Sixty more tomorrow?

17            MS. SIEGMANN:  Yes.

18            Okay.

19            Your name again?

20            MS. BELLOWS:  Kellie Bellows, 34.

21            THE COURT:  Thirty-four.

22            Yes.

23            MS. BELLOWS:  I have a wedding in 11 weeks, and this

24   was my crunch time.  I just graduated college in May, and this

25   was my crunch time to just -- like I said, I have a wedding in,

1  like, 11, 12 weeks, and I just --

2         THE COURT:  You're getting married?

3         MS. BELLOWS:  Yeah.

4         THE COURT:  Okay.

5         MS. BELLOWS:  And I work for a dance studio.  She's

6  obviously the owner, and she's paying a sub instead of me, so

7  this was like huge.

8         THE COURT:  Okay.

9         MS. BELLOWS:  My parents obviously can help me out,

10  but it would be great if I can make my own money.

11         THE COURT:  Okay.  Well, I hope your

12  wedding's -- well, it's in 11 weeks, and I hope it's on a

13  Saturday or a Sunday, is it?

14         MS. BELLOWS:  Yes, it's on a  -- yes, it's on a --

15  yeah.

16         THE COURT:  Okay.  All right.

17         MS. BELLOWS:  Which that won't affect it, but...

18         THE COURT:  I don't take any pleasure in doing this at

19  all, but I'm going to have to keep you on.

20         MS. BELLOWS:  That's all right.

21         THE COURT:  Basically, it will be 9:00 to 1:00.

22  You'll have after 1:00 every day.  If you can make your fiance

23  do more of the work.  No?

24         MS. BELLOWS:  He's graduating in December.

25         THE COURT:  Not a chance.

1     MS. BELLOWS:  Actually graduating in January.

2     THE COURT:  But I think -- I know it's going to be

3  hard, but I'm going to have to leave you on.

4     MS. BELLOWS:  Okay.  Thank you.

5     THE COURT:  Okay.  Next.

6     Hi.  Your name?

7     MR. KUIST:  Timothy Kuist, K-U-I-S-T.

8     MR. ZALKIND:  What number?

9     MR. CABELL:  What number?

10     THE COURT:  Twenty-four.

11     Yes, sir.

12     MR. KUIST:  I -- my family -- recently, I'm a

13  self-employed carpenter and have -- after being employed for a

14  long period of time over the last few months been spottily

15  employed; and I think after six weeks, I'd be in a pretty

16  difficult position with respect to my house.

17     THE COURT:  Okay.  All right.  Because you're

18  self-employed, I'm going to let you go then for a trial this

19  length, but you will have to report down to the jury room

20  again.  Okay?

21     MR. KUIST:  Okay.  Thank you.

22     MR. ZALKIND:  Your Honor.

23     THE COURT:  Yes, I'm sorry.

24     MR. ZALKIND:  I would challenge that for cause.

25     THE COURT:  Ah, hold on, Mr. Kuist.

1    MR. ZALKIND:  I would challenge that.  I think that a

2    lot of these people are going to have to have really good

3    excuses, and I --

4    THE COURT:  I don't think -- I don't think being

5    self-employed is an excuse.  I mean, he can't work as long as

6    he's on the jury.  There's no employer to take care of him.

7    MR. ZALKIND:  No.  I understand that, but the only way

8    we're going to get a jury as to a cross-section is to have

9    people like him.  That's --

10    THE COURT:  Well.

11    MR. ZALKIND:  -- you know, that's my position.

12    THE COURT:  Unless someone can point me to some law

13    that says otherwise, it seems to me that being self-employed is

14    a considerable hardship for serving on a six-week jury.  On a

15    two- or three-day jury, I might feel otherwise, but he's going

16    to be effectively out of work for that period, and --

17    MR. ZALKIND:  We only go 9:00 to 1:00, your Honor.

18    THE COURT:  Well, you know -- anyway, I'm going to

19    stand by my ruling.

20    Thank you, Mr. Kuist.

21    Next.

22    MS. SACKS:  Hello.

23    THE COURT:  Hi.  What's your name?

24    MS. SACKS:  Paula Sacks.

25    THE COURT:  Okay.  No. 57.

1          Yes, ma'am.

2          MS. SACKS:  Three reasons.  Mondays, I do an

3    externship where I'm getting qualificat -- where I'm getting

4    towards a certificate towards hypnotherapy that I'm interested

5    in.

6          Second, I work at a clinic where I have a full

7    caseload, and for me to leave my clients between Thanksgiving

8    and Christmas is really not a good time for their psychological

9    well-being.

10         Number three, I want to be disqualified, because I am

11   Jewish.  I live in an Orthodox Jewish community.  My children

12   go to a Jewish day school, and I cannot morally and ethically

13   give any verdict on this matter.

14         THE COURT:  Okay.  Did you fill out a questionnaire?

15         MS. SACKS:  I did.

16         THE COURT:  Yes.

17         MS. SACKS:  I don't think I went into explanation.

18         THE COURT:  Okay.

19         MS. SACKS:  I thought that was enough.

20         THE COURT:  Okay.  Well, just being Jewish alone

21   obviously doesn't disqualify you, but the -- the issue is your

22   ability to be fair and impartial.

23         MS. SACKS:  I will not be fair.  I can tell you right

24   now.  My verdict will be the same today.

25         THE COURT:  I'm not going to argue with you.

1        MS. SACKS:  Okay.

2        THE COURT:  I'll let you go, and please report down to

3  the jury room.

4        MS. SACKS:  I will, and I will be happy to serve any

5  other -- on any other jury.

6        THE COURT:  Okay.

7        MS. SACKS:  Thank you.

8        THE COURT:  Next.

9        What's your name?

10        MR. SAYWARD:  Kevin Sayward.  I think I was four.

11        THE COURT:  No. 4.  Oh, yes.  There you are.

12        Yes, sir.

13        MR. SAYWARD:  Well, I have two jobs.  One of which I'm

14  a sole proprietor, and I do 100 percent of my business in the

15  morning.  I essentially work mother's hours as a contractor;

16  and my second business is a small soccer school, and I have

17  preschool classes a couple of days a week in the mornings for

18  an hour, which would -- you know, a trial of this length would

19  probably require me to return the money and cancel all those

20  classes.

21        THE COURT:  Okay.  So the soccer school meets when?

22        MR. SAYWARD:  10:30 in the morning, Tuesdays and

23  Thursdays currently, with a potential Wednesday class starting

24  up and --

25        THE COURT:  And is it going on now?

1          MR. SAYWARD:  It starts next week.

2          THE COURT:  Okay.  And -- and the other is a

3     contractor meaning?

4          MR. SAYWARD:  I work for a contractor.  I'm a

5     carpenter, and I do almost 100 percent of my business with this

6     single, you know, contractor.  He's a small -- he's my

7     neighbor, and it's kind of small potatoes, but everyone wants

8     everything done by the holidays, as you probably all know.

9          THE COURT:  Okay.  All right.  I'm going to let you go

10    then, Mr. Sayward, but please report down to the jury room.

11         MR. SAYWARD:  I will.  Thank you.

12         THE COURT:  Next.

13         MR. SAYWARD:  Hi.

14         THE COURT:  Your name?

15         MS. THOMPSON:  Julie Thompson.

16         THE COURT:  Forty-nine.  Oh, yes, here you are.

17         MR. CABELL:  Forty-nine.

18         THE COURT:  Yes.

19         MS. THOMPSON:  A work hardship.  I work for a small

20    travel agent.  I'm the bookkeeper, and I have to do the

21    payroll, and there's an airline report that has to be submitted

22    weekly, at a certain time; and, you know, checks and whatever

23    else has to be done and end-of-the-year stuff.

24         THE COURT:  Okay.  And where do you work out of?

25         MS. THOMPSON:  Marblehead.

1          THE COURT:  Marblehead.

2          Okay.  And if we broke at 1:00, you could be in

3     Marblehead at probably 2:00 or 2:30?

4          MS. THOMPSON:  Yes.

5          THE COURT:  And is there something that -- I know it's

6     not ideal, but is it something that you could muddle your way

7     through in the afternoons and --

8          MS. THOMPSON:  I think so.

9          THE COURT:  Okay.

10         MS. THOMPSON:  If we do break at 1:00.

11         THE COURT:  Okay.  While I have you here, I see your

12    spouse is a correctional officer.

13         MS. THOMPSON:  Uh-huh.

14         THE COURT:  Okay.  Where does he work?

15         MS. THOMPSON:  Actually, there's a case pending this

16    week up here.  He works at the Essex County Sheriff's -- well,

17    he got fired.  Sorry.  He got fired.  He worked -- he used to

18    work at the Essex County Sheriff's Department.  There's a case

19    pending for a website involvement.

20         THE COURT:  Okay.  He was fired for having involvement

21    in a website; is that the idea?

22         MS. THOMPSON:  Yes.

23         THE COURT:  Okay.  And a lawsuit has been filed.  Is

24    he one of the plaintiffs?

25         MS. THOMPSON:  Yes, he is.

1    THE COURT:  Okay.  And while I have you here, is there

2    anything about his experience as a correctional officer that

3    would affect your service as a juror here today?

4    MS. THOMPSON:  I don't believe so.

5    THE COURT:  Are you pretty confident about that?

6    MS. THOMPSON:  Yes.

7    THE COURT:  Okay.  All right.  What I'm going to do is

8    I -- I know it's going to be a hardship, and I don't take any

9    pleasure doing this, but I think as to the work thing, I'm

10   going to have to leave you on --

11   MS. THOMPSON:  Okay.

12   THE COURT:  -- leave you on the panel.

13   Okay.  Thank you very much.

14   MS. THOMPSON:  Excuse me.

15   THE COURT:  Thank you.

16   MS. LUNT:  She was one of the people that --

17   MR. ANDREWS:  What was the nature of her husband's

18   discharge?

19   THE COURT:  I think she said website.

20   MR. ANDREWS:  Website.

21   THE COURT:  We can explore it later if she's still

22   there when we get to these kinds of questions, but she said

23   that he was fired for having involvement with a website.

24   MR. ANDREWS:  Okay.

25   MS. LUNT:  She was one of the people you were going to

1  question further, I think, 41?

2      THE COURT:  Forty-nine.

3      MR. CABELL:  It was 49.

4      MS. LUNT:  She was 49.  I'm sorry.

5      THE COURT:  Okay.  Next.

6      MR. ANDREWS:  Thank you.

7      MS. DUENAS:  Good afternoon, your Honor.

8      THE COURT:  What's your name?

9      MS. DUENAS:  Duenas, D-, as in David, -U-E-N, as in

10 Nancy, -A-S, as in Sam, Susan.

11      MR. CABELL:  Ninety-one.

12      THE COURT:  Ninety-one.

13      MS. DUENAS:  I'm at the very end.

14      THE COURT:  Ninety-one.

15      MS. SIEGMANN:  Ninety-one.

16      THE COURT:  Okay.

17      MS. DUENAS:  I'm a family nurse practitioner in

18 private practice on the Cape.

19      THE COURT:  Okay.

20      MS. DUENAS:  And I had to move patients to be here

21 today, so it would be a hardship to do a lengthy trial like

22 this.  I'd have to reschedule patients.  It would be difficult

23 on the physician and the nurse practitioner that I work with in

24 the office, plus it would be -- I'm self-employed, so

25 financially it would be a hardship, too.

1          THE COURT:  Okay.  You're -- are you part of a medical

2     group?

3          MS. DUENAS:  I am.

4          THE COURT:  Okay.  How many people are in your office?

5          MS. DUENAS:  There are three of us that see patients

6     in the office, and then one part-time physician that works

7     12 hours.

8          THE COURT:  Okay.

9          MS. DUENAS:  So it would be essentially reducing the

10    force by one-third.

11         THE COURT:  Okay.  And how many of them -- of them are

12    nurse practitioners?

13         Are you all nurse practitioners?

14         MS. DUENAS:  No, one physician, one internist, and two

15    nurse practitioners.

16         THE COURT:  Two nurse practitioners?

17         MS. DUENAS:  Myself.

18         THE COURT:  Okay.

19         MS. DUENAS:  But we all carry -- I'm a primary care

20    provider, so --

21         THE COURT:  Okay.

22         MS. DUENAS:  -- I see patients that the physician

23    doesn't see.

24         THE COURT:  And where's your office located?

25         MS. DUENAS:  Yarmouthport, Massachusetts --

1          THE COURT:  Okay.

2          MS. DUENAS:  -- obviously.

3          THE COURT:  Okay.  Any follow-up questions?

4          Okay.  Can I get you to step out of earshot.

5          MS. DUENAS:  Sure.

6          THE COURT:  All right.  Counsel.

7          MR. ZALKIND:  I take the same position as I did with

8    the man.  I mean, I think it's an inconvenience to be on a

9    jury.  They have got to switch things around, but those are the

10   best jurors, if we eliminate all these people that are really

11   busy.

12         THE COURT:  Well, it's not -- it's more than being

13   busy.  It's -- she's not quite self-employed, but she's also in

14   Yarmouthport, which I have frankly more of a concern with for

15   the same reason of the woman from Provincetown.

16         MR. CABELL:  We're always sensitive to somebody that's

17   self-employed, but I note she is married.  Her husband appears

18   to be employed.  I don't know what he does, and I don't know

19   whether the financial impact would be significant; but

20   Yarmouthport, that's probably a good hour and a half each way

21   every day, an hour and 40 minutes.

22         MR. ZALKIND:  I think you have a jury trial.  This is

23   the Eastern District, and --

24         MR. McGINTY:  The notes on the questionnaire indicate

25   that her husband is an director of the public access

1    television, so there may be the means to get over this

2    financial part of it.

3         THE COURT:  Like I said, I'm more concerned about the

4    juror from the Cape coming in a long distance.

5         MR. McGINTY:  The difficulty is that it is part of the

6    district, and, you know, whether the district lines ought to be

7    the way they are, they are that way.

8         THE COURT:  Well, they --

9         MR. McGINTY:  Part of the pool is -- is the Cape.

10        THE COURT:  Well, the -- the -- every citizen of the

11   United States has to be assigned to a district, and, you

12   know -- period.  They have the right to -- to -- to serve on a

13   jury.  We can't exclude them on that basis, if they want to

14   serve, but she didn't express hardship about the travel

15   distance, but again that doesn't do us any good to stand up for

16   some abstract point and then simply lose the juror the first

17   time it rains, which is my concern.  Well --

18        MR. ZALKIND:  I would object, your Honor, to this.

19        THE COURT:  All right.  Ms. Duenas.

20        Okay.  What I'm going to do for now, and I don't take

21   any pleasure doing it is I'm going to leave you in the pool.

22        MS. DUENAS:  Okay.

23        THE COURT:  Of course, you may not wind up --

24        MS. DUENAS:  Uh-huh.

25        THE COURT:  -- being called, but we have an awful lot

1    of hardships here, as you can see --

2            MS. DUENAS:  Uh-huh.

3            THE COURT:  -- and it's hard for me to sort things out

4    sometimes.

5            MS. DUENAS:  Sure.  I understand.

6            THE COURT:  So for now you're still in the pool.

7    Okay?  Thank you.

8            MS. DUENAS:  Thank you for listening.

9            THE COURT:  Next.

10           Hi.  What's your name?

11           MS. DALY:  Ah, ruth Daly.

12           THE COURT:  Okay.  No. 97.

13           Yes, ma'am.

14           MS. DALY:  Well, the problem is I've been unemployed

15   since June, and I just got employed and was supposed to start

16   today but for this, and so they said -- anyhow, I need the

17   money.

18           THE COURT:  Okay.  And where are you working?

19           MS. DALY:  Harbor Medical in Norwell.

20           THE COURT:  Harvard Medical in Norwell?

21           MS. DALY:  Harbor.

22           THE COURT:  Harbor.

23           MS. DALY:  Uh-huh.

24           THE COURT:  Okay.  And what will you be doing there?

25           MS. DALY:  Medical billing clerk.

1      THE COURT:  Okay.  Okay.  My understanding is they're

2  not allowed to let you go, because you've been called for jury

3  duty.

4      MS. DALY:  No, it's not a matter of them letting me

5  go.  It's a matter of my not having money.

6      THE COURT:  You're not getting any money.  Okay.

7      MS. DALY:  Not even to get up here.

8      THE COURT:  Okay.

9      MS. DALY:  They haven't let me go.  They've just hired

10  me.

11      THE COURT:  Okay.

12      MS. DALY:  So, which today should have been the

13  starting date, but...

14      THE COURT:  Okay.  All right.  Can you step out of

15  earshot.

16      MS. DALY:  Sure.  Uh-huh.

17      THE COURT:  All right.  Counsel.

18      MR. McGINTY:  Your Honor, with no money --

19      THE COURT:  I'm inclined to let her go.

20      MS. SIEGMANN:  Yes.

21      THE COURT:  All right.

22      MR. DUNCAN:  She seems pretty desperate.

23      THE COURT:  Ms. Daly.

24      I'm going to let you go.  Okay.  But you still have to

25  check in with the jury room downstairs.  Okay?

1          MS. DALY:  Okay.  Thank you.

2          THE COURT:  Okay.  All right.

3          All right.  I'm inclined now to break for lunch.  I

4   don't know that I have any real alternative and come back at

5   2:00, unless someone has a brighter suggestion here.

6          In Worcester, we have all our juries impaneled

7   by -- at eleven o'clock; so, this is new to me, but I think I'm

8   just going to tell them that to break, to do it -- Marty, do

9   they need --

10          (The Court conferred with the clerk.)

11          ...end of sidebar.)

12          THE COURT:  All right.  Ladies and gentlemen, what

13   we're going to do now is, so as not to torment you any further

14   than necessary, we're going to break for lunch.  I want

15   everyone back here at two o'clock.

16          Just a couple of cautions are in order.  You haven't

17   been sworn in as jurors, none of you, obviously.  You're just

18   still citizens, who have shown up in response to a jury

19   summons, but as you're mingling about and going down to the

20   cafeteria, whatever, I'm going to ask all of you not to talk

21   about the case or the impanelment process or whatever.  Okay?

22          You can sit with one another.  You can talk about the

23   Patriots or the Celtics or the Red Sox or the weather, but

24   please don't talk about the case or -- in any way, shape, or

25   form.

1          And I'll see you promptly at two o'clock.  We can't

2     get started until everyone's back, so two o'clock.

3          I wanted to get it in quickly before they left.

4          (Recess from 1:07 p.m. until 2:02 p.m.)

5          THE CLERK:  All rise.

6          THE COURT:  Counsel, you wanted to see me?

7          THE CLERK:  Court is now open.

8          You may be seated.

9          MR. ANDREWS:  Yes, your Honor.

10         (Sidebar as follows:

11         MR. ANDREWS:  Yes.  I think it's my obligation to

12    report the following to the court:  A juror came up to

13    Mr. Mubayyid when he was standing outside the lunchroom and

14    commented on the fact that it had been raining earlier and now

15    it was sunny.  Mr. Mubayyid replied that yes, that's what the

16    weather forecast said it was going to do.  The juror said

17    something about you don't know what kind of coat to bring to

18    court, and that's the extent of the conversation with this

19    juror contact.

20         MR. DUNCAN:  They talked about the weather.

21         MR. ANDREWS:  I thought to bring it up.

22         THE COURT:  Okay.  I haven't instructed them yet,

23    obviously.

24         MR. ANDREWS:  I know.  I was going to try to suggest

25    that about how we're not supposed to say hello, and they can't

1   talk to them.

2          THE COURT:  That's just the standard instructions, but

3   usually they would have gotten that by now.

4          MR. ANDREWS:  Right, I know.  So I just thought it was

5   my obligation to inform the Court.

6          THE COURT:  Well, my inclination is to let this pass

7   and maybe give a better instruction if we don't get completed

8   before we have to take another substantial break.

9          Does anyone have a different reaction?

10         MS. SIEGMANN:  No, your Honor.

11         MR. CABELL:  No.

12         MR. ANDREWS:  Your Honor, there's a second matter

13  since I'm here.  There's a series of questions about -- I don't

14  know if the Court is going to get to it.  You asked if people

15  were related to FBI agents, INS, Homeland Security, but there's

16  usually more general questions about law enforcement --

17         THE COURT:  Yes.

18         MR. ANDREWS:  -- police officers.

19         THE COURT:  That's on the list.

20         MR. ANDREWS:  All right.  And as far as believing law

21  enforcement testimony over regular witness testimony, you've

22  asked it on an ad hoc basis.

23         THE COURT:  That's on my list as well.

24         MR. ANDREWS:  Thank you.

25         THE COURT:  I'm trying to do the questions up front

1    that screen out the greatest number of people to make this as

2    efficient as possible.  That's why I'm going out of order.

3            MR. ANDREWS:  Thank you, your Honor.

4            THE COURT:  Okay.

5            MS. SIEGMANN:  Did you want us to stay here, your

6    Honor?

7            THE COURT:  Yeah, actually.

8            Counsel, let's --

9            MR. CABELL:  Charlie.

10           THE COURT:  Let's reassemble that line we had before

11   the break.  Remember who's standing in line.  I can't promise

12   you'll be in the same order.

13           Okay.  And let me ask everyone please just try to

14   remain quiet, if you can.  Okay.

15           Please, we need -- we need silence.

16           Thank you.

17           MR. JANNETTI:  Good afternoon.  My name's John

18   Jannetti, J-A-N-N-E-T-T-I.

19           THE COURT:  The last page.  Okay.  Yes, sir.

20           MR. ZALKIND:  What number?

21           THE COURT:  Ninety-eight.

22           MR. JANNETTI:  I -- I teach high school chemistry in

23   Arlington.  I teach two -- two classes of advanced placement.

24   I have 181 calendar days from the AP exam today, and my kids

25   will have a stroke if I'm not there.  And I'm also taking a

1  class evenings in education, so I'm -- I'm spread a little bit

2  thin.  I understand though.  If you need me, I'm here.

3         THE COURT:  Okay.  When do the classes, the AP classes

4  meet?

5         MR. JANNETTI:  They -- they meet every day.

6         THE COURT:  Okay.  But in the afternoon as well as the

7  morning, because you'll have afternoons.  I imagine you

8  could --

9         MR. JANNETTI:  The end of school is 2:30.

10         THE COURT:  2:30.  All right.  So you won't make it

11  back.

12         Okay.  I -- I hate to do this, but I'm going to have

13  to leave you on the panel, unfortunately.  You may wind up not

14  being selected for a number of reasons, but I think --

15         MR. JANNETTI:  Okay.

16         THE COURT:  -- I really don't have any choice.

17         MR. JANNETTI:  Thank you, your Honor.

18         THE COURT:  Okay.  Thank you.

19         Okay.  Next.

20         MS. MURPHY:  This is a little overwhelming.

21         MR. ZALKIND:  Sorry.

22         MS. MURPHY:  Hi.  My name's Mary Murphy.  I'm --

23         THE COURT:  Okay.  Mary Murphy?

24         MS. MURPHY:  Yep.

25         THE COURT:  Let me find you.

1        MS. MURPHY:  There's four Murphies called, but I am

2   Mary G. Murphy.

3        THE COURT:  Mary G. Murphy.

4        MR. CABELL:  Thirty-eight.

5        THE COURT:  I went right past you.  There you are.

6   Thirty-eight.

7        MS. MURPHY:  Okay.  I want to be honorable, but I

8   think if I -- if I do serve, it's going to pose a hardship,

9   because I'm coordinator of school transportation for the

10  Brookline Public Schools; and operationally, even though we're

11  in at 8:00 and out at 2:00, I'm a department of one, and I

12  could maybe find a designee, but I do think it would pose a

13  hardship on the administration.

14       THE COURT:  Okay.  Okay.  What I'm going to do, what I

15  feel like I'm forced to do is -- and I take no pleasure doing

16  it -- is to leave you on the panel, unfortunately.

17       MS. MURPHY:  No, I understand.

18       THE COURT:  Okay.  Thank you.

19       MS. MURPHY:  I'm cool.

20       THE COURT:  Yeah.  Okay.

21       MS. MURPHY:  No, I'm cool.  I'm really cool.  All

22  right.  Thank you.

23       THE COURT:  Thank you, ma'am.

24       Okay.  Next.

25       MS. SHOSTAK:  Hello.

1        THE COURT:  Hi.  What's your name?

2        MS. SHOSTAK:  Shostak, S-H-O-S-T-A-K.

3        THE COURT:  Okay.  No. 79.  Okay.

4        MS. SHOSTAK:  I can't afford it.  I can't afford it.

5   I won't be paid for this.  This will ruin any chances for

6   overtime I'll have for about a month and a half.

7        THE COURT:  What do you do?

8        MS. SHOSTAK:  I work with adults with developmental

9   disabilities.  I'm also in school in the evenings.  I'm going

10  to be missing a meeting this evening with my professor; and if

11  I'm here tomorrow, I'm probably missing a class, so it will

12  make for a very difficult commute, and it will -- it will just

13  be really tough.  Basically, it's around finals, and like I

14  said, I'll lose my overtime.  I'll lose everything for six

15  weeks.  A week, no problem, but --

16       THE COURT:  Are your -- your classes are in the

17  evening?

18       MS. SHOSTAK:  My classes are in the evening.

19       THE COURT:  Your exams are in the evening as well?

20       MS. SHOSTAK:  Sorry.

21       THE COURT:  Are your exams in the evening as well?

22       MS. SHOSTAK:  Yeah.

23       THE COURT:  Okay.  And do you work for an

24  organization?

25       MS. SHOSTAK:  Yes.  Master of Industries (phonetic),

1    in Salem, Massachusetts.

2         THE COURT:  Okay.  And how big is the organization?

3         MS. SHOSTAK:  We serve, I think, about 200 people

4    total.  In my building, we serve about 80 people.

5         THE COURT:  Okay.  And you could probably be back in

6    Salem about two o'clock or 2:30 in the afternoon.

7         MS. SHOSTAK:  Yeah.  My program is over.  All the

8    clients are gone by then.

9         THE COURT:  Okay.

10        MS. SHOSTAK:  So, I mean I'm at work about 7:30 to

11   4:00, but the guys are gone about 3:00.

12        THE COURT:  Okay.

13        MS. SHOSTAK:  And I wouldn't be able to get any

14   overtime if I was not working during the day.

15        THE COURT:  Okay.  All right.  Can you stand out of

16   earshot for just a moment.

17        MS. SHOSTAK:  Sure.

18        THE COURT:  What do counsel think?  And one

19   possibility is taking someone like this and dropping them to

20   the end of the list to make it more likely that they won't be

21   called, but not discharging them, which is an option other than

22   either keeping her or striking her.

23        What is counsel's reaction?

24        MR. ZALKIND:  My position is, whether it -- there may

25   be even some jurors that I would even strike later on from

1  preempts, but I have to be pretty consistent.  I think that the

2  juror should serve; and, yes, there are certain hardships that

3  they cannot manage, but I think, first of all, with a

4  200-person company, my experience is that those companies pay

5  them.  They do get some money here, and they are -- and they

6  can go to work by one o'clock.  Yes, it's a big inconvenience

7  for everybody.

8           THE COURT:  All right.  Anyone else?

9           MR. CABELL:  I think putting her at the end of the

10  list is a nice strike.

11           MR. ANDREWS:  I felt that her objections were sincere.

12           MS. SIEGMANN:  Yeah.

13           MR. ANDREWS:  And we've given a couple unemployed

14  people a break.  I would at least drop her to the end of the

15  list.

16           THE COURT:  All right.  That's what I'm going to do

17  then.  It may not have a practical effect, because we may have

18  to reach those people, but I'm going to -- I'm not going to

19  strike her, but I'm going to drop her from 79 to the end of the

20  list to make it less likely she'll be called, and we'll take it

21  from there.

22           Ms. Shostak.

23           What I'm going to do is this:  I'm going to drop you

24  down on the list to make it less likely you're going to be

25  called, but I can't promise that you won't be called.  That's

1   the best I can do.

2             MS. SHOSTAK:  Okay.  Thank you.

3             THE COURT:  I'm terribly sorry.  Okay?

4             MS. SHOSTAK:  Thank you.

5             THE COURT:  Next.

6             Hi.  What's your name?

7             MS. LOPES:  Christine Lopes.

8             THE COURT:  Okay.  Seventy-six.

9             MR. CABELL:  Seventy-six.

10            THE COURT:  Okay.

11            MS. LOPES:  I'm self-employed, and I have a six-month

12  old, so with the babysitting --

13            THE COURT:  Okay.

14            MS. LOPES:  -- and stuff like that.

15            THE COURT:  You're a massage therapist?

16            MS. LOPES:  Yes.

17            THE COURT:  Okay.  And who's taking care of the

18  six month?

19            MS. LOPES:  Right now, my mother is.

20            THE COURT:  Okay.  And is that your usual day care?

21  You have your mother take care?

22            MS. LOPES:  Usually my mother, yeah.

23            THE COURT:  Okay.  And do you work out of your home?

24            MS. LOPES:  No.

25            THE COURT:  Okay.  All right.  And I just want to make

1  sure when you say self-employed, you literally work for

2  yourself; that is, you freelance?

3        MS. LOPES:  Basically, I work -- I rent out a space at

4  a massage place.

5        THE COURT:  Okay.

6        MS. LOPES:  And I just work certain days that I want

7  to work.

8        THE COURT:  Okay.  All right.  And -- and you're in

9  Fall River, right?

10        MS. LOPES:  Uh-huh.

11        THE COURT:  All right.  So it would be hard for you to

12  get back there?

13        MS. LOPES:  Yeah.

14        THE COURT:  All right then.  Since you're

15  self-employed, I'm going to let you go.

16        MS. LOPES:  Okay.

17        THE COURT:  But you're going to have to report down to

18  the jury room, and you may get picked for a shorter trial.

19  Okay?

20        MS. LOPES:  Okay.  Thank you.

21        THE COURT:  Thank you, ma'am.

22        Okay.  Next.

23        MR. ANGELO:  Hi, your Honor.  My name is Stephen

24  Angelo.

25        MR. DUNCAN:  Forty-four.

1       THE COURT:  Forty-four.  Yes, sir.

2       MR. ANGELO:  My --

3       MS. LUNT:  Thirty-four?

4       THE COURT:  Forty-four.

5       MR. DUNCAN:  Forty-four.

6       MR. ANGELO:  I'm a self-employed, sole proprietor,

7  sole provider for an optometric practice that generates

8  99 percent of my family income.

9       THE COURT:  Okay.

10      MR. ANGELO:  I have a family of five.  Two of which

11 are in -- I'm paying college tuition, and one that's in a

12 private high school I'm also paying tuition at.  Six weeks, I

13 think, would be too much of a financial burden for me to incur

14 to be able to make ends meet.

15      THE COURT:  Okay.  All right.  And --

16      MR. ANGELO:  If it was six days, it would be one

17 thing, but six weeks is a big proportion, 15 percent of my

18 annual gross.

19      THE COURT:  Okay.  And you're in Methuen; is that

20 right?  Is that where's your practice?

21      MR. ANGELO:  Yes.

22      THE COURT:  Is it in Methuen?

23      MR. ANGELO:  Yes.

24      THE COURT:  All right.  I'm going to let you go then,

25 because you're self-employed, but you will have to report

1  downstairs.

2          MR. ANGELO:  Thank you, your Honor.

3          THE COURT:  Thank you.

4          MR. ZALKIND:  Your Honor, I would make a -- I would

5  object to the exclusion of this man.  He's an optometrist.

6  They make a very good living, and they can do a lot of their

7  work after one o'clock in the afternoon.

8          THE COURT:  Well, he's going to have to get back to

9  Methuen, which he'd be lucky to get back by 2:30 or 3:00; and

10  he's self-employed, and I think it's just too much to expect

11  for people to -- for a six-week trial to have a self-employed

12  person on the jury.

13          Thank you.  Sir.

14          What's your name?

15          MR. TURNER:  My name is Richard Turner.  I think I'm

16  63.

17          THE COURT:  Sixty-three.  Yes, you are, sir.

18          MR. TURNER:  I'm a clinical therapist and also a

19  licensed addiction specialist, and I have a number of people

20  that I care for on a weekly and daily basis; and for me to go

21  six weeks without seeing these men -- they're young men 20 to

22  24 years old -- I believe would have an adverse affect on them.

23          They -- these guys are dealing with abandonment and

24  rejection issues, and I don't think it would be fair for me to

25  literally walk out on them for six weeks.

1        THE COURT:  Would you be able to see them in the

2   afternoons?  In other words, you'll be out of here every day at

3   1:00, and I would guess --

4        MR. TURNER:  This is in a structured residential area.

5   I can't always have the ability to do that.  That's the

6   problem.

7        THE COURT:  Um...

8        THE WITNESS:  They see me in my office at the

9   residential.

10        THE COURT:  Okay.  Any follow-up questions?

11        MS. SIEGMANN:  No.

12        THE COURT:  Okay.  Can I get you to step away for a

13   second?

14        MR. TURNER:  Sure.

15        THE COURT:  Thanks.

16        All right.  Counsel, what do we do with him?

17        MR. ZALKIND:  He said he can't always change these

18   things.  It's a hardship.  There's no question.  We're not

19   going to get a cross-section of jurors, if we don't get some of

20   these people with these kinds of jobs, and I would say he has

21   to be on.

22        MS. SIEGMANN:  It sounds like he has -- I mean his

23   patients will suffer irreparable harm if they can't see him.

24   They're in a residential program and at 20, 24 he said they're

25   handling rejection.  They have rejection issues.

1        MR. CABELL:  Yeah, but that's the perfect line.  If we

2   accept that as true, I'd think striking him is an act of

3   compassion here.

4        THE COURT:  I think what I'm inclined to do with him

5   is to drop him down the list as well, rather than reject him

6   and see where that comes out.

7        Mr. McGinty.

8        MR. McGINTY:  If he, in fact, then he gets excluded

9   from the jury, in order to have a representative jury of people

10  of this sort are critical to the jury.  Frankly, the

11  government's objections seems supporting the theory of an

12  expression of compassion seems to be more driven by a

13  preference to not waste a peremptory on him, which

14  they claim --

15       THE COURT:  The good -- save me the rhetoric, okay.

16  Let's talk about this particular juror's issues.

17       MR. ZALKIND:  We would object to going down the list,

18  your Honor.

19       MR. McGINTY:  Your Honor, there are issues.  Some

20  people can't adjust their schedule.  He has a residential

21  program.  They can rearrange the therapy program to address at

22  least some of the problems created by this.  Excluding someone

23  like this prefaces him for exclusion of a lot of people that

24  are critical to a fair jury here.

25       THE COURT:  Well, actually let me think about this for

1    a second.  If he is -- if it is residential then presumably he

2    has access to these people more than normal hours.  I'm going

3    to ask that question.

4         MR. TURNER:  Yes, sir.

5         THE COURT:  Your work is primarily in the residential

6    setting, correct?

7         MR. TURNER:  It's a residential setting.

8         THE COURT:  So there is at least some greater degree

9    of control over these people than might otherwise be present;

10   in other words, if you saw one of them at four o'clock, you

11   might not be happy; they might not be happy, but it's possible

12   as opposed to --

13        MR. TURNER:  Well, it's possible, as I said.

14        THE COURT:  They don't have work schedules to work

15   around, for example?

16        MR. TURNER:  Well, they do have work schedules.

17        THE COURT:  They do.

18        MR. TURNER:  That's the problem, you know.  I see them

19   at certain times in the morn -- generally, I see them in the

20   morning.

21        THE COURT:  Okay.

22        MR. TURNER:  What they have in the afternoon, I

23   schedule them as part of the programs, part of the structure

24   for these men, and, you know, it's very difficult to work

25   around that --

1          THE COURT:  Okay.

2          MR. TURNER:  -- you know, if it's already set in.

3          THE COURT:  Okay.  All right.  Here's what I'm going

4     to do.  I'm going to -- and I take no pleasure in doing this.

5     I'm going to leave you on the list for now.  It doesn't mean

6     you're going to get called.  I think I'm forced to leave you on

7     the list for the time being.  Okay?

8          MR. TURNER:  Okay.  All right.  Thank you.

9          THE COURT:  Next.

10          MS. BRATHWAITE:  Hello.

11          THE COURT:  Hi.  What's your name?

12          MS. BRATHWAITE:  Margo Brathwaite.

13          THE COURT:  Okay.  No. 90.

14     Yes, ma'am.

15          MS. BRATHWAITE:  I am self-employed, and I have a

16     workshop that I am committed to do on December 5th from 9:00 to

17     12:00.

18          THE COURT:  What do you do?

19          MS. BRATHWAITE:  I'm a financial consultant.

20          THE COURT:  And are you literally self-employed; that

21     is, like you work out of your home, or do you have an office?

22          MS. BRATHWAITE:  I go to my clients, and I work there.

23          THE COURT:  Okay.  And this is not something you could

24     do after one o'clock in the afternoon, for example?

25          MS. BRATHWAITE:  I guess I may have to, but...

1          THE COURT:  Well, that's -- that's one of my

2    questions.  I mean often financial consultants are meeting

3    with, you know, people after hours in the evenings and so

4    forth.  That's why I'm asking the question.

5          MS. BRATHWAITE:  But generally for my clients they do

6    go every day to their office and I do work from 9:00 to 5:00.

7          THE COURT:  Okay.  And tell me about this workshop.

8    What is --

9          MS. BRATHWAITE:  It's a community workshop based on

10   teaching them about financial management.

11         THE COURT:  Okay.  And are you on the faculty of it

12   or --

13         MS. BRATHWAITE:  No, they just hired me as a

14   consultant.

15         THE COURT:  As a consultant.  Okay.

16         And what time of day is the workshop?

17         MS. BRATHWAITE:  From 9:00 to 12:00.

18         THE COURT:  9:00 to 12:00, okay.

19         Okay.  Can I get you to step out of earshot just --

20         MS. BRATHWAITE:  Okay.

21         THE COURT:  All right.  This is someone, who's

22   self-employed, but at least suggested that, you know, she could

23   do some of the work in the evenings, as opposed to some of the

24   others, but what's counsel's reaction?

25         MR. ZALKIND:  I have to be consistent.  I would say,

1   you know --

2           THE COURT:  You can be compassionate every now and

3   then.  It wouldn't hurt anything.

4           MR. ZALKIND:  No.  No.  I'm not trying to knock her

5   out.  I just have to be compassionate for my client, which is

6   really what I'm here for, your Honor, with all due --

7           THE COURT:  I don't think it helps them to have --

8           MR. ZALKIND:  It's not that I'm not compassionate,

9   your Honor.

10          THE COURT:  I don't think having angry jurors is going

11  to be any good.

12          MR. ZALKIND:  Well, I don't think they -- my

13  experience is they don't get angry.  They -- they --

14  they -- the best jurors are the ones that have the most to do,

15  because they're the most intelligent, and it's not a

16  question -- I object to the Judge saying I'm not compassionate,

17  because this is not a question of compassion, your Honor.

18          I say that she stays on the jury.  This is within the

19  cross-section of our community in Eastern Massachusetts, and I

20  have to be consistent with my position on this.

21          THE COURT:  All right.  Ms. Brathwaite.

22          Okay.  What I'm going to do is I'm going to leave you

23  on for now.  I don't take any pleasure in doing this, but I'm

24  going to have to leave you on the panel for now.  Okay?

25          MS. BRATHWAITE:  Okay.

1          THE COURT:  Thanks.

2          Okay.  Next.

3          Hi.  What's your name?

4          MS. STENCEL:  Hi.  Valerie Stencel.

5          THE COURT:  Okay.  No. 31.

6          Okay.

7          MS. STENCEL:  I'm a special education teacher, and in

8    addition to teaching duties, I'm on a team that's in the middle

9    of testing several students to meet November and December

10   state-mandated guidelines to determine eligibility, and I'm

11   just worried -- I don't think we have anyone -- no one I know

12   of anyway who could take my place.

13          THE COURT:  Do you have a particular specialty?

14          MS. STENCEL:  I teach moderate special needs.

15          THE COURT:  Moderate special needs.  I'm just

16   wondering what the testing or evaluation piece of this is.

17   There isn't someone who has a similar background who could step

18   in anywhere in the school district?

19          MS. STENCEL:  In a timely manner, I don't know.  I

20   don't know.

21          THE COURT:  Okay.  All right.  What I'm going to do is

22   this:  I'm going to -- I'm afraid to say leave you on the panel

23   for now.  I don't take any pleasure of doing it, but I'm going

24   to have to leave you on the panel for now.

25          MS. STENCEL:  Okay.

1          THE COURT:  And you may not wind up being picked, but
2     I'm going to have to leave you on.  Okay?
3          MS. STENCEL:  Okay.
4          THE COURT:  Thank you.
5          Okay.  Next.
6          MR. HEGARTY:  Hi.  Mark Hegarty, H-E-G-A-R-T-Y.
7          THE COURT:  Okay.  No. 52.
8          Yes, sir.
9          MR. HEGARTY:  Fifty-two.  It's a good number.
10          My parents have both had surgery over the last month
11     or so, and I fortunately live close to home.  They need
12     something, they need a ride, something from a drugstore or
13     something, I'm able to take them.  My mother doesn't drive, and
14     my father can't drive.  He had back surgery.  This happened all
15     over the last month or so.
16          THE COURT:  Okay.  And you would only be tied up from
17     9:00 to 1:00.  Is there someone -- if something happened, would
18     there be somebody who could cover between 9:00 and 1:00?  I
19     mean an emergency, obviously.
20          MR. HEGARTY:  Well, an emergency, maybe, but during
21     the week, my brother works in Westwood, and they're not
22     available.
23          THE COURT:  Okay.  And how often have you taken your
24     parents within the last few months for --
25          MR. HEGARTY:  Oh, there's several doctors'

1 appointments, and like I said, my mother doesn't drive.  I take

2 her for errands and so forth.

3          THE COURT:  Okay.  All right.  What I'm going to do is

4 I'm going to leave you on the panel for now.

5          MR. HEGARTY:  Okay.

6          THE COURT:  And we'll see what happens.  Again, I

7 don't take any pleasure in doing that, but I think I'm going to

8 be forced to leave you on.

9          MR. HEGARTY:  Okay.

10          THE COURT:  Okay.  Thank you, sir.

11          MR. HEGARTY:  Fair enough.

12          THE COURT:  Okay.  Next.

13          MS. O'NEIL:  Hi.

14          THE COURT:  Hi.  What's your name?

15          MS. O'NEIL:  Maribeth O'Neil.

16          THE COURT:  Okay.  No. 82.

17          MS. O'NEIL:  My husband's getting both knees replaced

18 December 17th, and we have a Down's Syndrome son that has to be

19 helped, as well as my husband during that time.  I'm a high

20 school teacher.  I plan to take personal days off to help him

21 during that time.

22          THE COURT:  Okay.  Does your son live at home?

23          MS. O'NEIL:  Yes.

24          THE COURT:  Okay.  And how old is he?

25          MS. O'NEIL:  Twenty-three.

1          THE COURT:  Twenty-three.  Okay.

2          MS. O'NEIL:  He goes to Salem Bass River Rehab Center

3     every day.

4          THE COURT:  Okay.  All right.  I'm going to let you go

5     based on that, and -- but you'll still have to check in

6     downstairs.  Okay?

7          MS. O'NEIL:  Okay.  Thank you.

8          THE COURT:  Next.

9          MR. KING:  I'm Jeffrey King.

10         THE COURT:  King?

11         MR. KING:  Yeah.

12         MR. ZALKIND:  What number?

13         MS. LUNT:  I don't know.

14         MR. DUNCAN:  Forty-five, your Honor.

15         THE COURT:  Forty-five.  I went by him.  Forty-five.

16         Okay.  Mr. King.

17         MR. KING:  Yes.  I'm a divorced father of two boys.

18    We live on a single income, and the monetary loss would be

19    pretty devastating; and also my brother is a police officer in

20    Marlborough, and I currently have two cousins serving overseas.

21         THE COURT:  Okay.  Let's take that a step at a time.

22    You're a truck driver; is that right?

23         MR. KING:  Yep.

24         THE COURT:  Okay.  And --

25         MR. KING:  I don't make much money.

1          THE COURT:  All right.  Who do you work for?

2          MR. KING:  S & G Construction.  That's a private,

3   small business.

4          THE COURT:  Okay.  And what are your normal working

5   hours?

6          MR. KING:  7:00 to 3:00.

7          THE COURT:  Okay.  And you said you have two cousins

8   overseas; is that right?

9          MR. KING:  Yeah.

10         THE COURT:  Okay.  And is that likely to affect your

11  service as a jury -- as a juror?

12         MR. KING:  No.

13         THE COURT:  Okay.  And what about the fact that your

14  brother's a Marlborough Police Officer?

15         MR. KING:  No, it shouldn't.

16         THE COURT:  Okay.  All right.  Any follow-up

17  questions?

18         MR. CABELL:  Just with respect to whether the schedule

19  for driving can be adjusted.

20         THE COURT:  Can -- can -- can -- will you be able to

21  readjust your schedule at all?  You'll have your afternoons

22  off.

23         MR. KING:  Not for that long.

24         THE COURT:  Okay.

25         MR. KING:  I'm -- well, I'm a single father.  They

1   live with me.  Their mother's not in the picture at all, so...

2            THE COURT:  How old are your children?

3            MR. KING:  Like, one is 13, and one is 17.

4            THE COURT:  Okay.  So are they in school --

5            MR. KING:  Yep.

6            THE COURT:  -- during most of the day?

7            MR. KING:  Uh-huh.

8            THE COURT:  Okay.

9            MR. ZALKIND:  Could -- could you ask him about the

10   relationship with his brother, the police officer.

11           MR. KING:  Very close.

12           THE COURT:  Okay.  But do you -- I think you indicated

13   he would not affect --

14           MR. KING:  He served overseas also.  He just got back

15   a year ago.

16           THE COURT:  Okay.  But is there anything about the

17   relationship --

18           MR. KING:  No.

19           THE COURT:  -- with your brother that would affect

20   your jury service?

21           MR. KING:  No.

22           THE COURT:  Okay.  All right.  But you have children

23   at home, 13 to 17.  Although -- you live in Marlborough; is

24   that right?

25           MR. KING:  Uh-huh.

1          THE COURT:  Is Marlborough Middlesex County?

2          MR. CHAKRAVARTY:  It is, your Honor.

3          MS. SIEGMANN:  Yes, your Honor.

4          THE COURT:  Just make sure it's not Worcester County.

5          All right.  Can you step out of earshot.

6          All right.  I guess I'd be inclined, reluctantly, to

7     leave him on.

8          What -- what's everyone's reaction?

9          MR. ANDREWS:  I wasn't sure what he said about being

10    paid, but he's a single father.  He's not getting paid for six

11    weeks.

12         MR. CABELL:  Yeah.

13         MR. ZALKIND:  I think the only thing that troubles me

14    is the two kids of his that -- that without him; otherwise, I

15    have no problem.

16         THE COURT:  All right.  Let's -- let's have mercy on

17    this fellow.

18         Mr. King.

19         All right.  I'm going to let you go, based on the

20    combination of the job and the children, but you'll have to

21    check in downstairs.

22         MR. KING:  Okay.

23         THE COURT:  Thank you.

24         Okay.  Next.

25         Hi.  What's your name?

1    MS. SMIGIELSKI:  Donna Smigielski, S-M-I...

2    THE COURT:  Okay.  No. 55.

3    Yes, ma'am.

4    MS. SMIGIELSKI:  My husband died last year, and

5    unfortunately, left me penniless, so, of course, I'm back to

6    work world, which was a feat in itself at my age to get a job.

7    I'm barely paying my rent and utilities.  Forty dollars a day

8    for a couple of days, I could do it; but six weeks, I'll be

9    living on the street before the trial's over.

10    THE COURT:  Okay.  And you don't think -- you work for

11   Filene's Basement; is that right?

12    MS. SMIGIELSKI:  Yes.

13    THE COURT:  Okay.

14    MS. SMIGIELSKI:  Retail.  I work seven days a week

15   just to pay my bills now.

16    THE COURT:  Okay.  And you don't think they're going

17   to pay you if -- if you're not there?

18    MS. SMIGIELSKI:  I would be surprised if my job was

19   there.

20    THE COURT:  All right.

21    MS. SMIGIELSKI:  You know, like I said, they were

22   willing to accept a couple of days, but six weeks is -- at this

23   time of the year in retail it's like ridiculous, not to mention

24   that I won't be making any overtime or anything to keep me

25   going.

1          THE COURT:  Okay.  Okay.  Can you step out of earshot,

2     please.

3          All right.  Counsel, the penniless woman.

4          MR. ZALKIND:  I wouldn't -- I wouldn't oppose her

5     being, you know, let off, because if she can't support herself,

6     it's not like she has a husband or somebody to take care of

7     her.

8          MS. SIEGMANN:  The government agrees.

9          THE COURT:  Okay.  Ms. Smigielski.

10         Okay.  I'm going to let you go, but you're going to

11    have to still check with downstairs.

12         MS. SMIGIELSKI:  Okay.  Thank you very much.

13         THE COURT:  Next.

14    Hi.

15         MS. LHEUREUX:  Hi.

16         THE COURT:  Your name?

17         MS. LHEUREUX:  Janice Lheureux.

18         THE COURT:  Okay.  No. 74.

19    Yes.

20         MS. LHEUREUX:  I -- I just can't afford six weeks off

21    without pay.  I could have done a week, but I just can't afford

22    it.  My check pays my mortgage, and if I don't -- if I only get

23    reimbursed $200 a week, it just doesn't cover it.

24         THE COURT:  Okay.  You're single; is that right?

25         MS. LHEUREUX:  No, married.

1          THE COURT:  Married.  And what does your spouse do?

2          MS. LHEUREUX:  He's a pipe fitter.

3          THE COURT:  Okay.  And where do you work?

4          MS. LHEUREUX:  I work in a nursing home.

5          THE COURT:  Okay.

6          MS. LHEUREUX:  In Somerset.

7          THE COURT:  Okay.

8          MS. LHEUREUX:  And I live in Dartmouth, so the -- what

9    it costs to get here by the train is just -- it just adds up to

10   too much.

11         THE COURT:  Okay.  How many hours a week do you work?

12         MS. LHEUREUX:  Forty.

13         THE COURT:  Forty.

14         And are you an hourly worker?

15         MS. LHEUREUX:  Uh-huh.

16         THE COURT:  Okay.  Can I get you to step aside for a

17   second.

18         MS. LHEUREUX:  Sure.

19         THE COURT:  Okay.  Counsel.

20         MR. ZALKIND:  I would oppose her being excused, your

21   Honor.  She's married.  She could probably work some of the

22   hours, and it's just not -- you know, a pipe fitter is a

23   well-paying job, so...

24         MR. CABELL:  I'm curious how much it costs for her to

25   commute by train up here each day.  Because if you qualify

1    that, that may offset that, plus the loss of her salary may be

2    enough to tip the balance.

3          THE COURT:  It could be an eight or $10 one-way

4    ticket, if she's getting on at Middleborough.

5          MR. CABELL:  She's only down in Dartmouth.  That's

6    down by Fall River and New Bedford.

7          THE COURT:  Whether she's getting on in Attleboro or

8    Middleborough, it's going to be eight or $10 one way.

9          MS. SIEGMANN:  It's not as like she's just making ends

10   meet with both salaries, and that's the concern.  We wouldn't

11   want her to lose the house, because they couldn't make the

12   mortgage payments.  That's what I heard her say.

13         MR. ZALKIND:  Husband.

14         MS. SIEGMANN:  Yeah, but with both salaries --

15         THE COURT:  All right.  Okay.  Let's --

16         MS. SIEGMANN:  -- it sounded like they're struggling.

17         THE COURT:  Ma'am.

18         How much were your -- are your train ticket?  How

19   much -- where did you come from?

20         MS. LHEUREUX:  Dartmouth.  It's $15.50 for the

21   roundtrip, plus the parking --

22         THE COURT:  Okay.

23         MS. LHEUREUX:  -- and the taking the bus here.

24         THE COURT:  Okay.  All right.  I'm going to let you go

25   for financial hardship reasons, but you'll have to check in

1  downstairs.  Okay?

2          MS. LHEUREUX:  Okay.  Thank you.

3          THE COURT:  Okay.

4          Next.

5          MR. ZALKIND:  Your Honor, note my objection.

6          THE COURT:  It is noted.

7          Hi.  What is your name?

8          MR. McKENNA:  Keith McKenna.

9          THE COURT:  No. 11.

10         Yes, sir.

11         MR. McKENNA:  I'm a little concerned about the time

12  commitment of the trial.  I am in cancer research and in

13  collaboration with a major biotech company on a clinical trial

14  that we've been gearing up for the past four months; and while

15  another week isn't, you know, so bad, six weeks puts me behind

16  12 weeks, and I'm the one delivering most of the results back

17  to them.

18         THE COURT:  Okay.  All right.  And you work for Dana

19  Farber; is that right?

20         MR. McKENNA:  Yeah.

21         THE COURT:  Okay.  I'm -- I don't take any pleasure in

22  doing this, but I'm afraid I'm going to have to leave you on

23  the panel for now, and you may not get picked; and if you do

24  get picked, then we can at least mitigate some of this, because

25  I'm going to let everyone off at one o'clock in the afternoon,

1    but I'm going to take --

2         MR. McKENNA:  Okay.  Even though that would be -- our

3    time points are kind of livable in the morning when we actually

4    have to do things, which is what brought it up.  One o'clock

5    doesn't really -- it completely kills it.

6         THE COURT:  I -- I understand.  I'm just -- the

7    problem I have is if every single person with a job has --

8         MR. McKENNA:  I understand.

9         THE COURT:  -- has a serious problem and -- anyway,

10    we'll see how it turns out.  You may wind up not being picked.

11         MR. McKENNA:  Understood.

12         THE COURT:  Okay.  Thanks.

13         Next.

14         MS. BUNKER:  Hi.

15         THE COURT:  Hi.  What's your name?

16         MS. BUNKER:  Teri Bunker.

17         MR. DUNCAN:  Seventy-two, your Honor.

18         THE COURT:  Seventy-two.  Okay.

19         MS. BUNKER:  I have two kids that are in school, and I

20    also work part-time.  If I don't go to work, I don't get paid,

21    and that way I wouldn't be able to pay for a babysitter.

22         Also, I help in the care of my two in-laws, who are

23    sick, elderly, and I help bring them to appointments and

24    grocery shopping, whatnot, like that.

25         THE COURT:  Okay.  How old are your children?

1          MS. BUNKER:  Seven and five.

2          THE COURT:  Okay.  And who's going to be there this

3    afternoon when they --

4          MS. BUNKER:  Actually, my husband has today off,

5    because yesterday was a holiday, so he gets the Tuesday off.

6    That's how they work it at his job.  It just happened to fall

7    that way.

8          THE COURT:  Okay.  And part-time you work as a dental

9    assistant; is that right?

10          MS. BUNKER:  Yes.

11          THE COURT:  And what's the situation with your

12    in-laws?

13          MS. BUNKER:  They're both sick.  My mother-in-law has

14    Stage IV lung cancer, early onset Alzheimer's; and my

15    father-in-law actually just had heart surgery two weeks ago,

16    and he's getting out of his life care center today, as a matter

17    of fact.

18          THE COURT:  Okay.  And do they live near you or with

19    you?

20          MS. BUNKER:  One of -- they live about 20 minutes from

21    me.

22          THE COURT:  Okay.  All right.

23          MS. BUNKER:  Also it took me about two hours to get

24    here; and if I don't get paid, I don't have the money and the

25    gas and the parking.

1          THE COURT:  So, it probably took all of us two hours

2     to get here --

3          MS. BUNKER:  Honesty.

4          THE COURT:  -- in the rain.

5          All right.  Based on the school-age children and the

6     part-time employment, I'm going to let you go, but you're going

7     to have to still check in downstairs.

8          MS. BUNKER:  Okay.  Thank you.

9          THE COURT:  Okay.  Next.

10         Hi.  What's your name?

11         MR. SAINT LEGER:  My name is Rudolphe Saint Leger.

12         THE COURT:  Saint Leger?

13         MR. SAINT LEGER:  Yes.  Rudolphe Saint Leger, yes.

14         THE COURT:  Yes.  Okay.

15         MR. ZALKIND:  What number?

16         THE COURT:  He's number --

17         MR. CABELL:  Ten.

18         THE COURT:  -- ten.

19         Yes, sir.

20         MR. SAINT LEGER:  I am a self-employed cab driver.  I

21    make my money on a daily basis.  Recently, my wife and I would

22    just be -- have been difficult situation.  We bought a house.

23    All of the money are to pay off some of the bills, so

24    working -- I mean if there's no trial like that.  If it was

25    something like a couple of weeks, I'd do it, but four or more,

1  it would drive me -- put a hardship on me.

2  THE COURT:  Would -- when do you normally work as a

3  cab driver?  What hours?

4  MR. SAINT LEGER:  I start at 7:00 a.m. in the morning

5  to 4:00.

6  THE COURT:  To 4:00.

7  And would it be possible to work a different shift,

8  like an evening shift?  Do you work in Boston?

9  MR. SAINT LEGER:  I work in Boston.

10  THE COURT:  Okay.  Like, if you worked a like 2:00 to

11  10:00 shift, would that work?

12  MR. SAINT LEGER:  I'm doing to get, you know, my -- my

13  daughter just had another baby, so I'd like to be there this

14  time, because she go to school, and I'm still there -- so you

15  understand, I'm the only dad in the house.  My wife go to work

16  from 12:00 to 8:00, so I got to be in the house, because of

17  different things.

18  THE COURT:  Okay.  Any follow-up questions?

19  Okay.  Can you stand over there.  Well, he has some

20  flexibility, but...

21  MS. SIEGMANN:  Did he say he has a kid?

22  THE COURT:  Pardon.

23  MS. SIEGMANN:  I couldn't understand what he said.

24  THE COURT:  I thought he said his daughter had a kid

25  that his wife took care of, which impairs his flexibility in

1    some respect.

2           MR. CABELL:  If I understand it right, it's when he's

3    done driving, he needs to be home to take care of the baby or

4    his daughter.

5           THE COURT:  Well, I guess that's not completely clear.

6           MR. ZALKIND:  The part that troubles me is the

7    daughter, whether he really has to take care of the daughter.

8    If he does, then that's one thing, and I think cab drivers can

9    switch their hours around, but I think it's the daughter

10   question.

11          THE COURT:  Let me follow-up.  Mr. Saint Leger.

12          Tell us again the situation.  Your daughter has a

13   child?

14          MR. SAINT LEGER:  Yes.  She just has a child.  He's

15   one month, two days.

16          THE COURT:  Okay.

17          MR. SAINT LEGER:  So she's with us in the house,

18   and --

19          THE COURT:  She lives in the house with you?

20          MR. SAINT LEGER:  She lives in the house with us, and

21   when I would go to work, I bring the baby over to the mother,

22   from my wife's side.

23          So, in the afternoon, I have to be there at four

24   o'clock to pick up my wife, because we only have one car.  I

25   have to pick her up.

1          THE COURT:  Okay.  You have to pick her up.

2          MR. SAINT LEGER:  To take my wife to work, take her

3     out of work, because I live in Watertown.

4          THE COURT:  Okay.  Where does your wife work?

5          MR. SAINT LEGER:  She works at

6     Mass. General -- not -- I mean the Mass. Eye and Ear.

7          THE COURT:  Okay.  All right.  I think with all of

8     that put together, I'm going to let you go.  Okay.  But you'll

9     have to check in downstairs.  Okay?

10         MR. SAINT LEGER:  Yes, sir.  Thank you.

11         THE COURT:  Next.

12         MS. LOUGHMAN:  Hi.  My name is Kerry Loughman.

13         THE COURT:  Okay.  No. 8.

14         MS. LOUGHMAN:  I am a special education aide for three

15    elementary school children, and these kids are emotionally

16    fragile, and I'm kind of worried about what might happen if I'm

17    gone for six weeks.

18         THE COURT:  Okay.  Are you in the classroom with them;

19    is that the way it works?

20         MS. LOUGHMAN:  All day, every day, yeah.

21         THE COURT:  Okay.  And what is the -- the three

22    children, what is their situation?  In other words, what's

23    their condition?

24         MS. LOUGHMAN:  No memory -- excuse me -- behavioral,

25    emotional issues having to do with being in refugee camps;

1    academic problems like not being able to read.  I kind of do

2    lots of different things for them.

3              THE COURT:  What happens if you're sick?

4              MS. LOUGHMAN:  Oh, they call in a substitute, and of

5    course --

6              THE COURT:  -- for that day.

7              MS. LOUGHMAN:  -- I don't know if you've been in

8    elementary school settings at any point, but when a sub comes

9    in, not a lot of work gets done, and so, you know, a day or two

10   might be fine, but over six weeks time, I guess I'm afraid that

11   they could regress a great deal, but that's out of my hands.

12             THE COURT:  Okay.

13             MS. SIEGMANN:  Your Honor, she answered yes to the

14   question.

15             THE COURT:  Oh, can I see the --

16             MS. SIEGMANN:  I don't have it.

17             MS. LOUGHMAN:  I answered yes?

18             MS. SIEGMANN:  No. 8.

19             MS. LOUGHMAN:  No, I answered --

20             THE COURT:  On the questionnaire?

21             MS. LOUGHMAN:  No.  I answered no on both of those

22   questions.

23             THE COURT:  Okay.  Sorry.  Okay.

24             MS. LOUGHMAN:  Let's keep it straight.  That's it.

25             THE COURT:  All right.  Here's what I'm going to do.

1    I'm going to, I'm afraid, leave you on the panel for now --

2              MS. LOUGHMAN:  Uh-huh.

3              THE COURT:  -- and I don't do that with any pleasure

4    at all, but as you can tell, it's --

5              MS. LOUGHMAN:  I understand.

6              THE COURT:  -- there's a lot of hardship to go around.

7              MS. LOUGHMAN:  I understand.  We've all got our own,

8    but...

9              THE COURT:  So, we'll see how it goes.

10             MS. LOUGHMAN:  Okay.

11             THE COURT:  Okay.

12             MS. LOUGHMAN:  Okay.  Thank you for listening.

13             THE COURT:  Okay.  Thank you.

14             Okay.  Next.

15             MR. DEMARIA:  Alfred Demaria.

16             THE COURT:  Demaria.  Okay.  There you are.

17   Fifty-nine.

18             Okay.  Yes, sir.

19             MR. DEMARIA:  I'm the Chief Medical Officer and

20   Director of Communicable Disease Control in the State of

21   Massachusetts Department of Public Health.  I'm just raising

22   the issue to be conscientious of my responsibilities, but also

23   because if I do get impaneled, I have to explain to the

24   commissioner that I did raise the issue.

25             THE COURT:  Okay.  I understand.

1       All right.  What I'm going to -- I'm sure this will be

2   a hardship, and you're not the sort of person that's easily

3   replaced, but I'm going to be forced to leave you on the panel.

4   Okay?

5       So, I will leave you on for now, and we'll see.  You

6   may not wind up being impanelled, but -- okay?

7       Thank you, sir.

8       Next.

9       MR. CHAKRAVARTY:  Your Honor --

10       THE COURT:  Yes.

11       MR. CHAKRAVARTY:  -- before we go to the next --

12       THE COURT:  Yes.

13       MR. CHAKRAVARTY:  -- person.  In an unrelated

14   investigation, I believe I sent correspondence to that

15   gentleman, Mr. Demaria, at the Department of Public Health

16   before.  I don't recall what specific, you know, term or

17   correspondence I had gotten, but he didn't raise his hand that

18   he recognized me, but the name sounds extremely familiar in the

19   context of that other investigation.

20       THE COURT:  Okay.  Do you want me to explore it?

21   Should I call him back and ask him if he recognizes you or your

22   name?  Do you remember what it was?

23       MR. CHAKRAVARTY:  I do.

24       THE COURT:  Can you --

25       MR. CHAKRAVARTY:  It's under Rule 60, I would not be

1    able to disclose it to counsel.

2            THE COURT:  Okay.

3            MR. McGINTY:  Can I just ask whether he was performing

4    a ministerial task when he produced it.

5            MR. CHAKRAVARTY:  I believe he had some supervisory

6    capacity as well.  There was a -- I don't know what his

7    standing is there.  I don't know what his personal role is.  I

8    know that he had personal knowledge of the underlying facts of

9    the investigation.

10           THE COURT:  Okay.  But -- what I propose we do is

11   bring him back and ask him whether he remembers anything about

12   it, whether it would affect him in any way or another,

13   and -- well, let's see what happens, and then respond to that.

14           Mr. Demaria, could I see you again.

15           Mr. Demaria, Mr. Chakravarty, who's one of the

16   prosecutors, has a memory that he corresponded with you on an

17   unrelated case at some point in time, and the question is

18   first, do you remember that?  Well, let's ask that question

19   first.  Do you remember having any --

20           MR. DEMARIA:  I have so many -- so many

21   communications.  I really don't specifically remember the

22   details.

23           THE COURT:  Okay.  And I'm -- I'm inferring from that

24   that it wouldn't have any affect on your service as a juror;

25   that is, you're neither favorably disposed toward him nor

1    unfavorably disposed toward him.

2         MR. DEMARIA:  I don't even remember what the topic

3    was.

4         THE COURT:  Okay.  All right.  Anything else you want

5    me to explore?

6         MR. CHAKRAVARTY:  That's fine.

7         MR. ZALKIND:  Thank you.

8         THE COURT:  Okay.  Thank you.

9         Okay.  Sir.

10        MR. McGINTY:  The correspondence made a weak

11   impression.

12        MR. CHAKRAVARTY:  It was the timing.

13        THE COURT:  Your name?

14        MR. ARCHDEACON:  Kevin Archdeacon.

15        THE COURT:  Oh, yes.  Okay.

16        MR. ARCHDEACON:  No. 81.

17        THE COURT:  Yes, sir.

18        MR. ARCHDEACON:  Okay.  My situation is professional,

19   okay.  It's not personal, but personal to me.

20        My boss is going to be most likely let go in the next

21   couple of weeks, and the opportunity is there for me to either

22   take his place after 29 years, seven-day-a-week work, or go to

23   the competition.

24        My only point here is you put me out of reach for six

25   weeks, that's 29 years of wasted opportunity.  There's no

1    justice in that for me.

2            THE COURT:  Um.

3            MR. ARCHDEACON:  I understand service.  I've been

4    called to jury duty since I was 18 very frequently, and they

5    finally call me at the most inopportune moment.  I'm glad to

6    serve today, but six weeks, maybe another six weeks at the turn

7    of the year, or a shorter trial, but if you put me out for six

8    weeks --

9            THE COURT:  Is your boss retiring, or do you have

10   advance knowledge he's going to be --

11           MR. ARCHDEACON:  He's going to be -- he's going to be

12   let go.

13           THE COURT:  He's going to be let go.

14           All right.  Does counsel have any follow-up questions?

15           MS. SIEGMANN:  No, your Honor.

16           MR. CABELL:  No, your Honor.

17           THE COURT:  Okay.  Mr. Arch [sic], I hate to do this

18   to you, but I think I'm going to have to leave you on the panel

19   at least for now.

20           You're getting closer and closer every time you come

21   up here.

22           MR. ARCHDEACON:  Well, the first two times were only

23   following your instructions.

24           THE COURT:  No, I understand.

25           MR. ARCHDEACON:  This is the first time for me.

1        THE COURT:  And we have other, you know, questions

2 that I'm going to ask as well, but the problem is that --

3        MS. LUNT:  What's his number?

4        MS. SIEGMANN:  Eighty-one.

5        THE COURT:  -- every single person with a job has a

6 problem, and, you know, it's just -- it's so difficult.

7        MR. ARCHDEACON:  No, I understand that.

8        THE COURT:  So I understand.

9        MR. ARCHDEACON:  If I could transfer, I'll do the six

10 weeks another time in January.

11        THE COURT:  I'm very sympathetic, but I think

12 you're -- I'm going to have to leave you on for now.  Okay?

13        MR. ARCHDEACON:  Okay.

14        THE COURT:  Thanks.

15        MR. ARCHDEACON:  All set.

16        THE COURT:  Okay.  Sir.

17        Okay.  Hi.  What's your name?

18        MR. YONAKER:  Yonaker.

19        MR. DUNCAN:  Thirty-five, your Honor.

20        MR. CABELL:  Eighty-five?

21        THE COURT:  Thirty-five.

22        Yes, sir.

23        MR. YONAKER:  I just -- I just don't feel as though I

24 can afford financially six weeks.  I'm the sole provider in the

25 house.  My wife is a student, and she works part-time two

1    Sundays a month.

2              I just don't think that I could afford to be here six

3    weeks.

4              THE COURT:  Okay.  You're -- you're doing auto body

5    tech; is that right?

6              MR. YONAKER:  Uh-huh.

7              THE COURT:  How big is the company you're working for?

8              MR. YONAKER:  It's like 13 people maybe.

9              THE COURT:  Okay.  Is it one shop?

10             MR. YONAKER:  One shop, yeah.

11             THE COURT:  All right.  And are you paid hourly?

12             MR. YONAKER:  Yes.

13             THE COURT:  Okay.  Any follow-up questions?

14             MR. CABELL:  Just about the ability to maybe readjust

15   the work schedule.

16             THE COURT:  Oh, yeah.

17             We're going to be on trial from 9:00 to 1:00, which

18   means there would be some afternoons and evenings, you know,

19   off.  Can you -- will you be able to pick up any of that work

20   at all in the afternoons?

21             MR. YONAKER:  No.  We start at 7:00 and leave at 3:30.

22             THE COURT:  Okay.  The place shuts down at 3:30?

23             MR. YONAKER:  Uh-huh.

24             THE COURT:  Okay.  Can you step out of earshot here.

25             MR. YONAKER:  Sure.

```
1              THE COURT:  Okay.  Counsel.

2              MR. CABELL:  I mean if you take it as true, it's six

3    weeks without an income for the family.

4              THE COURT:  Okay.

5              MR. ZALKIND:  I won't oppose if you let him go,

6    because he has no --

7              THE COURT:  Would not?

8              MR. ZALKIND:  No, I would not oppose it.

9              THE COURT:  Okay.  Mr. Yonaker.

10             Okay.  I'm going to let you go, based on financial

11   hardship, but you'll have to check in down below, okay?

12             MR. YONAKER:  Okay.

13             THE COURT:  Okay.  Next.

14             MS. POLLARD:  I'm Mary Pollard.

15             THE COURT:  Mary Pollard?

16             MS. SIEGMANN:  Forty-seven.

17             THE COURT:  I'm sorry.  What is it?

18             MR. CHAKRAVARTY:  Forty-seven.

19             THE COURT:  Forty-seven.  Okay.

20             Yes.

21             MS. POLLARD:  I'm a mom of three, a three, six, and

22   nine-year-old, and I work part-time; and today was just

23   challenging enough to get the kids to school and activity

24   shuffling around, and I think that six weeks is a long time to

25   do this.
```

1          THE COURT:  Okay.  What hours do you work?  I have

2     director of OB/GYN.

3          MS. POLLARD:  I'm the co-administrative director for

4     OB/GYN.

5          THE COURT:  At Beth Israel?

6          MS. POLLARD:  At Beth Israel.

7          THE COURT:  Okay.  And what hours do you work?

8          MS. POLLARD:  You know, it's a flexible part-time.

9          THE COURT:  Okay.  How many hours do you work?

10          MS. POLLARD:  Twenty-eight to 30.

11          THE COURT:  Twenty-eight to 30.

12          MS. POLLARD:  It's really school hours.

13          THE COURT:  Okay.  And you must have some childcare

14     for the three-year-old?  No.

15          MS. POLLARD:  Yeah, she's at school until quarter of

16     12:00.

17          THE COURT:  Okay.

18          MS. POLLARD:  And I have a babysitter, who, you know,

19     is -- I use her when I -- you know, when needed.

20          THE COURT:  Okay.

21          MS. POLLARD:  But I'm really -- I work part-time so I

22     can be home with the kids, so I don't have --

23          THE COURT:  Okay.  And --

24          MS. POLLARD:  -- help.

25          THE COURT:  -- what does your spouse do?

1        MS. POLLARD:  He works in the money management

2   business.

3        THE COURT:  Okay.  Okay.  Can I get you to step aside

4   for a second.

5        MS. POLLARD:  Sure.

6        THE COURT:  Well, ordinarily, you know, someone with

7   childcare issues with young children at home would be off

8   automatically.  Obviously, there's rather more income here than

9   would be the ordinary case.

10       What's counsel's reaction?

11       MR. ZALKIND:  I say keep her on.  I think that she's

12  got plenty of money, and she says that -- she says that she has

13  a babysitter that comes in and helps her.  These people are

14  brilliant, and they can handle these things.  She handled more

15  stress and more changes than anybody in this courtroom.

16       THE COURT:  You're lucky that my wife is not here to

17  hear this.

18       MR. ZALKIND:  I mean, they're -- they're the best at

19  this, and I've had some very good jurors where there are women

20  from Children's Hospital that have so many balls in the fire,

21  but these are the super ladies, and I think they should be on

22  the jury.

23       THE COURT:  Okay.

24       MR. CABELL:  I am sympathetic to her, but I guess

25  don't see a reason to categorically strike her.

1          THE COURT:  Okay.  All right.  Ms. Pollard.

2          All right.  I hate to do this to you -- and my own

3     wife would kill me if she heard me say it -- but I'm going to

4     leave you on the panel.

5          MS. POLLARD:  She should kill you.

6          (Laughter.)

7          THE COURT:  Okay.  Maybe that will be in another

8     category, but I really -- I don't feel I have any choice under

9     the circumstances.

10         MS. POLLARD:  Well, that's okay.  I hope you don't

11    have three children.

12         THE COURT:  I do.  Thank you.

13         MR. CHAKRAVARTY:  Wow.

14         MS. SIEGMANN:  Wow.

15         THE COURT:  Okay.  Next.

16         What's your name?

17         MR. ZAVATSKY:  Last name's Zavatsky, Z-A-V --

18         MR. DUNCAN:  Thirty, your Honor.

19         MR. ZALKIND:  Thirty?

20         THE COURT:  Thirty.

21         MR. ZALKIND:  Thirty.

22         THE COURT:  Yes, sir.

23         MR. ZAVATSKY:  I've been a probation officer for the

24    District Court for 25 years, and most of that time I've had an

25    adversarial situation with defense counsel, conducting

1   surrender hearings, and I think, you know, over the period of

2   time, I think you become somewhat prosecutorial in nature

3   regarding defendants; so, the Court should be aware of that up

4   front.

5           THE COURT:  Okay.  Well, let me --

6           MR. ZAVATSKY:  I'm not sure I can be totally

7   objective.

8           THE COURT:  Okay.  Let me tease that out a little bit.

9           MR. ZAVATSKY:  Uh-huh.

10          THE COURT:  I mean obviously you work in the criminal

11  justice system, and so you're aware of the presumption of

12  innocence --

13          MR. ZAVATSKY:  Absolutely.

14          THE COURT:  -- and so forth, and, you know, we all

15  work as part of the same system in substance.

16          Do you really think it's going to affect your ability

17  to serve as a juror here; that you're going to -- it's going to

18  affect your judgment?

19          MR. ZAVATSKY:  With all due respect to the Court, if I

20  were on a jury, or if I were the defendant, I am not sure I'd

21  want someone with my experiences on the jury --

22          THE COURT:  Well, they -- they can make that choice

23  because --

24          MR. ZAVATSKY:  -- you know.

25          THE COURT:  -- they'll have the right to strike you.

1    That's not really the issue.

2              MR. ZAVATSKY:  I understand.

3              THE COURT:  The question is in your own mind whether

4    you can be fair, or whether you're going to have preconceptions

5    or not.  I mean these three gentlemen are entitled to be tried

6    according to the evidence in this case, and according to the

7    law and, you know, without regard to prejudice; and even if you

8    spend your entire day in an adversarial situation or having

9    defendants lie to you, it doesn't mean that these -- by any

10   means that these defendants are --

11             MR. ZAVATSKY:  I totally understand.

12             THE COURT:  -- are -- are guilty, and the question is

13   can you -- can you separate all that out, and can you be fair

14   and listen to the evidence and make the best choice you can --

15             MR. ZAVATSKY:  I'm supposed to be fair in my position

16   at work.  I suppose I could, but -- but I do lean towards the

17   prosecution.  I have to say that, but that's neither here nor

18   there at this point.

19             THE COURT:  Well, I -- I -- I'm -- you know, you're

20   not leaving me any choice here.  If you say you're biased,

21   there's not much I can do about that, so I'm going to cross you

22   out, and you're free to go, other than you have to check in

23   downstairs.  Okay?

24             MR. ZAVATSKY:  All right.

25             THE COURT:  Next.

1          MS. MURPHY:  Hi.

2          THE COURT:  Your name?

3          MS. MURPHY:  Lauren Murphy.

4          THE COURT:  Lauren?

5          MS. MURPHY:  Yes.

6          THE COURT:  Okay.  No. 58.

7          Yeah.

8          MS. MURPHY:  The reason that I'm just a little bit

9    inconvenienced is I started a brand-new job yesterday, and I've

10   been in the job search for the past five months, so I'm a

11   little financially strained right now, and I know this company

12   won't pay for me to go to jury duty.

13         THE COURT:  And what is your job?

14         MS. MURPHY:  I'm going to be a retail dental

15   coordinator.

16         THE COURT:  Okay.

17         MS. MURPHY:  And I'm going through a training process

18   as well that will have to be postponed.

19         THE COURT:  Okay.  Were you out of work for the

20   previous five months, or just looking for a new job?

21         MS. MURPHY:  I was working really part-time.

22         THE COURT:  Okay.

23         MS. MURPHY:  Just a weekend job.

24         THE COURT:  All right.  And your job started?

25         MS. MURPHY:  Yesterday.

1          THE COURT:  Yesterday.

2          Okay.  Is it an hourly job or a salaried job?

3          MS. MURPHY:  It's a salary job.

4          THE COURT:  All right.  So would you be paid whether

5    you're there or not as a salaried worker?

6          MS. MURPHY:  It says that I only get paid for one day,

7    and then after that they don't pay you for jury duty at all.

8          THE COURT:  Okay.  It's -- you mean that's what your

9    employer's policy is?

10          MS. MURPHY:  Yeah.

11          THE COURT:  Okay.  Can you just step out of range

12    here.

13          MS. MURPHY:  Yep.

14          MS. SIEGMANN:  Your Honor, Ms. Murphy has answered not

15    sure on the questionnaire.

16          THE COURT:  Oh, okay.

17          MR. ANDREWS:  I'm trying to get that sheet for you.

18          THE COURT:  Okay.

19          MR. CABELL:  I'm always sympathetic, but I do have a

20    question of whether she lives at home or rents.

21          THE COURT:  Okay.

22          MR. McGINTY:  I can't put my hands on it.

23          MR. CHAKRAVARTY:  Your Honor.

24          THE COURT:  Okay.  Ms. Murphy.

25          MS. MURPHY:  Yes.

1    THE COURT:  Okay.  I also -- while I have you here, I

2    want to ask you about your question on the questionnaire.  Can

3    you explain a little bit more what you meant by that.

4    MS. MURPHY:  Um, well, I guess it just kind of meant

5    what the case was about.  I didn't really understand what this

6    mean -- what this question meant.

7    THE COURT:  Let's see.

8    MS. MURPHY:  What was the question?  Well, I have no

9    prejudice against the Muslim or Muslim religion or race or

10   anything like that, but I mean if it was related to terrorists,

11   any kind of terrorist case, I probably would be a little

12   biased.

13   THE COURT:  Okay.  Well, let me think how to phrase

14   this.  There may be evidence in this case involving support of

15   one kind or another for people fighting.  Okay?

16   MS. MURPHY:  Uh-huh.

17   THE COURT:  Muslims fighting in other countries.  For

18   example, publishing newsletters, advocating things, or maybe

19   donating money for one cause or another.

20   Is that the sort of thing that would affect you if

21   there were Muslim-type causes?  In other words, what I'm trying

22   to figure out is whether or not you would have any kind of bias

23   or prejudice that you bring to the table?

24   MS. MURPHY:  Um, yeah, I mean, kind of, a little bit.

25   I mean, it depends on what it was.  I mean, I don't really

1    understand the information, so I can't really go on about it.

2              THE COURT:  Right.

3              MS. MURPHY:  But I know like, for instance, I'm

4    against the war and I'm against fighting, so that's kind of...

5              THE COURT:  Okay.  All right.  Counsel, does anyone

6    want to follow up questions on the questionnaire issue?

7              MR. ZALKIND:  Could you be fair toward a -- to a

8    Muslim defendant that was charged with being in a foreign -- in

9    a foreign country and supporting certain causes?

10             MS. MURPHY:  Yeah.  I mean, yeah.  I think so.  I mean

11   what would the causes be?  It would depend on the causes, I

12   guess.

13             MR. ZALKIND:  Okay.

14             THE COURT:  All right.  All right.  I think what I'm

15   going to do to be careful here is, I guess, I'm not completely

16   confident on this issue, so I think what I'm going to do is let

17   you go, and maybe, you know, you can check in downstairs, and

18   maybe this isn't the right kind of case for you to sit on.  You

19   can serve on a different kind of case.

20             MS. MURPHY:  Okay.

21             THE COURT.  So I'm going to let you go.  Okay.

22   Okay.  Next.

23             MS. BELLOWS:  Hi.  I really, really don't think I'm

24   going to be able to do it.

25             THE COURT:  Okay.  Your name again?

1         MS. BELLOWS:  Kellie Bellows, the wedding, the wedding

2    one.  I have -- I'm moving into my new apartment.  I have first

3    and last.  I have the wedding that's coming up.  I have so much

4    to pay for, it's ridiculous.  I just got out of college, and my

5    student loans are coming.  I just -- we have like every penny

6    planned for.  My fiance's student teaching.  He is done in

7    December, but he hasn't been paid -- you don't get paid for

8    student teaching, so it's been me, just me, and I just if this

9    was like a year from now, six months from now, it would work,

10   but just -- I don't think it's going to work.

11         THE COURT:  Okay.  Okay.  Can you step aside.

12         MS. BELLOWS:  Yeah.

13         MR. CABELL:  What number is she?

14         MS. SIEGMANN:  Thirty-four.

15         THE COURT:  Thirty-four.

16         MR. ZALKIND:  I wouldn't -- I wouldn't object.  She's

17   too upset.

18         MS. SIEGMANN:  She seems strapped.  She seems very

19   upset.

20         MR. ZALKIND:  She's too upset.

21         MR. ANDREWS:  This is something at the time she has to

22   do.

23         MR. ZALKIND:  I mean I would object in terms of

24   theory, but not in terms of practice, your Honor.

25         THE COURT:  All right.  Ms. Bellows.

1        All right.  I'm going to let you go.  Good luck with

2    your wedding.

3        MS. BELLOWS:  Thank you.  Thank you very much.

4        ...end of sidebar.)

5        THE COURT:  All right.  Ladies and gentlemen, thank

6    you again for your patience.

7        I'm going to turn to a subject that we've discussed,

8    or rather has been raised already in the questionnaires, and

9    which is somewhat difficult.  The defendants in this case are

10   Muslim; that's their religion.  They are Arabs; that is their

11   ethnicity; and they are originally from three different

12   countries: Lebanon, Libya, and Kuwait.

13       These -- that presents issues that potentially might

14   affect the trial in different ways.  Some people may have

15   strong feelings about Muslims or Arabs, either in favor or

16   against that may affect their judgment.  People may, for one

17   reason or another, even without strong feelings might be

18   affected in some way, positively or negatively, by the fact of

19   their religion or their ethnicity or their national origin.  It

20   doesn't have to be a strong prejudice.  It doesn't have to be

21   an extreme.  It's enough of an issue if a juror thinks it might

22   affect his or her judgment even a little bit.

23       Both sides, the defendant and the government

24   are -- the defendants and the government are entitled to a fair

25   trial.  They are entitled to jurors who have open minds, who

1   will decide the case solely on the evidence and according to

2   the law, and who will be scrupulously fair.

3           It is particularly important, of course, that the

4   defendants, who are on trial receive a fair trial.  These three

5   men are entitled to exactly the same degree of justice as any

6   other person in the courts of our country and not one bit less.

7           Each individual must -- each defendant must be

8   considered as an individual and judged according to what he, as

9   an individual, did or did not do.

10          Now, it's difficult sometimes in this day and age for

11  people to talk openly about issues such as this and to be

12  honest and open about whatever feelings they may have on the

13  subjects.  Your duties and obligations as citizens and

14  potential jurors require you to be completely honest and candid

15  about this subject.

16          Some of you have already raised this issue in the

17  questionnaire since we have gone over it with some of you at

18  sidebar, but let me ask the question to any -- to everyone.

19          Do any of you have any feelings of any kind that may

20  affect your ability in any way to be fair and impartial in the

21  trial of these defendants, who are Muslim and Arab, and from

22  certain countries in the Middle East?

23          If you are not completely confident, if there was any

24  doubt in your mind on these issues, and regardless of whether

25  your feelings -- feelings would affect you favorably or

1    unfavorably, please raise your hand.

2         Okay.  What we're going to do on this one is we're

3    going to -- I'm going to see you back in the back -- in the

4    jury room.  So we're going to leave the courtroom momentarily,

5    and there were some people who had filled out questionnaires,

6    who I think I have not spoken to yet.

7         Let me -- and I'm going to have Mr. Castles read out

8    their -- your names, and I'd like to speak to you as well.

9         (The Court conferred with Mr. Castles.)

10        THE CLERK:  Robert -- Robert Daniels.

11        THE COURT:  Okay.  All right.  And I'm sorry.  Someone

12   raised their hand.  Okay.  Can you line up.  And what we're

13   going to do is we're going to go back here, but if you can

14   just -- or line up.  I'm sorry.  Line up over here, and we'll

15   see you one by one.

16        Okay.  Then it's -- just we'll take you one by one.

17        (Sidebar as follows:

18        THE COURT:  All right.  This is juror Robert Daniels,

19   who's No. 6, and he had answered yes to the first question on

20   the questionnaire.

21        Mr. Daniels, let me --

22        MR. DANIELS:  I have bad handwriting.

23        THE COURT:  That's all right.

24        MR. DANIELS:  Do you want me to read it?

25        THE COURT:  No.  I think we can read it, but it says

1    that you're -- you went to Catholic high school.  You're stern

2    on the beliefs of your religion and really not open at all to

3    different views.

4            MR. DANIELS:  Yeah.

5            THE COURT:  What do you mean by that, and how's it

6    going to affect you as a juror in this case?

7            MR. DANIELS:  I'm a -- I'm trying to think.  Well, I

8    mean, like I said, I went to Catholic school, so I mean I have

9    a certain set of values and -- instilled in me and what I

10   believe in and how I view things, and you asked like if I'd be

11   open to that religion, and I'm not.

12           THE COURT:  Well, it's not -- no one's asking you to

13   convert to Islam.  That's not --

14           MR. DANIELS:  I think I have to say at like 9:00 in

15   the morning, I was pretty half asleep.  I might have read it

16   wrong and not even wrote it right.

17           THE COURT:  Well, there's no right or wrong answer.  I

18   mean what we're trying to figure out here is not -- you're

19   entitled to your religion.  You're entitled to have whatever

20   views you have.  That's -- that's not the issue, and you don't

21   have to accept anyone else's religious views --

22           MR. DANIELS:  All right.

23           THE COURT:  -- but if you're -- if you're serving as a

24   juror for defendants who are Muslims, sometimes people have

25   pretty strong feelings about it, and they can't be fair.  They

1    might be affected by it, and since you answered the question

2    yes, I want to explore that with you.

3         Do you think you'd be affected just because they're

4    Muslims?  In other words, would it affect your judgment about

5    whether they were guilty or not guilty?

6         MR. DANIELS:  No.  I guess, no.

7         THE COURT:  Well --

8         MR. DANIELS:  Kind of an all-time backfire.  I was

9    hoping you guys would see that and not pick me.

10        THE COURT:  Well, I'm -- what we're doing now is

11   exploring whether people should be stricken for cause.

12        MR. DANIELS:  Uh-huh.

13        THE COURT:  You know, either side might strike you,

14   because they don't like your haircut.  That's their --

15        MR. DANIELS:  Yeah.  Yeah, I know.

16        THE COURT:  -- or anything else.

17        MR. DANIELS:  I did criminal justice in college.  I

18   know all about the jury selection.

19        THE COURT:  What I'm trying to find out now is whether

20   or not there's something about the fact that the defendants are

21   Muslim or Arab or whatever that's going to make it -- going to

22   affect your judgment as a juror; that you wouldn't be --

23        MR. DANIELS:  I can't say that I would.  I mean, my

24   parents raised me right.  I don't really pass judgment on other

25   people.  I'm not -- you know, I don't like them because they're

1   not Mus -- you know, because they are Muslim, whatever; but the

2   only partial -- the only thing I can say I'm partial on is when

3   I was sitting in the courtroom, I saw one of them just

4   sleeping, straight out sleeping, which kind of, I don't know,

5   got on my nerves.

6           THE COURT: One of them meaning one of the defendants?

7           MR. DANIELS: Yeah, one of the defendants, just out

8   cold. Just -- I don't know. That's -- that's the only thing I

9   have against them. Other than that, I don't know them. I

10   don't --

11           THE COURT: All right. And you think you could be a

12   fair and objective juror in the trial of this case, decide the

13   case according to the evidence?

14           MR. DANIELS: Yeah, I guess I could.

15           THE COURT: Okay. Can I get you to just step out of

16   the room for just a second.

17           MR. McGINTY: Can -- can -- can I ask, your Honor?

18           THE COURT: Yes.

19           MR. McGINTY: What about -- what about one of them

20   sleeping angered you?

21           MR. DANIELS: It just -- I mean, I don't know -- I

22   mean, you figure if you're going to trial and you're on trial

23   and they're doing a jury selection, wouldn't you want to be

24   interested in the people that they're picking, and like,

25   wouldn't you want some involvement to cover your own, you know,

1  so to speak, your ass, instead of just passed out in the seat,

2  not caring what's going on, or what's happening, what's going

3  on.  I mean I -- it's -- I don't know.  It's just how I felt

4  when I saw it.  I just didn't think it was right.

5          THE COURT:  Okay.  Can I get you to step out quickly.

6          MR. DANIELS:  Yeah, no problem.

7          THE COURT:  Should we spend any more time on this

8  individual?  Is there anyone who wants to keep him on the

9  panel?

10          MR. CABELL:  I don't think so.

11          MR. McGINTY:  There's no way to --

12          THE COURT:  Okay.  Bring him in.

13          He doesn't have to sit down.

14          All right.  Mr. Daniels, I'm going to excuse you.

15  You're free to go, but you have to go down to the jury room.

16  Okay.

17          MR. DANIELS:  All right.  Thank you very much.

18          THE COURT:  Okay.

19          MR. DANIELS:  Good luck, guys.

20          MR. McGINTY:  Wow.

21          MS. SIEGMANN:  Oh, my goodness.

22          MR. McGINTY:  Wow.

23          THE COURT:  That's not really a pretty sight.

24          MR. McGINTY:  My parents raised me well.  You don't

25  see that.

1          MR. ANDREWS:  That makes you feel good, doesn't it?

2          MR. CABELL:  I could make a joke about it, picking him

3     for our intern program.  I don't care.

4          MS. SIEGMANN:  How old is he?

5          MS. LUNT:  Twenty-two.

6          MS. SIEGMANN:  Oh, 22.

7          MR. McGINTY:  Going on 18.

8          MR. ANDREWS:  Anyone else?

9          THE COURT:  Yeah, there was another woman, who raised

10    her hand.

11         MR. ZALKIND:  Number 22.

12         THE COURT:  No, I don't know.  I don't know.

13         MR. CHAKRAVARTY:  Your Honor, on a serious note.

14         THE COURT:  Yes.

15         MR. CHAKRAVARTY:  From that --

16         MS. SIEGMANN:  Oh, wait.  Someone's coming.

17         THE COURT:  Okay.  Come on in.  Sorry.

18         MR. CHAKRAVARTY:  It can wait.

19         THE COURT:  Don't be afraid.  I'm sure it's very

20    intimidating, but --

21         MS. POSNICK:  I don't feel intimidated.

22         THE COURT:  Why don't you have a seat.  What's your

23    name?

24         MS. POSNICK:  Carol Posnick.

25         THE COURT:  Okay.  You're number --

1         MS. POSNICK:  Toward the end.

2         THE COURT:  Ninety-two.

3         Okay.  And why did you raise your hand?

4         MS. POSNICK:  I hired one of the T -- TJX victims that

5    was killed on Flight 11.  It flew into the World Trade Center.

6         THE COURT:  Okay.

7         MS. POSNICK:  And I also happen to be Jewish, and I'm

8    not so sure with what these gentlemen are alleged, the funds

9    where they go, I'm not sure that I could be 100 percent

10   impartial.

11        THE COURT:  Okay.  You think the combination of the

12   two things is going to affect your judgement as a juror?

13        MS. POSNICK:  Well, I already have some preconceived

14   thoughts, so I guess so.

15        THE COURT:  Okay.  Any follow-up?

16        MR. ZALKIND:  No.

17        MS. SIEGMANN:  No, your Honor.

18        THE COURT:  Okay.  I think if you don't think you

19   could be impartial, I'm not going to try to talk you into it.

20   So, I'm going to let you go, but you'll have to check in

21   downstairs.

22        MS. POSNICK:  Okay.

23        THE COURT:  Is that everyone, Marty?

24        Is that everyone?

25        THE CLERK:  There's no one else left.

1          THE COURT:  Okay.

2          MR. DUNCAN:  And here's two more, your Honor, that

3    haven't answered the questionnaire.

4          Fifty-eight.

5          THE COURT:  They're already struck?

6          MR. DUNCAN:  I don't have him struck.

7          Do you have it stricken?

8          MS. SIEGMANN:  Yeah.

9          MR. McGINTY:  Fifty-eight's gone.

10          THE COURT:  Could I ask what -- what -- you're free to

11    go.

12          MS. POSNICK:  Okay.  This way?

13          THE COURT:  Yeah, out this way and get the card.

14          Okay.

15          ...end of sidebar.)

16          MR. CHAKRAVARTY:  Your Honor, there was one serious

17    point that --

18          THE COURT:  Yes.

19          MR. CHAKRAVARTY:  -- I was making when Mr. Stevens

20    came up.  And, of course, I didn't observe anything with

21    regards to one of the defendants appearing to sleep.  It may be

22    that there was prayer going on.  I don't want to invade the

23    client relationship; however, to the extent that there is -- he

24    has had that misapprehension, it's very possible that as this

25    trial proceeds, that there may be other misapprehension and/or

1  maybe he was sleeping, and the jury's obviously allowed to

2  consider that, but we don't want to cast an aspersion, because

3  they are in the form of prayer in the middle of the court.

4          THE COURT:  Okay.

5          MR. CHAKRAVARTY:  I just wanted to alert counsel and

6  the Court on that issue.

7          THE COURT:  Do defense counsel want me to do or say

8  anything about this?

9          MR. McGINTY:  Yes.  It's my client.  I would, and

10  frankly that's a good suggestion, and maybe, you know, after

11  they're sworn in general instructions just say that -- I don't

12  know how to say it.

13          THE COURT:  You mean, wait until we get down to the

14  16?

15          MR. McGINTY:  Right.  Right.  Because I can't believe

16  it will be an element of prejudice if it came to pass, but

17  perhaps, you know, there are times in the court where people

18  need to stand up, that they raise their hand.  People on

19  occasion do fall asleep, try not to do that.  It's not a good

20  thing, but, you know, just a way to kind of make it part of the

21  instruction.

22          THE COURT:  I'm hoping you'll keep me awake.

23          No, that's -- that's fine.  I mean, we can wait till

24  then.  We can handle it, you know, whatever.

25          MR. McGINTY:  I think so, but I think that was a

1    sensitive comment.  I don't mean to say nice things to you --

2              MR. CHAKRAVARTY:  For once.

3              ...end of sidebar.)

4              THE COURT:  All right.  As a follow-up question to

5    that last one, I expect that there will be evidence in this

6    case in the Arabic language.

7              Do any of you speak or read Arabic?

8              All right.  I see no hands.

9              I'm now going to give a list of the people, who may be

10   called as witnesses in this case.  Not all of these people are

11   actually going to be called, but I've asked the lawyers to give

12   me a list of all potential witnesses.  It's quite a long list,

13   so I'm going to break it into parts.  Don't panic.  There's no

14   way all of these people are going to be called, but we need to

15   find out these sorts of things now.

16             So, I will read some names, and then I'll stop and ask

17   whether any of you know any of these people or whether your, to

18   your knowledge, family members or close friends know these

19   people.

20             All right.  The following people are agents or

21   affiliated with the FBI: Peter Gomez; Lorraine Johnson; Brian

22   McElhinney; David Habich, H-A-B-I-C-H; Christopher Peet,

23   P-E-E -- P-E-E-T; Brendan Cleary; Victor Treadway; Bradley

24   Davis; Bill Iapopucci, I-A-P-O-P-U-C-C-I; Ken Harris; Nicholas

25   Boshears, B-O-S-H-E-A-R-S; Gunnar Demarco; Kevin McCusker;

 1    Daniel Einhaus, E-I-N-H-A-U-S; Eric Toole; James Siracusa,

 2    S-I-R-A-C-U-S-A; Kevin Swindon.

 3             All right.  Are any of you or any family members or

 4    close friends, to your knowledge, know or have any relationship

 5    with any of those people?

 6             Okay.  I'll see you at -- actually, I'll wait -- I'll

 7    wait until the end.  We'll do them all at the end.

 8             All right.  Trooper Richard Ball of the Massachusetts

 9    State Police; Officer Paul Walsh of the Boston Police

10    Department; Special Agent -- Special Agent David Lazarus of the

11    IRS; Michael Monahan of the IRS; Special Agent Lauren

12    Youngquist of the IRS; John Fernandez of CBP.  I'm sorry.  What

13    does that stand for, Mr. Chakravarty?

14             MR. CHAKRAVARTY:  Customs and Border Protection.

15             THE COURT:  Customs and Border Protection.  They've

16    changed the terminology on me.  John Fernandez of Customs and

17    Border Protection; Cynthia Westcott of the IRS; John O'Neil of

18    the IRS; or Joseph Desantis of the Social Security

19    Administration, Office of Inspector General.

20             Does anyone know any of those people, or to your

21    knowledge, do your family members or close friends know or have

22    a relationship with any of those people?

23             Okay.  No hands.

24             Some more names from the FBI:  Salime, S-A-L-I-M-E,

25    Vallee, V-A-L-L-E-E; John Elkialouby, E-L-K-I-A-L-O-U-B-Y;

1   Jamal Feghali Zakhary, Z-A-K-H-A-R-Y; Anne Marie Doursounian,

2   D-O-U-R-S-O-U-N-I-A-N; Elie Khoury, K-H-O-U-R-Y; Fouad Dagher,

3   D-A-G-H-E-R.  Again, those are all FBI.  Kenneth Bensman;

4   Charles Austin; William Phillips; or Chris Fullam, again, all

5   FBI.

6         Does any -- anyone know any of those individuals, or

7   to your knowledge do any family members or close friends know

8   them or have a relationship with them?

9         Okay.  I see no hands.

10        More FBI witnesses: Brent Potter; Betsy Pryor; Kent

11   Hukill, H-U-K-I-L-L; Jackie Ballas, B-A-L-L-A-S; Steve

12   O'Reilly; Thomas Stephen Hazard; Christina Martinez; Maida

13   Rivera; Russ Fincher; Paul Carpinteri, C-A-R-P-I-N-T-E-R-I;

14   Charlotte Jenig, J-E-N-I-G; Laura Cleveland; David Larson; Opal

15   Camp, C-A-M-P; Robert Shumaker; Sherry Staten; or Alene Starks.

16        Again, all those FBI witnesses.  Do any of you know,

17   or to your knowledge, do any of your family members or close

18   friends have -- know them or have a relationship with them?

19        Okay.  Another hand.  Again, I'll take you all at the

20   end.

21        More FBI witnesses:  Denise Butowski; Lee Markunas,

22   M-A-R-Q -- K-U-N-A-S; Chris Krizka, K-R-I-Z-K-A; Christine

23   Awender, A-W-E-N-D-E-R; Amy Schomer; Joel Scarbrough; James

24   Marinelli; Linda Rose; Frank Felker; Barry Schreiber; Brendan

25   Cleary.  I think I read that name before.  Joanne Erba,

1    E-R-B-A; Andrew Lenzen, L-E-N-Z-E-N; Jason Miller; Sandra

2    Blain; Betsy Colon; Randall Boone; Fotoula Duran; Vanessa

3    Guzman; John Stewart; James Bentley; Oscar Montoto,

4    M-O-N-T-O-T-O.

5         Do any of you know or, to your knowledge, do any

6    family members or close friends know or have a relationship

7    with any of those FBI employees?

8         Okay.  No hands.

9         More FBI witnesses: Irene Griffin; Gregory McDermott;

10    Timothy Groh, G-R-O-H; Andrew Thompson; Adeele Mickahail,

11    M-I-C-K-A-H-A-I-L; Leslie Hart; Abdo Shihata, S-H-I-H-A-T-A;

12    Virginia DeLorenzo; John Sylvester; Robert Celum, C-E-L-U-M;

13    Judy Mundell; Peter Shirajian; Shelly Sargent; C. Moyer; Keri

14    Jaworksi; Robert Gemme, G-E-M-M-E; Marie-Rose Fletcher; or

15    Sylvana McCord.

16         Again, all from the FBI.  Does anyone have any -- do

17    any of you know any of those people or, to your knowledge, do

18    any family members or close friends know or have a relationship

19    with any of those people?

20         No hands.

21         The following witnesses are not connected with the

22    FBI:  Gerald Sack; Robert Chernoff; Rabah Ahmed, A-H-M-E-D;

23    Karen White; Tyrone White, who worked at Storage USA; Bernard

24    LaFleur; Khalid Naseem, N-A-S-E-E-M; Richard Donahoe; Ernest

25    Cimino; Mohammad Tiba, T-I-B-A; Wissam Ali Ahmad; Robert

1   Squires; Joseph Braude, B-R-A-U-D-E; Afif Kadri, K-A-D-R-I;

2   Kubilay Celebi, C-E-L-E-B-I; or Khaled Burgrara,

3   B-U-R-G-R-A-R-A.

4        Do any of you know or, to your knowledge, are any

5   family members or close friends aware of or know or have a

6   relationship with any of those individuals?

7        Okay.  I see no hands.

8        More names not affiliated with the FBI or the

9   government: Suheil Laher, L-A-H-E-R; Munther Baara, B-A-A-R-A;

10  Sharon Mullaley, M-U-L-L-A-L-E-Y; Jerry Friedman; David

11  Fechheimer, F-E-C-H-H-E-I-M-E-R; Jay Groob, G-R-O-O-B; Dustin

12  Lewis; Sonja Petri; James Tierney; John Stuart Blackton; Daniel

13  Kanstroom; Michael Sells; Sandra Shreve; Marcus Owens; Nazif

14  Shahrani.

15       Do any of you know or have any connection with any of

16  those individuals, or to your knowledge, do any family members

17  or close friends know or have any relationship with any of

18  those individuals?

19       All right.  I see no hands.

20       And then finally, Edward Valla of the FBI, V-A-L-L-A;

21  Matthew Levitt; Evan Kohlmann; Dawn Goldberg of the IRS; Dennis

22  Brown of the FBI; or James Marinelli of the FBI.

23       Do any of you know or, to your knowledge, do any

24  family members or close friends know or have any relationship

25  with any of those individuals?

1          All right.  Let me see the two people who raised their

2    hands.

3          Oh, I'm sorry.  I believe I missed a name:  Alton --

4          VOICE:  Alton Saucier.

5          THE COURT:  Alton Saucier, S-A-U-C-I-E-R, for

6    Immigration Services.

7          Okay.  I see no hands.

8          (Sidebar as follows:

9          MR. CRONIN:  Hello.

10          THE COURT:  Hi.  And you're Mr. --

11          MR. CRONIN:  Cronin.

12          THE COURT:  No. 88.  Okay.

13          MR. CRONIN:  Stephen O'Reilly.

14          THE COURT:  Okay.  Who -- what is your connection with

15    him?

16          MR. CRONIN:  We sat and drank almost every night this

17    summer at the bar.  He was staying at the hotel, and he would

18    frequent that.  That was part of the hotel.

19          THE COURT:  Okay.  Was he an FBI agent?

20          MR. CRONIN:  FBI agent, yes.

21          THE COURT:  Okay.  Okay.  And how did you come to know

22    him?

23          MR. CRONIN:  Well, he used to hang around the bar.

24          THE COURT:  That's all?

25          MR. CRONIN:  Yeah.

1          THE COURT:  Okay.  Did you ever take a night off?

2          MR. CRONIN:  Yeah.

3          THE COURT:  Okay.

4          MR. CRONIN:  About three or four.  I don't drink, so

5     it's not a problem I have.

6          THE COURT:  Okay.  Okay.  Can you step out of earshot.

7          Do you expect him to be a witness?

8          MS. SIEGMANN:  I don't -- Al?

9          MR. CHAKRAVARTY:  I think he is.

10          MS. SIEGMANN:  You think he is?

11          THE COURT:  Look, if there's even a reasonable

12     possibility he's a witness, unless you think I need to inquire

13     further, I'm inclined to --

14          MR. CHAKRAVARTY:  I think we can probably work around

15     him.  I believe he is on for chain of custody.

16          MR. McGINTY:  Chain of custody of what?

17          MR. CHAKRAVARTY:  I'm sorry.  I missed the last name.

18          MR. McGINTY:  Mr. O'Reilly.

19          THE COURT:  Stephen O'Reilly.

20          MR. CHAKRAVARTY:  Stephen O'Reilly.  He's a borderline

21     witness for chain of custody, your Honor.  If the defense

22     stipulate, as we've proposed, which I think they may be

23     inclined to do, we wouldn't have to call him.

24          THE COURT:  Well, but if they don't.

25          MR. CHAKRAVARTY:  If they don't, then he'd be one of

1   the witnesses -- one of the few witnesses that we would call to

2   establish chain of custody.

3        MR. McGINTY:  Chain of custody on what?

4        MR. CHAKRAVARTY:  On electronic interceptions.  They

5   are the FISA intercepts.  One point of clarification that does

6   merit follow-up.  Stephen O'Reilly that we've named is an FBI

7   agent out of the Chicago office, not unlike the common name.

8   It might just be a miscommunication.

9        THE COURT:  Okay.

10       MR. McGINTY:  So it appears not to be the same guy?

11       THE COURT:  Well, maybe not.

12       Mr. Cronin.

13       The Stephen O'Reilly, who may be a witness in this

14  case is an FBI agent out of the Chicago office.  Is that --

15       MR. CRONIN:  I have no idea.

16       THE COURT:  You have no idea?

17       MR. CRONIN:  Nope.

18       THE COURT:  Was it O'Reilly, not Riley?

19       MR. CRONIN:  It was O'Reilly.

20       THE COURT:  Okay.  And identified as an FBI agent?

21       MR. CRONIN:  Yes.

22       THE COURT:  Okay.  And where -- where were you hanging

23  out?  Where was this bar?

24       MR. CRONIN:  This would be Newton Corner Applebee's --

25       THE COURT:  Newton Corner Applebee's.

1          MR. CRONIN:  -- which was hooked onto the hotel there.

2          THE COURT:  Yes.  Okay.

3          MR. CRONIN:  And he was staying in the hotel.

4          THE COURT:  Okay.  Okay.  Let me get you to step over

5     again.

6          Thank you.

7          MR. CHAKRAVARTY:  It could be him.  I don't know.

8          THE COURT:  Pardon.

9          MR. CHAKRAVARTY:  It could be him.  I don't know.

10    He's a nice guy.

11         THE COURT:  I was holding my tongue for very many

12    reasons here.  I think in excess of caution, we should let

13    Mr. Cronin go.

14         What do you think?  I mean --

15         MR. ZALKIND:  I agree.

16         THE COURT:  -- if there's a possibility he's going to

17    be a witness.

18         Okay.  Mr. Cronin.

19         MR. CRONIN:  Yes, sir.

20         THE COURT:  Okay.  Based on that, I'm going to let you

21    go.

22         MR. CRONIN:  Okay.

23         THE COURT:  So thanks for your patience.

24         MR. CRONIN:  Thank you.

25         THE COURT:  And check in downstairs.  Okay.

1          Okay.  Sir.

2          MR. DUNCAN:  Demaria, I think -- I believe, your

3   Honor.

4          MR. DEMARIA:  Alfred Demaria.

5          THE COURT:  Okay.  No. 59.  Yes, sir.

6          MR. DEMARIA:  FBI Agent Dan Einhaus is with the Boston

7   Office Weapons of Mass Destruction, and while I was Acting

8   Director of the State Laboratories, so we interacted; and

9   actually we all attended a conference, and I had lunch with

10  him, but that's the extent, so...

11         THE COURT:  Okay.  And have you had any -- when was

12  your last contact with him?  Ballpark.

13         MR. DEMARIA:  Maybe last fall.

14         THE COURT:  Okay.  And how often did you see him when

15  he was on this Weapons of Mass Destruction?

16         MR. DEMARIA:  It was occasional.

17         THE COURT:  Okay.

18         MR. DEMARIA:  Maybe every two months at meetings.

19         THE COURT:  Okay.  Any follow-up from counsel?

20         MR. DEMARIA:  Actually there were others, too.

21         THE COURT:  Other people who were in the unit with

22  you?

23         MR. DEMARIA:  Yeah.

24         THE COURT:  Okay.  Can I get you to just step aside

25  for just a moment.

1          MS. LUNT:  Did you catch the right agent?

2          MR. CHAKRAVARTY:  It's not the same agent that's on my

3     case, but that is the squad, and that is the type of

4     investigation which I was running.

5          It seems to me though that the fact that he has daily

6     interaction in the course of his, you know, duties,

7     professional duties with the FBI doesn't necessarily mean that

8     he is going to be biased or that -- in this case, he happens to

9     know Agent Einhaus, who again if we can come to an agreement,

10    he wouldn't be testifying.  If we don't, then he is one of the

11    likely witnesses to testify about FISA interceptions and

12    specifically extracting these phone calls for purposes of

13    playing them in court.

14         THE COURT:  All right.  Let me find out a little bit

15    more about his interaction with him.

16         MR. DUNCAN:  Your Honor, he seemed to be saying he had

17    another job at the time.  It's not clear.

18         THE COURT:  Yeah.  Okay.

19         Can I just clarify the amount of interaction you had

20    with Mr. Einhaus and the nature of the interaction, how often

21    you saw him, you know, were you -- were you really working

22    together or, you know, sometimes you're present at a meeting.

23    It's not quite the same thing.

24         MR. DEMARIA:  Yeah.  No.  It would be rare that we

25    have -- would have had direct contact out of -- outside of a

meeting, but I was responsible for the Biowatch Program, which

is a national surveillance program for biologic agents, and we

would attend those meetings. I'm actually still the chair of

that committee.

THE COURT: Okay.

MR. DEMARIA: So the FBI attends that meeting.

THE COURT: Okay. And one of the things the jury in

this case would have to do is assess the credibility of every

witness, including, you know, possibly Mr. Einhaus, and the

jurors would have to be prepared to say, "yes, I believe him,"

"no, I don't believe him," and essentially have a blank slate

and decide the case based on what they heard in court.

Would that be a problem for you? Is there anything

about your interaction with him --

MR. DEMARIA: No.

THE COURT: -- that would affect your ability to, for

example, decide that you didn't believe him, if it came -- you

know, if it came to that? Would you be prepared to do that?

MR. DEMARIA: Yes.

THE COURT: Okay. And vice versa obviously?

MR. DEMARIA: Uh-huh.

THE COURT: Be prepared to believe him if -- if it

came to that.

Okay. Can I get you to step aside just for a moment.

Well, what do you think? Counsel?

1          MR. ZALKIND:  I have no objection to this witness.

2          MR. DUNCAN:  Juror.

3          MS. LUNT:  Juror.

4          THE COURT:  Okay.

5          Okay.  Thank you, Mr. Demaria.  You may -- you may

6     take your seat again.

7          Thank you.

8          ...end of sidebar.)

9          THE COURT:  All right.  Ladies and gentlemen, have

10     you, or a member of your family, or a close friend, served in

11     Afghanistan or Iraq or the Middle East in the military, or as a

12     military contractor, or in any intelligence service?

13          I don't need to know about all military service, only

14     service in Afghanistan, Iraq, or the Middle East, and let's

15     confine that to the last 20 or 25 years or so.

16          Okay.  A few hands.  Let me see you.

17          (Sidebar as follows:

18          MS. SIEGMANN:  Your Honor, after we talk to these

19     people, is it possible to take a rest room break?

20          THE COURT:  Yes.

21          MS. SIEGMANN:  Okay.  Thank you.

22          THE COURT:  What's your name?

23          MR. HUGHES:  Tim Hughes.

24          MR. ZALKIND:  What number?

25          MS. LUNT:  Hughes.

1    THE COURT:  No. 96.

2    Yes, sir.

3    MR. ZALKIND:  What number?

4    THE COURT:  Ninety-six.

5    MR. HUGHES:  I had an attorney brother, Captain Dan

6 Bower (phonetic), who served a tour over in Iraq as a doctor,

7 and one guy that I play hockey with and invited him to my

8 wedding.  He's -- Sergeant Mark Harris served one tour over in

9 Iraq, and I think he's due up for a second one.

10    THE COURT:  Okay.  Is there anything about your

11 relationship with those people or that experience that would

12 affect you in any way as a juror in this case?

13    MR. HUGHES:  No.

14    THE COURT:  Okay.  And you're pretty confident about

15 that?

16    MR. HUGHES:  Yeah.  They weren't front line.

17    THE COURT:  Okay.  Thank you.

18    Okay.  Next.

19    I'm holding up -- people are leaving the room.  We'll

20 take a bathroom break after this, but I can't let anyone leave

21 the room while we're doing this.  I'm sorry.

22    Let me get through these next group of people, and

23 we'll take a short break.

24    I'm sorry.  Your name, please?

25    MR. FAHEY:  Scott Fahey.

1          THE COURT:  Fahey?

2          MR. FAHEY:  Yes.

3          THE COURT:  No. 20.

4          Yes, sir.

5          MR. FAHEY:  My wife's uncle when he -- his first

6    deployment was an MP in Iraq.

7          THE COURT:  Okay.  In the '91 Gulf War, or whenever

8    that was?

9          MR. FAHEY:  Yes, sir.

10          THE COURT:  Okay.  Okay.  And is there anything about

11    that -- your relationship with him or that experience that

12    would affect your service as a juror?

13          MR. FAHEY:  No, sir.

14          THE COURT:  Okay.

15          MR. FAHEY:  Just being honest, that's all.

16          THE COURT:  No.  That's why I ask the question.

17          Thank you.

18          MR. FAHEY:  Okay.  Thank you.

19          MS. LUNT:  His wife's uncle?

20          THE COURT:  Okay.  Next.

21          MS. GRIFFIN-RYDER:  Abigail Griffin-Ryder.

22          THE COURT:  Okay.  No. 67.

23          Okay.

24          MS. GRIFFIN-RYDER:  I've lived with a friend for six

25    months, who served in both Iraq and Afghanistan.  I have three

1     girlfriends, who either their brother, brother-in-law, or a

2     boyfriend have served in Iraq or Afghanistan.

3          THE COURT:  Okay.  Was the friend a roommate, or was

4     it a more -- in other words, was it a boyfriend?

5          MS. GRIFFIN-RYDER:  No, not a boyfriend.

6          THE COURT:  Okay.

7          MS. GRIFFIN-RYDER:  Just a friend.

8          THE COURT:  Just a roommate friend.

9          MS. GRIFFIN-RYDER:  Uh-huh.

10          THE COURT:  Okay.  Is there anything about your

11     relationship with those people or their experience that would

12     affect your service as a juror here?

13          MS. GRIFFIN-RYDER:  I don't think so.

14          THE COURT:  Okay.  Is there any doubt in your mind at

15     all?

16          MS. GRIFFIN-RYDER:  Maybe a little, but...

17          THE COURT:  Okay.  Well, let's talk about it.  I mean

18     this case isn't about the Iraq war --

19          MS. GRIFFIN-RYDER:  Right.

20          THE COURT:  -- but the reason I'm asking is to just to

21     explore attitudes and make sure everyone can be fair.

22          Well, tell me in your own words, do you think there's

23     an issue there as you're deciding whether these people are

24     guilty beyond a reasonable doubt how any of this might affect

25     you?

1          MS. GRIFFIN-RYDER:  No.

2          THE COURT:  You don't think it would?

3          MS. GRIFFIN-RYDER:  No.

4          THE COURT:  Okay.  And are you --

5          MS. GRIFFIN-RYDER:  Sure.

6          THE COURT:  You're sure about that?

7          MS. GRIFFIN-RYDER:  Yeah.

8          THE COURT:  Okay.  Any follow-up questions?

9          MR. CABELL:  No.

10         THE COURT:  Okay.  Thank you.

11         Okay.  Next.

12         MR. McKENNA:  Hi.  Keith McKenna.

13         THE COURT:  Keith McKenna.

14         MR. McKENNA:  Eleven.

15         THE COURT:  Keith McKenna.  Eleven.

16         Okay.  Yep.

17         MR. McKENNA:  I have two good friends from high

18    school, who's in the Marines who's currently in Afghanistan,

19    and one of the guys I lived with during the summer in college

20    is in the Marines as well.

21         THE COURT:  Okay.  And is there anything about your

22    relationship with those people or their experience that would

23    affect your service as a juror here?

24         MR. McKENNA:  I don't think so.

25         THE COURT:  Okay.  Is there any doubt at all in your

1    mind on that?

2              MR. McKENNA:  I don't think so.

3              THE COURT:  Well, I need to explore that a little bit.

4    Obviously, this case is not about the Iraq war, but I ask that

5    question to make sure we're checking to see whether people have

6    attitudes that might somehow affect --

7              MR. McKENNA:  Right.

8              THE COURT:  -- their jury service.

9              And, again, these defendants have the right to be

10   treated as individuals and have the case be tried according to

11   the evidence and the law, and, you know, do you think you're

12   going to be affected as a juror by the fact you had friends

13   that served overseas?

14             MR. McKENNA:  No.

15             THE COURT:  Okay.  Are you sure about that?

16             MR. McKENNA:  I mean, I've heard stories, but they

17   can't tell me anything.  One of them's in communications, so he

18   just says he has seen things, but I don't think --

19             THE COURT:  Well --

20             MR. McKENNA:  I don't think it would affect me.

21             THE COURT:  I guess -- let me put it this way.  We

22   hear lots of stories.  You know, we read things.  You see

23   things.  You can't shut off the rest of your life, but in this

24   trial, you have to be absolutely fair, and what I don't want is

25   for you to be -- you know, if you wind up on the jury saying

1    I'm voting one way or the other, because some friend of mine

2    served in Iraq told me something, and I'm going to make the

3    decision on that basis.  In other words, it has to be only the

4    evidence and the law in this case.

5             MR. McKENNA:  If you say I have to be 100 percent, I

6    don't -- it could be a 1 percent that says I might not be able

7    to.

8             THE COURT:  One percent meaning that you think it

9    would be -- it could affect you?

10            MR. McKENNA:  Yeah, I mean...

11            THE COURT:  Okay.  Can you step aside for a second,

12   just out of earshot.

13            My reaction is that he isn't confident.  Again, I -- I

14   don't --

15            MR. ZALKIND:  I think he's --

16            THE COURT:  Pardon.

17            MR. ZALKIND:  I think he can serve.

18            THE COURT:  Well, let me hear all the defendants then.

19            Mr. McGinty.

20            MR. McGINTY:  I think he hesitated.  I think he gave

21   the 1 percent.  I am concerned about whether he would be a

22   fair --

23            MR. ZALKIND:  You are concerned?

24            MR. McGINTY:  I am concerned.

25            THE COURT:  Mr. Andrews?

1          MR. ANDREWS:  Yes, your Honor.  I -- it's an odd

2     response.  If you have a percent, it doesn't really matter if

3     it's one or five or ten.  It's sort of an odd response.  There

4     is something bothering him.  I don't know what he's heard.

5     It's not a case about Iraq, but there's something bothering

6     him.  I'm uneasy.

7          THE COURT:  Well, I guess -- I share the unease, and I

8     think we should err on the safe side here, even though we're

9     getting down to low numbers.

10          Mr. McKenna.

11          All right.  I'm going to let you go.  And good luck

12     with your cancer research.

13          MR. McKENNA:  Thank you.

14          THE COURT:  Okay.

15          Next.

16          Hi.  Your name?

17          MS. RADKE:  Lisa Radke.

18          THE COURT:  Okay.  No. 80.

19          Okay.

20          MS. RADKE:  I'm a disabled Navy veteran of the Gulf

21     War.  My husband is also a veteran of the Gulf War, and I have

22     a younger brother who is now -- is still in.  He's a Navy chief

23     who is stationed over in Qatar.

24          THE COURT:  Okay.  And Gulf War, you mean the first

25     one, right, '90?

1          MS. RADKE:  The first one.

2          THE COURT:  Okay.

3          MS. RADKE:  I was discharged in 1996.

4          THE COURT:  Okay.

5          MS. RADKE:  And my husband was discharged in 1994.

6          THE COURT:  Okay.  Is there anything about your

7     experience or your relationships with your husband or your

8     brother that would affect your ability to be a juror -- affect

9     your service as a juror here?

10         MS. RADKE:  No, sir.

11         THE COURT:  Okay.  And you're confident of that?

12         MS. RADKE:  Yes, sir.

13         THE COURT:  Okay.

14         Okay.  Thank you.

15         MS. RADKE:  You're welcome.

16         THE COURT:  Next.

17         MS. PROUTY:  Hi.  Elizabeth Prouty.

18         THE COURT:  No. 48.  Always glad to see you.

19         MS. PROUTY:  And you, sir.

20         THE COURT:  I think you're probably not as glad as I

21    am.

22         MS. PROUTY:  I have close personal friends from

23    Wellesley.  I'm a godparent to one of her children, and her

24    brother Connor Stevens (phonetic) is a marine and in Iraq now.

25         THE COURT:  Okay.  Is there anything about that

1  relationship with the friends or that experience that would

2  affect your ability to be -- or that would affect you as a juror

3  in this case?

4       MS. PROUTY:  No.  His mother's deceased when this

5  happened.  I just hope he gets home.

6       THE COURT:  So do we fervently.  The real question is,

7  you know, is there anything there that you would bring to bear

8  in this trial?

9       MS. PROUTY:  No.

10       THE COURT:  Okay.  Thank you.

11       Okay.  Next.

12       MS. ALEXANDER:  Mary Barbara Alexander.  My

13  brother-in-law --

14       THE COURT:  Hold on.  Let me just --

15       MS. ALEXANDER:  Okay.

16       THE COURT:  -- find you.  Oops.  Twenty-two, right?

17       MS. ALEXANDER:  I don't know what my number is.

18       THE COURT:  Yeah.  I think so.

19       MS. ALEXANDER:  My brother-in-law served in the Army

20  Special Forces as a colonel, in Kuwait, Afghanistan, and Iraq,

21  and I don't know where else, because he's Special Forces, so he

22  can't tell you all the places he's been.

23       THE COURT:  Okay.

24       MS. ALEXANDER:  He has since retired.

25       THE COURT:  Okay.  Is there anything about that, about

```
 1    your relationship with him or his experience that would affect

 2    your service as a juror?

 3             MS. ALEXANDER:  I don't think so.

 4             THE COURT:  Okay.  Is there any doubt in your mind?

 5             MS. ALEXANDER:  No.

 6             THE COURT:  Okay.  Thank you.

 7             MR. ANDREWS:  Your Honor, may I just --

 8             THE COURT:  I'm sorry.

 9             MR. ANDREWS:  How long ago was it that he served?

10             MS. ALEXANDER:  He retired, I think, about three years

11    ago.

12             THE COURT:  Okay.

13             MR. ANDREWS:  He served --

14             MS. ALEXANDER:  So it was recent.

15             MR. ANDREWS:  He served right up until his retirement?

16             MS. ALEXANDER:  Yes.

17             MR. ANDREWS:  All right.  Thank you.

18             THE COURT:  Okay.  Thank you.

19             Ma'am.

20             MS. DUENAS:  Hi.  Duenas, D-U-E-N-A-S, Susan.

21    D-U-E-N-A-S.

22             THE COURT:  Ninety-one.

23             MS. DUENAS:  My --

24             THE COURT:  Ninety-one.

25             MS. DUENAS:  My cousin's son died in combat about 18
```

1   months ago in Iraq.  He was the first soldier from the Cape to

2   die in the war.

3           THE COURT:  Okay.

4           MS. DUENAS:  I just thought I better tell you that.

5           THE COURT:  Okay.  Were you close to him, your

6   cousin's son?

7           MS. DUENAS:  I was close to his father, not --

8           THE COURT:  Okay.

9           MS. DUENAS:  -- not to the boy that died.

10          THE COURT:  Okay.  Is there anything about your

11  relationship there or that experience that would affect your

12  service as a juror here?

13          MS. DUENAS:  Honestly, I don't think so.

14          THE COURT:  Okay.  You don't think so?

15          MS. DUENAS:  I would say no.

16          THE COURT:  Okay.  You're pretty confident of that?

17          MS. DUENAS:  I believe so.

18          THE COURT:  Okay.  Any follow-up questions?

19          MR. ZALKIND:  No.

20          THE COURT:  Okay.  Thank you.

21          ...end of sidebar.)

22          THE COURT:  All right.  Let's take a bathroom break.

23  I know this is taking a very long time, but if you can do this

24  as quickly as possible, try to keep it to five or ten minutes,

25  it would be very much appreciated, because the faster we get

1    back, the faster we can keep -- get going on this.  Okay?

2            Thank you.

3            (Recess from 3:56 p.m. until 4:15 p.m.)

4            THE CLERK:  All rise.

5            Court is now open.  You may be seated.

6            THE COURT:  All right.  Again, ladies and gentlemen,

7    thank you for your patience.  I'm sure those benches are not

8    getting any more comfortable as time goes on.

9            I'm going to ask you some questions about whether you

10   have any connection to law enforcement officers or the law

11   enforcement system.  I expect that more than one of you is

12   going to raise your hand, and my follow-up question is going to

13   be whether you would be affected by the fact that you have a

14   connection to a law enforcement officer or the system as a

15   juror in this case.

16           What matters most, of course, is whether you can be

17   fair and unbiased.  Sometimes people have strong feelings about

18   law enforcement.  They may favor police officers; they may

19   disfavor police officers.

20           Again, the defendants, who are on trial, and the

21   government as well, is entitled to a fair trial.  They're

22   entitled to jurors, who are not prejudiced one way or the

23   other.  This case must be decided according to the evidence and

24   according to the law and not because jurors like or don't like

25   law enforcement officers, as the case may be.

1          So, with that, have you or any member of your family,

2    immediate family, or any close friend, ever been employed by a

3    police department or other law enforcement agency?

4          Okay.  Those of you who have raised your hands, keep

5    your hand raised if any of you believe that you would be

6    affected in any way by that service here today.

7          Okay.  Let me -- so that the lawyers know what the

8    numbers are, can I ask you to give your names.  Those of you

9    who have raised your hands, can I ask you to give your name.

10         MR. MacARTHUR:  William MacArthur.

11         THE COURT:  William MacArthur.

12         Okay.  Juror No. 33.

13         MS. GATELEY:  Janet Gateley.

14         THE COURT:  Ms. Gateley, Juror No. 100.

15         MR. FAHEY:  Scott Fahey.

16         THE COURT:  Baden?

17         MR. FAHEY:  Fahey.

18         THE COURT:  Fahey.  I'm sorry.  No. 20.

19         MR. HUGHES:  Tim Hughes.

20         THE COURT:  Hughes?

21         MR. DUNCAN:  Ninety-six.

22         THE COURT:  Okay.  No. 96.

23         Yes.

24         MS. FRATUS:  Donna Fratus.

25         THE COURT:  Donna...

1          MS. FRATUS:  Fratus.

2          THE COURT:  I'm sorry.  I'm having trouble finding

3    you.

4          MS. FRATUS:  Yeah.  It might be under my maiden name,

5    Iacobucci.  It starts with "I," I-A-C-O...

6          MR. CHAKRAVARTY:  Your Honor, 51.

7          THE COURT:  Fifty-one.  All right.  Donna Fratus, is

8    that -- why am I having trouble finding this?

9          MS. SIEGMANN:  Fifty-one.

10          THE COURT:  Is it 51?

11          MR. CABELL:  Yes.

12          THE COURT:  Oh, okay.  I'm sorry.  Fifty-one.

13          MR. PINKHAM:  Matthew Pinkham.  Pinkham, P-I-N-K-H-A-M.

14          THE COURT:  No. 50.

15          Okay.  Did I get everyone?

16          I'm sorry.  Yes.

17          MS. THOMPSON:  Julie Thompson.

18          THE COURT:  Julie Thompson.  No. 49.

19          MS. BARRY:  Nancy Barry.

20          THE COURT:  Nancy Barry.  No. 46.

21          Yes.

22          MS. ALEXANDER:  Mary Barbara Alexander, No. 22.

23          THE COURT:  Okay.  No. 22.

24          Did I get everyone?  No.

25          Yes.

1          MS. RADKE:  Lisa Radke.

2          THE COURT:  Lisa Radke.

3          THE CLERK:  No. 80.

4          THE COURT:  No. 80.

5          MS. McMANUS:  Kathrynne McManus.

6          THE COURT:  McManus.

7          THE CLERK:  No. 60.

8          THE COURT:  No. 60.

9          Okay.  Have you or any member of your immediate family

10   or any close friends ever been employed by a prosecutor's

11   office or a public defender's office?

12          Okay.  Ma'am, would that relationship or anything

13   about that connection affect you in any way at all

14   in -- in -- if you served as a juror in this case?

15          MS. LAZZARA:  No.  No.

16          THE COURT:  Okay.

17          MS. ALEXANDER:  No.

18          THE COURT:  The same question to you.

19          Okay.  And can I get your names.

20          MS. LAZZARA:  Joyce Lazzara.

21          THE COURT:  Joyce Lazzara.

22          Okay.  No. 77.

23          MS. ALEXANDER:  And Mary Barbara Alexander.

24          THE COURT:  No. 22.

25          Okay.  All right.  Have you or any member of your

1    immediate family or any close friend ever been employed by a

2    court or a probation office or a prison?

3              Okay.  Let me ask again that question, would the fact

4    that you had that relationship or connection affect you in any

5    way at all, no matter how slight, in your service as a juror in

6    this case?

7              Okay.  I see no hands.

8              All right.  Let me get your juror numbers again.

9              MS. RADKE:  Lisa Radke.

10             THE COURT:  Radke.  I'm sorry.  I forgot your number

11   already.

12             MS. RADKE:  Eighty.

13             THE COURT:  Eighty.  Okay.

14             MS. THOMPSON:  Julie Thompson.

15             THE COURT:  Julie Thompson.

16             MS. THOMPSON:  No. 48.

17             THE COURT:  I'm sorry.  What number -- which was?

18             MS. THOMPSON:  No. 48.

19             THE COURT:  Forty-eight -- nine.

20             MS. THOMPSON:  Forty-nine.

21             THE COURT:  I'm sorry.  Julie Thompson was 49.  Okay?

22             MR. MacARTHUR:  William MacArthur, 33.

23             THE COURT:  William MacArthur.

24             MR. MacARTHUR:  William MacArthur.

25             THE COURT:  Thirty-three.  All right.

1          All right.  Yes.

2          MR. GENTRY:  Robert Gentry.

3          THE CLERK:  Sixty-four.

4          THE COURT:  Sixty-four.

5          Yes.

6          MR. SHOENFELT:  Brad Shoenfelt.

7          THE COURT:  Okay.  Twenty-nine.

8          Yes.

9          MR. ARCHDEACON:  Kevin Archdeacon, 81.

10          THE COURT:  Kevin Archdeacon, 81.

11          MS. SHOSTAK:  Samantha Shostak.

12          THE COURT:  Seventy-nine.

13          Okay.  Did I get everyone?

14          All right.  Have you or any member of your immediate

15  family or any close friend ever been employed as a private

16  investigator or a security guard?

17          MS. PROUTY:  Can you repeat that, please.

18          THE COURT:  Yes.  Have you or any member of your

19  immediate family or any close friend ever been employed as a

20  private investigator or as a security guard?

21          Okay.  And, again the follow-up question.  Would any

22  of you be affected in any way by that relationship or

23  connection if you were to serve as a juror in this case?

24          VOICES:  No.

25          THE COURT:  Okay.  Yes.  I'm sorry.  One hand.

1          Okay.  Let me see you.  You would be affected?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Oh, I'm sorry.

4          PROSPECTIVE JUROR:  Sorry.

5          THE COURT:  Okay.  Let me get the numbers then.

6          MS. MURPHY:  I think I'm 38, Mary Murphy.

7          THE COURT:  Mary Murphy, 38.

8          MS. MURPHY:  Yes.

9          MR. GENTRY:  Robert Gentry, 64.

10         MR. MUNSON:  Theodore Munson.

11         THE COURT:  Okay.

12         MR. TAGLIAMONTE:  Paul Tagliamonte.

13         THE COURT:  Hold on.  Hold on.  I'm sorry.

14    Mr. Munson.

15         THE CLERK:  Thirty-seven.

16         THE COURT:  Thirty-seven.

17         MR. TAGLIAMONTE:  Paul Tagliamonte.

18         MR. CABELL:  Ninety-four.

19         MS. SIEGMANN:  Ninety-four.

20         THE CLERK:  Ninety-four.

21         THE COURT:  Ninety-four.

22         MR. MacARTHUR:  William MacArthur, 33.

23         THE COURT:  Okay.  MacArthur, 33.

24         Yes.

25         MS. THOMPSON:  Julie Thompson, 49.

1          THE COURT:  Julie Thompson, 49.

2          Did I get everyone?

3          Okay.  Now, some of the witnesses in this case are

4   likely to be law enforcement officers or other agents of the

5   federal government, including agents of the FBI, the IRS, the

6   Department of Homeland Security, Immigration and Naturalization

7   Service, or Immigration and Customs Enforcement.

8          Do any of you have any feelings or beliefs about law

9   enforcement officers or other government agents, whether

10  positive or negative, that might interfere with or affect in

11  any way your ability to serve as a juror in this case?

12         Okay.  I'll see you at sidebar.

13         (Sidebar as follows:

14         THE COURT:  Okay.  I am sorry.  Your name again?

15         MS. SHOSTAK:  Shostak, No. 79.

16         THE COURT:  Okay.

17         Okay.  Yes.

18         MS. SHOSTAK:  The question --

19         THE COURT:  Yeah, you had raised your hand about.

20         MS. SHOSTAK:  Yes.

21         THE COURT:  Okay.

22         MS. SHOSTAK:  I don't always trust law enforcement.

23  I'm sorry.

24         THE COURT:  Okay.  Okay.  Do you think that that's --

25         MS. SHOSTAK:  I'm not sure.  I'm really nervous about

1    it.  It could sway me.  I mean it sort of depends.  I just have

2    had some -- not personally, but I've had a lot of friends that

3    have had poor experiences, and I don't really have the -- I

4    don't have a favorable opinion.

5          THE COURT:  Okay.  Do you think that's something

6    that's going to affect you as a juror in this case; in other

7    words, you're entitled to your opinions, but the question is --

8          MS. SHOSTAK:  I know.

9          THE COURT:  -- is it going to affect you here?

10         MS. SHOSTAK:  I can't -- I can't answer it.  I'm not

11    sure.

12         THE COURT:  Okay.

13         MS. SHOSTAK:  That's all I can give you.

14         THE COURT:  All right.  Well, if -- it seems to me

15    that I -- I don't really have much choice, except to if you're

16    not sure that you could be fair to law enforcement, I think I

17    have no choice but to let you go --

18         MS. SHOSTAK:  Okay.

19         THE COURT:  -- so I'm going to have to strike you.

20         MS. SHOSTAK:  Okay.

21         THE COURT:  And you're free to leave, although you'll

22    have to check downstairs.  Okay?

23         MS. SHOSTAK:  Okay.  Do I need any -- anything else?

24         THE COURT:  Okay.

25         MS. SHOSTAK:  Thank you.

1          THE COURT:  Next.

2          MR. BEE:  Hi there.

3          THE COURT:  Hi.  What's your name?

4          MR. BEE:  My name's Jonathan Bee.

5          MR. CABELL:  Forty-two.

6          THE COURT:  Okay.  No. 42.

7          Yes, sir.

8          MR. BEE:  Yep.  My brother was pulled over, and he was

9   charged with possession of weed, so I'm not too keen, but

10  whatever.

11         THE COURT:  Well, do you think he was treated unfairly

12  by the police?

13         MR. BEE:  Yes.

14         THE COURT:  Okay.  And do you think that that

15  experience is going to affect how you would serve as a juror in

16  this case?

17         MR. BEE:  Not a whole lot, no, I don't think so.

18         THE COURT:  Well, what do you mean "not a whole lot?"

19         MR. BEE:  I don't think so, I mean unless it has

20  something to do about drugs or something, but...

21         THE COURT:  Well, it's not a drug case, but one of the

22  roles of the jury, one of the principal roles, is decide who's

23  telling the truth, who isn't.

24         MR. BEE:  Uh-huh.

25         THE COURT:  And --

1          MR. BEE:  I could do a pretty good job at that.

2          THE COURT:  Well, you know, we're going to have law

3     enforcement witnesses --

4          MR. BEE:  Uh-huh.

5          THE COURT:  -- and you're entitled to bring your life

6     experience to the table.

7          MR. BEE:  Of course.

8          THE COURT:  And -- but what you're not allowed to do

9     is to have a prejudice or bias --

10         MR. BEE:  Yeah.

11         THE COURT:  -- you know, the police never tell the

12    truth; the police always tell the truth --

13         MR. BEE:  Yeah.

14         THE COURT:  -- or have a thumb on the scale.  You have

15    to listen to each person and -- and make your decision --

16         MR. BEE:  Uh-huh.

17         THE COURT:  -- according to the evidence and according

18    to the law, and what I'm trying to figure out from you

19    is -- is -- are you going to be affected by this experience or

20    attitude such that it wouldn't be fair for you to be a juror in

21    this case?

22         MR. BEE:  No.

23         THE COURT:  Okay.  Are you pretty confident of that?

24         MR. BEE:  Yeah.

25         THE COURT:  You can be fair, fair to both sides?

1          MR. BEE:  Yeah.

2          THE COURT:  Fair to the government and the defense?

3          MR. BEE:  Yeah.

4          THE COURT:  Okay.  Any follow-up?

5          MR. CABELL:  Your Honor, would you ask why he believes

6     his brother was treated unfairly.

7          THE COURT:  Okay.

8          MR. BEE:  He -- actually, he was pulled over for

9     speeding, but they didn't have probable cause, because there

10    was nothing in his car; and what happened is the cop actually

11    called up another police officer, called a canine unit, to go

12    through his car without any -- without any, you know, whatever

13    it's called, and then they found like a really tiny bit on the

14    back seat of his car.  I thought that was not fair.

15         THE COURT:  Okay.  And, again, you don't -- just so

16    that we're absolutely clear, you don't have to believe that

17    that was fair, and nobody here is saying that it is fair.  The

18    question is --

19         MR. BEE:  Uh-huh.

20         THE COURT:  -- what -- what attitude, if any, it

21    creates in your own mind about law enforcement generally; and

22    if you think that you can be fair and take each witness as they

23    come, so to speak, and decide --

24         MR. BEE:  Yeah, I've got no problem with it now.

25         THE COURT:  Okay.  All right.  Anything else?

1          Okay.  Thank you, Mr. Bee.

2          MR. BEE:  All right.

3          ...end of sidebar.)

4          THE COURT:  All right.  Ladies and gentlemen, do any

5     of you believe that law enforcement officers or other

6     government agents are more likely or less likely to be telling

7     the truth than other kinds of witnesses?

8          Okay.  I see no hands.

9          Have any of you ever filed a lawsuit against a police

10    officer or another law enforcement agent?

11         I see no hands.

12         Have you or any member of your immediate family or any

13    close friend ever been convicted of or accused of a crime?

14         Okay.  Let me see you one by one.

15         (Sidebar as follows:

16         THE COURT:  Your name again?  I'm sorry.

17         MR. HUGHES:  Timothy Hughes, 96.

18         THE COURT:  Ninety-six.

19         Yes, sir.

20         MR. ZALKIND:  What number?

21         MR. HUGHES:  Ninety-six.

22         THE COURT:  Ninety-six.

23         MR. HUGHES:  My uncle, James O'Brien, was

24    convicted -- I'm not sure of the exact crime, but it was a

25    computer-related crime.

1      THE COURT:  Okay.  Do you feel he was treated fairly

2  by the criminal justice system?

3      MR. HUGHES:  Actually, I don't know any -- I don't

4  know what the specifics of the thing.  More than likely I just

5  wanted to stay out of the loop of that one.

6      THE COURT:  Okay.  And is there anything about that

7  relationship or that experience that would affect your ability

8  to be -- or to serve on this jury?

9      MR. HUGHES:  No.

10      THE COURT:  Okay.

11      MR. HUGHES:  I just wanted...

12      THE COURT:  Okay.  Thank you.

13      Next.

14      Hi.  Your name?

15      MS. THERIAULT:  Judy Theriault.

16      THE COURT:  Okay.  No. 2.  No. 2.

17      Okay.

18      MS. THERIAULT:  I've -- excuse me -- a brother -- I

19  don't know the crime -- bookmaking, whatever it's called

20  technically.

21      THE COURT:  Okay.

22      MS. THERIAULT:  And a brother who went to jail for two

23  weeks for not paying his taxes.

24      THE COURT:  Okay.  And is there anything about that

25  experience -- well, let me ask you.  Do you think your brothers

1    were treated fairly by the criminal justice system?

2          MS. THERIAULT:  Yeah.

3          THE COURT:  Okay.  You don't have to be happy about

4    them.

5          MR. McGINTY:  We won't tell them that.

6          MS. THERIAULT:  No, they were.

7          THE COURT:  You don't have to be happy about the

8    situation.

9          (Laughter.)

10          THE COURT:  Obviously, what I'm trying to find out is

11    whether there's -- well, I'll ask the question

12    directly -- whether there's anything in that experience that

13    would affect your service as a juror here today?

14          MS. THERIAULT:  No.

15          THE COURT:  Okay.  Okay.  Thank you.

16          MS. THERIAULT:  All right.

17          THE COURT:  Next.

18          MS. THOMPSON:  Hi.

19          THE COURT:  Your name, please?

20          MS. THOMPSON:  Julie Thompson, 49.

21          THE COURT:  Forty-nine.  Okay.

22          MS. THOMPSON:  My husband is -- I don't know how to

23    put it.  He's accused of discrimination on a website.  I'm not

24    sure.

25          THE COURT:  Okay.

1          MS. THOMPSON:  It's pending.

2          THE COURT:  Okay.  Let me see if I understand -- oh,

3     this is -- your husband is the correctional officer?

4          MS. THOMPSON:  Yes.

5          THE COURT:  Okay.  Tell me what happened there,

6     because I'm little confused by it.  He was working as a

7     correctional officer in Essex, right?

8          MS. THOMPSON:  Yes, and he was on the union as a

9     treasurer --

10         THE COURT:  Okay.

11         MS. THOMPSON:  -- and they implemented the website --

12         THE COURT:  Okay.

13         MS. THOMPSON:  -- and things on the website -- people

14    can go on the website and have comments or whatever, and racial

15    comments were made about the sheriff.

16         THE COURT:  Okay.

17         MS. THOMPSON:  And because it wasn't him personally

18    that did it, but he was the person monitoring it, and things

19    weren't taken down soon enough.

20         THE COURT:  Okay.  All right.  And then he was -- he

21    lost his job as a result of that; is that right?

22         MS. THOMPSON:  Yes.

23         THE COURT:  Okay.  And he has --

24         MS. THOMPSON:  He has a court --

25         THE COURT:  -- sued?

1          MS. THOMPSON:  Yeah.

2          THE COURT:  Okay.  To get his job back?

3          MS. THOMPSON:  Yes.

4          THE COURT:  Okay.

5          MS. THOMPSON:  I guess they have an injunction --

6          THE COURT:  Okay.

7          MS. THOMPSON:  -- they call it.

8          THE COURT:  Okay.  I think I asked you this question

9  before, but I'll ask it again, just to be sure.  Is there

10  anything about that whole experience that would affect your

11  service as a juror here?

12          MS. THOMPSON:  Not here, but I mean towards that case

13  probably.

14          THE COURT:  Yeah, well, of course, yeah.

15          MS. THOMPSON:  Yeah.

16          THE COURT:  And I don't expect you to be happy about

17  it --

18          MS. THOMPSON:  No.

19          THE COURT:  -- but you're not going to carry over a

20  bad attitude --

21          MS. THOMPSON:  No.

22          THE COURT:  -- into this case?

23          MS. THOMPSON:  No.

24          THE COURT:  That's what I really want to know.

25          Okay.  Okay.  Thank you.

1        Okay.  Next.

2            MS. BARRY:  Forty-six, Nancy Barry.

3            THE COURT:  Okay.  Yes, ma'am.

4            MS. SIEGMANN:  What number?

5            THE COURT:  Forty-six, Nancy Barry.

6            MS. BARRY:  Is this legal to do, to ask these

7    questions?

8            (Laughter.)

9            MS. BARRY:  I wondered.  No, I'm serious.  My husband

10    was excused of forging prescriptions to obtain Percocets.

11            THE COURT:  Okay.

12            MS. BARRY:  And it was about five -- no, it was about

13    eight years ago.

14            THE COURT:  Okay.  My -- the real purpose for asking

15    the question was whether you thought he was treated fairly by

16    the criminal justice system.

17            MS. BARRY:  He was very much so.

18            THE COURT:  Okay.  And whether there's anything about

19    that experience that would affect your juror service here

20    today.

21            MS. BARRY:  No.

22            THE COURT:  Okay.  That's all I need.

23            MS. BARRY:  Okay.

24            THE COURT:  Any follow-up?

25            Okay.

1          MS. BARRY:  Okay.

2          THE COURT:  Thank you.

3          MS. BARRY:  Yep.

4          THE COURT:  Next.

5          Okay.  No. 59.  Mr. Demaria, welcome back.

6          MR. DEMARIA:  A close friend of mine is serving life

7     in a Massachusetts prison.

8          THE COURT:  Okay.  For?

9          MR. DEMARIA:  Murder.

10         THE COURT:  Okay.  Do you feel he was treated fairly

11    by the criminal justice system?

12         MR. DEMARIA:  I'd say no.

13         THE COURT:  Okay.  In what way do you think he was

14    treated unfairly?

15         MR. DEMARIA:  Well, it's a very long, complicated

16    case.  Norman Porter, who was at -- he was on escape for

17    20 years, and he -- I was very much involved in the '70s and

18    '80s trying to get him out of prison.

19         THE COURT:  Okay.

20         MR. DEMARIA:  I don't think it was the courts that

21    treated him wrong.  It was the posing conviction.

22         THE COURT:  The real question is whether there's

23    anything about that experience that would affect your service

24    as a juror here today, you know, lingering unhappiness,

25    resentments, attitudes that you'll bring to bear on this case.

1          MR. DEMARIA:  No.

2          THE COURT:  Okay.  And you're confident you'll keep

3     that separate?

4          MR. DEMARIA: (Nods.)

5          THE COURT:  Okay.  Thank you.

6          Okay.  Next.

7          Next.

8          MS. McMANUS:  Kathrynne McManus.

9          THE COURT:  I'm sorry.

10         MS. McMANUS:  Kathrynne McManus.

11         THE COURT:  Okay.  No. 60.

12         Okay.

13         MS. McMANUS:  I was arrested for DUI.

14         THE COURT:  How long ago?

15         MS. McMANUS:  Two years ago.

16         THE COURT:  Okay.  And what happened?  How was it

17    disposed of?

18         MS. McMANUS:  Pleaded no contest.

19         THE COURT:  Okay.  Do you feel you were treated fairly

20    by the criminal justice system?

21         MS. McMANUS:  Yes.

22         THE COURT:  Did it happen here in Massachusetts?

23         MS. McMANUS:  No, New Hampshire.

24         THE COURT:  New Hampshire.  Okay.  And is there

25    anything about that whole experience that would affect your

1   service as a juror here today?

2          MS. McMANUS:  No, I don't believe so.

3          THE COURT:  Any hard feelings or attitudes?

4          MS. McMANUS:  No, not towards them.

5          THE COURT:  Okay.  Nothing at all then that we should

6   be concerned about in terms of attitude or --

7          MS. McMANUS:  No.

8          THE COURT:  -- hard feelings?

9          MS. McMANUS:  No.

10         THE COURT:  Okay.  Thank you.

11         MS. McMANUS:  Thanks.

12         THE COURT:  Next.

13         In Worcester County we get dozens of these DUIs.  I'm

14  impressed.

15         MR. ARCHDEACON:  Hi.

16         THE COURT:  Hi.  I'm sorry.  Your name again is?

17         MR. ARCHDEACON:  Kevin Archdeacon, 81.

18         THE COURT:  Eighty-one.  Okay.

19         MR. ARCHDEACON:  There's two actually, one for myself,

20  I was convicted for driving under the influence about 20,

21  21 years ago.

22         THE COURT:  Okay.

23         MR. ARCHDEACON:  And more germane was the president of

24  my company, a friend of mine, who was convicted and did eight

25  months in a federal prison on an investigation in the State of

New Jersey.

        THE COURT:  Okay.  The person was a friend of yours?

        MR. ARCHDEACON:  Uh-huh.

        THE COURT:  Do you feel that you were treated fairly by the criminal justice system when you were convicted?

        MR. ARCHDEACON:  No.

        THE COURT:  Okay.

        MR. ARCHDEACON:  Oh, on my own case?

        THE COURT:  Yeah, your own case?

        MR. ARCHDEACON:  Yeah.  The way the judge instructed the jury, I would have voted guilty.

        (Laughter.)

        MR. ARCHDEACON:  Up until that point, I was fine.

        THE COURT:  Well, I hope to be a little more neutral here myself, but -- but I take it you've -- that your friend, the president, you think was not treated fairly; is that right?

        MR. ARCHDEACON:  I think I was not during the entire system.

        THE COURT:  Oh, you were not.  Okay.

        MR. ARCHDEACON:  He pleaded out, and, you know, he was guilty for --

        THE COURT:  Okay.

        MR. ARCHDEACON:  -- what he did.  I guess they --

        THE COURT:  Why do you feel you were not treated fairly?

1          MR. ARCHDEACON:  I think they were very heavy handed.

2     I was just trying to corroborate a story that someone else had

3     told and where he had asked me to do something that I refused,

4     I did the right thing.  Everyone told me I did the right thing,

5     and I still was dragged through the system, and I just didn't

6     like the way the whole thing was done.

7          THE COURT:  Okay.  The immediate question --

8          MR. ARCHDEACON:  And I got off easy compared to other

9     people.

10          THE COURT:  The immediate question I have for you is:

11     Is there anything about those experiences, taken together or

12     separately, that would affect your service as a juror here?  In

13     other words, are there lingering resentments, unhappiness,

14     strong feelings that would be hard for you to keep out of this

15     case?

16          MR. ARCHDEACON:  Okay.  Well, the honest answer to

17     that is, yeah, there's lingering bad feelings, but I can take

18     things on their own merit, I guess.

19          THE COURT:  Okay.  Well --

20          MR. ARCHDEACON:  But I'd be lying if I said I didn't

21     have lingering feelings.

22          THE COURT:  Well, no.  You're -- you're entitled to

23     have whatever feelings you want.  The question is keeping them

24     compartmentalized, so it doesn't spill over into this case so

25     that you're not -- in other words, this isn't a place to get

1    back at anyone.  It's not a place to make a --

2         MR. ARCHDEACON:  No.  No.  No.  There's no fear of

3    that, no.

4         THE COURT:  Okay.  Or -- or, you know, to right some

5    wrong that happened in the past.

6         MR. ARCHDEACON:  No.  No.  No.

7         THE COURT:  Okay.  And you're confident you can keep

8    things separate and be fair, if you wind up being called?

9         Yes?

10        MR. ARCHDEACON:  Yeah.

11        THE COURT:  Okay.  Any follow-up?

12        Mr. Cabell.

13        MR. CABELL:  Yeah, I do.  It's more in light of what

14   you just said coupled with what you said earlier about maybe

15   being on the edges of an investigation, which caused you some

16   discomfort, and comments about law enforcement, and the

17   possibility that anything might be -- you might tend to give

18   them less credit or credibility than others.  I wonder whether

19   when you throw it all together and think about being a juror in

20   this case whether you might tend to favor one side versus the

21   other, or one type of a witness over another type of witness.

22        MR. ARCHDEACON:  Yeah, I -- I have seen the bad side

23   of -- of the investigators, and I spent a lot of time in the

24   prosecutor's office being questioned and drilled where he told

25   me himself -- he said everyone we brought in for the last two

1  years has told us the same thing about you, Mr. Archdeacon,

2  you're an honest man.  Then why am I being treated this way?

3  It's part of the process.  So, yeah, I -- yeah -- and I just

4  didn't like the way it was done.

5       THE COURT:  Again, you don't have to like it.

6       MR. ARCHDEACON:  Right.  I understand.

7       THE COURT:  Yeah.  It's just --

8       MR. ARCHDEACON:  That's -- that's my answer.

9       THE COURT:  You know, I guess to follow up on

10  Mr. Cabell's point, do you think like all of this taken

11  together you can still set it aside for purposes of this trial,

12  if you wind up being impaneled?  And again, you're -- you're

13  entitled to a healthy skepticism of any witness or any

14  investigation.  You have that right as long as it doesn't

15  become a resentment, a bias, a preconceived attitude.

16       MR. ARCHDEACON:  I'm not going to assume that

17  prosecutors are lying about the case, no, if that's the

18  question.  I'm not going to just because he represents that

19  side that he is lying.  That will not be the case.

20       THE COURT:  Okay.

21       MR. McGINTY:  Also, if I can just follow up.

22       THE COURT:  Yes.

23       MR. McGINTY:  Given all of this, do you think you

24  could give both -- both sides a fair shake in evaluating

25  testimony and deciding who's telling the truth, both sides?

1          MR. ARCHDEACON:  I believe so, yeah, I guess.

2          THE COURT:  Okay.  Thank you, Mr. Archdeacon.

3     Okay.

4          ...end of sidebar.)

5          THE COURT:  All right.  Some of you have already

6     answered this question, but let me ask it nonetheless.  Have

7     you or any member of your immediate family or any close friend

8     ever been involved in a criminal matter as a victim or as a

9     witness?

10          Okay.  Why don't I see you quickly.

11          (Sidebar as follows:

12          MS. GRIFFIN-RYDER:  I think I'm 67.  I was a

13     victim --

14          THE COURT:  Sixty-seven.  Abigail Griffin-Ryder.

15          MS. GRIFFIN-RYDER:  I was a victim of a stabbing in

16     Springfield, Mass.

17          THE COURT:  Okay.

18          MS. GRIFFIN-RYDER:  And I testified for the

19     prosecution.

20          THE COURT:  Okay.

21          MS. GRIFFIN-RYDER:  For the DA.

22          THE COURT:  When was that?

23          MS. GRIFFIN-RYDER:  I think it was three years ago.

24          THE COURT:  Okay.

25          MS. GRIFFIN-RYDER:  I would say two and a half years

1    ago.

2           THE COURT:  Okay.  Do you feel you were treated fairly

3    throughout the process by the criminal justice system?

4           MS. GRIFFIN-RYDER:  Um, no.

5           THE COURT:  Okay.  How is it you think you were

6    treated unfairly?

7           MS. GRIFFIN-RYDER:  It -- the -- the trial was years

8    and years after it had happened, because it kept getting

9    delayed.

10          THE COURT:  Okay.  And that imposed a hardship on you?

11          MS. GRIFFIN-RYDER:  Yeah.

12          THE COURT:  Okay.  Do you think anything in that

13   experience is going to affect you here as a juror, that is, any

14   unhappiness or hard feelings or resentment or attitudes you

15   think is going to affect you here?

16          MS. GRIFFIN-RYDER:  I think I tend to favor

17   pros -- the prosecution and not defense attorneys.

18          THE COURT:  In what way?

19          MS. GRIFFIN-RYDER:  Well, because I -- I was -- the

20   defense attorneys in my case were the ones that kept delaying

21   the trial.

22          THE COURT:  Okay.  And -- and --

23          MS. GRIFFIN-RYDER:  But I would hope that that

24   wouldn't happen.

25          THE COURT:  Well, this is a very important point, so

1  let's try to be as careful as we can about it.  Are you saying

2  that that -- that feeling would carry over to this case?

3  You -- you would not treat the defense attorneys with the same

4  neutrality as the prosecution?

5          MS. GRIFFIN-RYDER:  I don't -- I don't know.

6          THE COURT:  Well --

7          MS. GRIFFIN-RYDER:  I would -- I would hope not.

8          THE COURT:  Well, I think I'm hearing some doubt here.

9          Does counsel want to follow up?

10          MR. ZALKIND:  Are you saying that you -- you felt the

11  defense attorneys were pretty brutal towards you?

12          MS. GRIFFIN-RYDER:  Yeah.

13          MR. ZALKIND:  And it was a very painful experience?

14          MS. GRIFFIN-RYDER:  Yeah.  You could say that.

15          MR. ZALKIND:  I have nothing else, your Honor.

16          THE COURT:  All right.  It seems to me if you think

17  you can't be fair that you give me no choice here but to let

18  you go, so...

19          MS. SIEGMANN:  Sixty-seven?

20          THE COURT:  I'm sorry.

21          MS. SIEGMANN:  Sixty-seven?

22          THE COURT:  Oh, 67.

23          So you're free to go.  Thank you.

24          Okay.  Next.

25          Your name?

1          MS. GATELEY:  Juror 100.  Gateley.

2          THE COURT:  Juror 100.

3          Okay.

4          MS. GATELEY:  My daughter was a victim of sexual

5     assaults about ten years ago.

6          MR. ZALKIND:  What number was that?

7          MS. GATELEY:  One-hundred.

8          THE COURT:  Okay.  Janet Gateley.

9          Daughter was a victim of sexual assaults?

10          MS. GATELEY:  Yes.  It has no bearing on any of this,

11     but --

12          THE COURT:  Okay.

13          MS. GATELEY:  -- I wanted to be honest about it.  She

14     was 18.

15          THE COURT:  Okay.  The real question is do you think

16     that she was treated fairly by the system?

17          MS. GATELEY:  Oh, absolutely.

18          THE COURT:  And do you have any feelings of any kind

19     coming out of that experience that would affect you as a juror

20     in this case?

21          MS. GATELEY:  No.  No.

22          THE COURT:  Okay.  Are you confident of that?

23          MS. GATELEY:  Yeah.  I just felt I should tell you

24     what happened.

25          THE COURT:  No.  No.  Okay.  Thank you.

1          MS. GATELEY:  All right?

2          THE COURT:  Okay.  Thank you.

3          Next.

4          MS. PROUTY:  I'm applying for frequent flyer miles.

5          (Laughter.)

6          MS. PROUTY:  In the last 12 months, my daughter

7   witnessed a crime and was the victim of a crime in San

8   Francisco.

9          THE COURT:  Two different incidents?

10          MS. PROUTY:  Yes.

11          THE COURT:  Okay.  Do you think she was or is being

12   treated fairly by the criminal justice system?

13          MS. PROUTY:  Very much so.

14          THE COURT:  Okay.  And is there anything about that

15   experience that would affect you as a juror in this case?  Any

16   lingering hard feelings or resentments?

17          MS. PROUTY:  I'm over it.

18          THE COURT:  Okay.  Over -- what is it that you had to

19   get over?

20          MS. PROUTY:  Her apartment was broken into by a young

21   person, who was on drugs.

22          THE COURT:  Okay.

23          MS. PROUTY:  The door beaten down, just breaking and

24   entering.

25          THE COURT:  Okay.

1        MS. PROUTY:  So it's -- I mean, it's huge.

2        THE COURT:  Yeah, I'm sure -- I'm sure it was

3   unpleasant.  Yeah, the question is again --

4        MS. PROUTY:  But she's -- she's fine.

5        THE COURT:  Can you compartmentalize that and whatever

6   hard feelings --

7        MS. PROUTY:  Yes.

8        THE COURT:  -- you have, you're not going to bring to

9   bear on this case?

10       MS. PROUTY:  No.

11       THE COURT:  Okay.  Thank you.

12       Okay.  Next.

13       MS. ALEXANDER:  Mary Barbara Alexander, No. 22.

14       None of these things went to trial, but some

15  years -- many years ago, my husband and I were the victims of a

16  scam in Hollywood.  We worked with the Hollywood Police and

17  ended up getting our money back from the perpetrator

18  eventually, and I was -- I was mugged in New York City once,

19  but I beat the guy up with my umbrella and chased him around

20  the block.

21       (Laughter.)

22       MS. ALEXANDER:  And then another time I helped the

23  New York Police catch a cat burglar, because I saw the guy

24  breaking in, and I got a commendation from the police

25  department for that.

1       And then last year, my daughter -- not last year.  The

2   year before last, my daughter was mugged on her college campus

3   at George Washington University, was knocked out and had her

4   wallet stolen, but the university ended up prosecuting her for

5   being inebriated, so it was kind of stupid, but anyway...

6       THE COURT:  Okay.  In these events involving you, do

7   you think that you and your husband were treated fairly by the

8   criminal justice system?

9       MS. ALEXANDER:  Yeah, the police -- well, I had to

10  cry, but the police eventually were helpful.

11      THE COURT:  Okay.  And your daughter at George

12  Washington, do you think she's been treated fairly?

13      MS. ALEXANDER:  She was very -- treated very fairly by

14  the Metropolitan Police, who were involved, but the university

15  I think was unfair in how they treated her.

16      THE COURT:  Okay.  And the real question is is there

17  anything about all of that that's going to affect you here in

18  this trial today that you're going to --

19      MS. ALEXANDER:  No, I don't think so.

20      THE COURT:  Okay.  You're confident of that?  In other

21  words, there's no resentment, hard feeling, anger, anything

22  like that that's going to be brought to bear --

23      MS. ALEXANDER:  No, I think, you know, each case is

24  its own case.

25      THE COURT:  Okay.  Thank you, ma'am.

1          MS. ALEXANDER:  Thank you.

2          THE COURT:  Okay.  Next.

3          MR. JANNETTI:  Hi, your Honor.

4          THE COURT:  Hello.

5          MR. JANNETTI:  Juror No. 98, John Jannetti.

6          THE COURT:  Okay.  Let me find you.

7          Okay.  Yes, sir.

8          MR. JANNETTI:  Let's see, about 23 years ago, we were

9    victims of a breaking and entering.  My wife was home at the

10   time, and she was in the basement, ran out the basement door.

11   She didn't quite see the two boys, but she wrote a victim

12   impact statement --

13          THE COURT:  Okay.

14          MR. JANNETTI:  -- for the court.  And they caught one

15   of the kids.

16          THE COURT:  Okay.  Do you feel that you and your wife

17   were treated fairly by the criminal justice system?

18          MR. JANNETTI:  Absolutely.

19          THE COURT:  Okay.  And is there anything about this

20   that has -- that would affect your service as a juror here

21   today?

22          MR. JANNETTI:  No, as a matter of fact, it took me a

23   while to kind -- to remember it.

24          THE COURT:  Okay.  So I take it there's no --

25          MR. JANNETTI:  No.

1        THE COURT:  -- hard feelings or resentments or

2    anything like that at this time?

3        MR. JANNETTI:  No, not at all, sir.

4        THE COURT:  Okay.  Thank you.

5        Counsel, stay here for just a second.

6        I don't have a whole lot more on the -- I hope I don't

7    have a whole lot more on the for-cause questions.

8        What I propose to do is to keep banging forward.  I'll

9    ask the panel if it's all right to go past 5:00.  I don't think

10    we're going to get to peremptories today, but I'd like to

11    finish the cause, and there may be a question about numbers,

12    but we won't know till we get to the end.  We're very close

13    right now, but we're still above where we need to be.  Okay?

14        MR. ANDREWS:  If I might, your Honor.  Conscious of

15    the time, I'm not trying to delay, but you asked a general

16    question about law enforcement connections.

17        THE COURT:  Yes.

18        MR. ANDREWS:  In my experience -- and then you had a

19    follow-up question later about do you believe law enforcement

20    more than a regular witness.  In my experience, some of these

21    people could be husbands or wives or sons could be police

22    officers, the next door neighbor, and it's in that context that

23    I usually ask a follow-up question:  How close are you?  I know

24    you asked the question about would you tend to believe the law

25    enforcement, and I was surprised how often I get a -- how often

1    I get a positive response to that.  I think just laying it out

2    there, asking them to raise their hand if they're going to be

3    biased isn't going to divulge that kind of bias.

4         THE COURT:  Okay.  Let's do this.  Let's -- I'm going

5    to go forward with the other questions.  Let me see where we

6    are in terms of time.  I'm not saying one way or the other.

7    Usually I do ask the questions individually, but let's see

8    where -- how many people answered yes?

9         MR. ZALKIND:  I agree with that, your Honor.

10        MR. ANDREWS:  I believe there were one, two --

11        Well, just on the law enforcement.

12        MR. DUNCAN:  Eleven.

13        MR. ANDREWS:  Eleven.

14        THE COURT:  Okay.  Okay.

15        ...end of sidebar.)

16        THE COURT:  All right.  Ladies and gentlemen, some of

17   the witnesses in this case are likely to give expert testimony.

18        Do any of you have any feelings or beliefs about

19   expert witnesses or expert testimony that might interfere with

20   or affect your ability to serve as a fair and impartial juror

21   in this case?

22        I see no hands.

23        I expect that you will hear evidence in this case in

24   the form of court authorized electronic surveillance, which is

25   commonly known as wiretaps.

1        Do any of you have any feelings or beliefs about the

2   use of electronic surveillance or wiretaps that might interfere

3   with or affect your ability to serve as a fair and impartial

4   juror in this case?

5        I see no hands.

6        This case involves allegations that the defendants

7   made false statements in order to obtain tax-exempt status as a

8   charity for an organization known as Care International.

9        Do any of you have strong feelings about charities or

10  alleged abuse of laws governing charities that might interfere

11  with or affect your ability to be a juror in this case?

12       I see no hands.

13       Have any of you learned or heard anything about this

14  case or read anything about this case or these defendants in

15  the television, radio, newspapers, or any other source?

16       Okay.  Let me see you at sidebar.

17       (Sidebar as follows:

18       THE COURT:  Okay.

19       MS. PROUTY:  I started to read the article in the

20  paper this morning.

21       THE COURT:  Hold on.  Let me --

22       MS. PROUTY:  Prouty.

23       THE COURT:  No. 48.  And you're entitled to a

24  first-class upgrade.

25       MS. PROUTY:  I'm sorry.

1          THE COURT:  You're entitled to a first-class upgrade

2     at this point.

3          MS. PROUTY:  Okay.  Yes.

4          (Laughter.)

5          THE COURT:  You started to read --

6          MS. PROUTY:  I started to read the article in the

7     paper.  I realized that it was about --

8          THE COURT:  Keep your voice down.

9          MS. PROUTY:  -- this trial, and I stopped reading it.

10         THE COURT:  Okay.

11         MS. PROUTY:  That's it.

12         THE COURT:  This is the article in this morning's

13    Boston Globe, right?

14         MS. PROUTY:  Uh-huh.

15         THE COURT:  And when did you start to read it, on the

16    lunch break or --

17         MS. PROUTY:  I don't know.  Midmorning.

18         THE COURT:  Midmorning.

19         Okay.  One of the difficult things, obviously, when

20    something appears in the newspaper is to make sure the jurors

21    aren't reading it.  As the case goes on, there may be other

22    press coverage.

23         MS. PROUTY:  Right.

24         THE COURT:  First off, do you think you would be

25    affected by anything you read in the article today?

1       MS. PROUTY:  No.

2       THE COURT:  Okay.  Are you able -- do you think you

3  could keep an open mind as the case goes forward --

4       MS. PROUTY:  Yes.

5       THE COURT:  -- about the case?

6       MS. PROUTY:  Yeah.  It was just matter-of-fact

7  information.

8       THE COURT:  Okay.  I'm going to instruct the jurors,

9  whoever they are, that they are not to read any newspaper

10  accounts about the trial or to listen to the radio or TV if

11  there is anything.  You can set the newspapers aside --

12       MS. PROUTY:  Uh-huh.

13       THE COURT:  -- but you can't read them while the

14  trial's going on.

15       Do you think you'd have any trouble complying with --

16       MS. PROUTY:  No.

17       THE COURT:  -- an instruction to that effect?

18       Okay.  Any follow-up from anyone?

19       MR. ZALKIND:  No.

20       MS. PROUTY:  As long as I can read the sports page.

21       THE COURT:  You can read the sports, which is filled

22  with good news these days.

23       Thank you.

24       Sir.

25       MR. HAYES:  Dennis Hayes.

1          THE COURT:  I'm sorry.

2          MR. HAYES:  Dennis Hayes.

3          MR. ZALKIND:  What number?

4          MS. SIEGMANN:  Sixty-two.

5          THE COURT:  Sixty-two.

6          Okay.  Yes, sir.

7          MR. HAYES:  I just recollect that there was news items

8  when the case broke, and provided I'm not confusing it with

9  another case, I believe it was in the Boston area that this

10  originally happened, and that's pretty much the extent.  I just

11  sort of remember the name of the group and --

12          THE COURT:  Okay.

13          MR. HAYES:  -- three individuals involved, and that's

14  the extent of my recollection.

15          THE COURT:  Okay.  Would you be affected in this case

16  in any way by --

17          MR. HAYES:  Not by this, no.

18          THE COURT:  Okay.  If I -- if you wind up on the jury,

19  and I give an instruction not to read anything in the papers or

20  listen to anything on the radio or watch any TV about it, do

21  you think you'd have any trouble following that?

22          You can read all the rest of the paper.

23          MR. HAYES:  I -- I know.  I just -- I tend to read a

24  lot of Internet news and stumble across things.  That's my

25  only, you know, issue that I --

 1          THE COURT:  Okay.

 2          MR. HAYES:  -- I will lump into it that way, but I can

 3    certainly restrict that.

 4          THE COURT:  And, you know, if -- sometimes it happens

 5    your eye catches on a headline or something --

 6          MR. HAYES:  Right.

 7          THE COURT:  -- but the trick is not to read the

 8    article.

 9          MR. HAYES:  I won't let newspapers to the house, so

10    it's not going to happen that way.

11          THE COURT:  Okay.  Okay.  Any follow-up?

12          Okay.  Thank you, Mr. Hayes.

13          Next.

14          MS. POLLARD:  Mary Pollard.  I actually have a

15    question about the last question you asked.

16          THE COURT:  Okay.  No. 47.

17          MS. POLLARD:  Do you remember -- do you remember it?

18          THE COURT:  Which one about the newspapers?

19          MS. POLLARD:  No, it was for the nonprofit

20    organizations and charities.

21          THE COURT:  Oh, yes, this case involves allegations

22    that the defendants obtained tax exempt status --

23          MS. POLLARD:  Uh-huh.

24          THE COURT:  -- for an organization and that they

25    violated the tax laws in doing so; that they've made false

1    statements; and the question was whether you had strong

2    feelings about charities or alleged abuse of --

3             MS. POLLARD:  Yeah, I do.

4             THE COURT:  -- laws governing charities.

5             Okay.  Well, would it affect your -- first off, tell

6    me what your concern is.

7             MS. POLLARD:  To be honest with you, I think they

8    probably are guilty, and I have a problem with them using the

9    not-for-profit organizations and charities in this way.

10            THE COURT:  When you say --

11            MS. POLLARD:  I mean, if you put me on the jury, and

12   I'll --

13            MR. McGINTY:  And you'll what?

14            MS. POLLARD:  I just -- I think that -- I mean it's

15   been difficult the questions that you've been asking, and it's

16   hard to come up and speak, you know, fairly about my feelings

17   towards the individuals that are sitting behind me.

18            THE COURT:  But do you think they're probably guilty,

19   meaning the defendants?

20            MS. POLLARD:  Uh-huh.

21            MR. McGINTY:  You wouldn't be saying that just to get

22   out of jury service, would you?

23            MS. POLLARD:  No.

24            THE COURT:  All right.  Ms. Pollard, I'm going to

25   strike you.  You're free to leave.  You'll have to check in

1    downstairs.

2              MR. ZALKIND:  What number?

3              MS. SIEGMANN:  No. 47.

4              MR. McGINTY:  I apologize.

5              MS. SIEGMANN:  No. 47.

6              THE COURT:  It's obvious.

7              MR. McGINTY:  I apologize.

8              THE COURT:  Okay.

9              MR. McGINTY:  That was shabby.

10             ...end of sidebar.)

11             THE COURT:  All right.  Have any of you learned or

12   heard anything from the media or from any other source

13   concerning a computer software company known as Ptech, all one

14   word, P-T-E-C-H, Inc.?

15             Okay.  I see no hands.

16             Have any of you formed any opinion about the guilt or

17   innocence of these defendants?

18             I see no hands.

19             The fact that the defendants are charged with crimes

20   is not proof that they are guilty of those crimes; to the

21   contrary, the defendants are presumed innocent, and the

22   government has the burden of proving their guilt beyond a

23   reasonable doubt.

24             Are there any of you who do not accept that basic

25   principle regarding the presumption of innocence and the burden

1  of proof?

2          I see no hands.

3          The defendants have the constitutional right not to

4  testify in this case, and no inference of guilt or anything

5  else may be drawn from the fact that they do not testify.  For

6  you to draw such an inference would be wrong.  Indeed, it would

7  be a violation of your oath as a juror.

8          Are there any of those -- any of you who do not accept

9  this basic principle regarding the defendant's right not to

10  testify and would hold it against them if they do not testify?

11          I see no hands.

12          Finally, you must decide the case solely on the

13  evidence presented in this courtroom.

14          Are there any of you who do not accept that principle

15  and would decide the case based on something other than the

16  evidence?

17          I see no hands.

18          Do any of you have any feelings or beliefs about the

19  federal government, whether positive or negative, that might

20  interfere with or affect your ability to serve as a fair and

21  impartial juror in this case?

22          I see no hands.

23          Do any of you have any feelings or beliefs about the

24  tax laws, whether positive or negative, that might interfere

25  with or affect your ability to serve as a fair and impartial

1   juror in this case?

2           I see no hands.

3           Have any of you ever filed a lawsuit against the

4   United States Government or one of its agencies?

5           I see no hands.

6           Do any of you have any political or religious or

7   ethical beliefs that might interfere with or affect your

8   ability to serve as a fair and impartial juror in this case?

9           I do not want to know your politics or your religion

10  or your personal beliefs, unless those beliefs could somehow

11  interfere with your ability to follow the law as I instruct you

12  and to render a fair verdict in this case.

13          I see no hands.

14          All right.  Ladies and gentlemen, it is five o'clock.

15  What I would like to do is I have a couple -- I want to revisit

16  a question, and I have a couple catchall questions.  I'd like

17  to do that, and then, I think, break for the day, and I

18  apologize that I'm going to have to bring you back tomorrow,

19  but I don't realistically see much alternative.  It's five

20  o'clock, and we can push forward here for awhile, but I can't

21  keep you here until seven or eight or nine o'clock at night.

22          Is there anyone here, who absolutely has to leave at

23  five o'clock?  Because if we can make some more progress, I'd

24  like to to get those of you who are not going to serve out of

25  here as soon as possible.

1          Okay.  You have to leave at 5:00?

2          PROSPECTIVE JUROR:  No, your Honor, I would just need

3    a break to make other arrangements --

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR:  -- for my son to be picked up.

6          THE COURT:  Okay.  Why don't we take a quick break and

7    let you do that, and everyone else if you can -- if you need to

8    go to the bathroom, that's fine, but if the rest of you can

9    just stay here, stretch your legs, and we'll resume as soon as

10   possible.

11         Yes, sir.

12         PROSPECTIVE JUROR:  What time do you want us here

13   tomorrow?

14         THE COURT:  It would be nine o'clock.

15         PROSPECTIVE JUROR:  Nine o'clock.

16         THE COURT:  Yes.  And I would imagine tomorrow will go

17   fast, you know, and we'll get the jury impaneled relatively

18   quickly, but I -- I just realistically I don't think we can get

19   it done tonight, and I think it's not fair to everyone to try

20   it, so...

21         Okay.

22         And, Mr. Andrews, I'm going to read the question you

23   asked to revisit.

24         MR. ANDREWS:  Thank you, your Honor.

25         THE COURT:  Yes, I'm sorry.

1          PROSPECTIVE JUROR:  If we are impaneled, we will be

2   impaneled, the jury won't start tomorrow?

3          THE COURT:  Well, what will happen is 16 people, 12

4   jurors and four alternates, will be picked tomorrow.  We'll go

5   through the process of selecting people.  Everyone else who is

6   not picked will be free to leave once that jury is sworn.

7   Those 16 people will be on the jury.  So it's the process of

8   winnowing this group down farther, but it will go much faster

9   than today's process.

10          Okay.  And, again, I apologize.  If it's any

11   consolation, in California, sometimes it takes three or

12   four months to pick a jury.

13          Yes.

14          MS. PROUTY:  Could you repeat her question and speak

15   in the mike.

16          THE COURT:  I think the question was, in substance,

17   what's going to happen tomorrow.  What I expect to happen today

18   is that we will finish the general questions.  We will put 16

19   people tomorrow morning in the jury box, and the lawyers will

20   start exercising their peremptory challenges.  That should go

21   fairly quickly, or at least much more quickly than today.

22          Once we have those -- that process completed, everyone

23   else is free to go; and as people are challenged, they're free

24   to go as well, so the number will be winnowed down from however

25   many are left to 40 or 50 of you down to the 16; and then 16

1  people will be on the jury, but everyone else will be free to

2  leave.  And if I had a reasonable alternative, I'd do it, but I

3  apologize.  Okay.  So let's make this happen as quickly as we

4  can.  We'll go forward for a little bit longer tonight.

5       MR. CHAKRAVARTY:  Your Honor, can we be seen at the

6  sidebar?

7       THE COURT:  Yes.

8       (Sidebar as follows:

9       MR. CHAKRAVARTY:  Your Honor, I -- the concern we had

10  was the national security type questions, which we had

11  discussed before.  We didn't hear those given in -- in

12  substance the way that you had indicated that you were planning

13  on doing so in lieu of putting it on the questionnaire.

14       THE COURT:  All right.  I -- I will -- the

15  question -- I think I have it somewhere, but it's do you have

16  feelings or attitudes about national security issues that would

17  affect your ability to serve?

18       MS. SIEGMANN:  The U.S. Government's --

19       MR. ZALKIND:  I would strongly object to that, your

20  Honor.

21       THE COURT:  All right.  The objection's overruled,

22  but --

23       MS. SIEGMANN:  I think it was the U.S. Government's

24  policy on national security or national security policy.

25       MR. ZALKIND:  You're going to tell us that we

1    can -- with all due respect, your Honor, you're saying that we

2    cannot argue to the jury about the policy of the United States

3    Government, but they can bring into this case national

4    security?  I just think it's --

5          THE COURT:  Mr. Zalkind.

6          MR. ZALKIND:  -- it's not an issue.

7          THE COURT:  Mr. Zalkind, we also asked about military

8    service, which I think the defendants were interested in asking

9    about, because it's a way of flushing out attitudes.

10         I would be hard pressed to believe that there's a

11    person left, who is secretly harboring some resentment or

12    national security-type issue that they haven't yet identified,

13    but I'll ask the question.  I frankly don't expect any

14    responses, and I don't see any harm from it.  It's not

15    injecting any issue into the case at all.

16         MR. ZALKIND:  This is not --

17         THE COURT:  I'm just going to ask a general question

18    about attitudes, about national security issues, and will it

19    affect their service as a juror.

20         MR. ZALKIND:  With all due respect, your Honor, this

21    is not a national security case.  This is a tax issues.

22         THE COURT:  It's not a military case either.  It's not

23    a case about corrections officers.  You know, if that were the

24    standard, I wouldn't ask any questions at all, Mr. Zalkind.

25         MR. ZALKIND:  I understand that, but once you touch

1  those buttons -- I've been informed -- I've been informed by

2  the prosecutors, they intend to ask the FBI agents, if they

3  can, would they work for the terrorist strike force of the

4  national security --

5       THE COURT:  Stop.  Stop.  Stop.

6       MR. ZALKIND:  So we're told.

7       THE COURT:  Stop.  The FBI task force is not going to

8  be identified as a Joint Terrorism Task Force period; and if

9  the indictment goes to the jury, that part of it will be

10  redacted, period.

11       MR. ZALKIND:  Well, what about national security?

12       THE COURT:  I'm going to ask a generalized question.

13       MR. ZALKIND:  No, but I mean with the witnesses, with

14  the FBI witnesses.

15       THE COURT:  We're going to have to -- do you

16  want -- what is your --

17       MR. ZALKIND:  My objection would be since this is a

18  tax case that none of those agents should be asked if they

19  worked on national security, because I think that prejudices

20  the case.

21       MS. SIEGMANN:  Your Honor, if we could be heard on

22  this tomorrow morning, rather than talking about this --

23       THE COURT:  I think that makes sense, yes.  Thank you.

24            ...end of sidebar.)

25            (The Court conferred with the clerk.)

1          THE COURT:  All right.  Ladies and gentlemen, when I

2     asked a question earlier about service in the military in

3     Afghanistan or Iraq or the Middle East, I neglected to ask a

4     follow-up question.

5          You -- have any of you had strong feelings about

6     national security issues that might affect your ability to be a

7     fair and impartial juror in this case?

8          All right.  I see no hands.

9          When I asked the question earlier about those of you

10    who had served in law enforcement, or you had friends or close

11    relations in law enforcement, about 11 or 12 of you raised your

12    hand, and what I'd like to see is to see you at sidebar and ask

13    what that relationship is.  This is the question about do any

14    of you or are any relatives or any close friends law

15    enforcement agents?

16         So let me see you quickly one by one.

17         (Sidebar as follows:

18         THE COURT:  Make sure that all the numbers are

19    identified.  Have we got everyone?  Did you write down the

20    numbers from when we...

21         THE CLERK:  I did.

22         THE COURT:  Okay.  Just make sure.

23         Yes, ma'am.

24         Hi.  What's your name?

25         MS. FRATUS:  I think I'm No. 51, Donna -- it's under

1    Iacobucci, I think, I-A-C-O-B-U-C-C-I.

2              THE COURT:  Okay.  I have Donna Fratus, but --

3              MS. FRATUS:  Yes.  That's my married name.

4              THE COURT:  Okay.  And what's your law enforcement

5    connection?

6              MS. FRATUS:  I have a close cousin, who is a police

7    officer.

8              THE COURT:  Okay.  What kind of work does he do?

9              MS. FRATUS:  He is a regular patrolman --

10             THE COURT:  Okay.

11             MS. FRATUS:  -- wearing uniform.

12             THE COURT:  Whereabouts?

13             MS. FRATUS:  In Wareham.

14             THE COURT:  Okay.

15             MS. FRATUS:  My sister also has a live-in boyfriend,

16   who is a detective for the Plymouth County Sheriff's

17   Department.

18             THE COURT:  Okay.  All right.  And is there anything

19   about those relationships that would affect you as a juror in

20   this case in any way?

21             MS. FRATUS:  I don't think so.

22             THE COURT:  Okay.  Is there any doubt in that respect?

23   In other words --

24             MS. FRATUS:  No.

25             THE COURT:  Okay.  I just want to make sure you were

1    confident.

2         MS. FRATUS:  I just don't know if you're looking for

3    something more specific, but I don't think so.

4         THE COURT:  Well, what I want to make sure is that

5    when we have law enforcement agents testifying that the jury

6    listens to them and assesses them individually and not because

7    they like law enforcement, or they don't like law enforcement,

8    or because they heard some story somewhere once.  I want --

9         MS. FRATUS:  No, I don't think --

10        THE COURT:  I want people to be fair and open-minded

11   as to each witness.

12        MS. FRATUS:  Absolutely.

13        THE COURT:  Do you think you can do that?

14        MS. FRATUS:  Yes, I can.

15        THE COURT:  Okay.  Thank you.

16        MS. FRATUS:  Okay.

17        THE COURT:  Next.

18        MS. GATELEY:  Janet Gateley, 100.

19        THE COURT:  100.  Okay.

20        MS. GATELEY:  My brother is a Boston Police Officer.

21        THE COURT:  Okay.

22        MS. GATELEY:  My brother-in-law is a lieutenant on the

23   Stoughton Police force, and my son-in-law is a lawyer for the

24   Department of Revenue, Mass. Department of Revenue.

25             THE COURT:  Okay.  I'm sorry.  Who is the -- who works

1　at Mass. DOR?

2　　　　　MS. GATELEY:  My son-in-law.

3　　　　　THE COURT:  Son-in-law.  Okay.  What does he do?

4　　　　　MS. GATELEY:  He's a lawyer.

5　　　　　THE COURT:  Okay.  All right.  Is there anything about

6　those relationships that would affect your ability to be a fair

7　and impartial juror --

8　　　　　MS. GATELEY:  No.

9　　　　　THE COURT:  -- this case?

10　　　　　MS. GATELEY:  I don't believe so.

11　　　　　THE COURT:  Okay.  This is a tax case, and you have a

12　son-in-law at Mass. DOR --

13　　　　　MS. GATELEY:  He doesn't talk about anything.

14　　　　　THE COURT:  Okay.  I just want to make sure you're not

15　going to be --

16　　　　　MS. GATELEY:  No, he doesn't talk about anything.

17　　　　　He doesn't like to talk about what he does --

18　　　　　THE COURT:  Okay.

19　　　　　MS. GATELEY:  -- because it's private.

20　　　　　THE COURT:  All right.  And you're confident again

21　that you can be a --

22　　　　　MS. GATELEY:  Yes.

23　　　　　THE COURT:  -- fair juror in this case?

24　　　　　MS. GATELEY:  Absolutely.

25　　　　　THE COURT:  Okay.  Thank you, ma'am.

1          MS. GATELEY:  Thank you.

2          MR. ANDREWS:  Your Honor, may I --

3          THE COURT:  Oh, I'm sorry.  Yes, Mr. Andrews.

4          MR. ANDREWS:  In -- in this case, there's likely to be

5     law enforcement witnesses.

6          MS. GATELEY:  Uh-huh.

7          MR. ANDREWS:  Do you believe you tend to favor or

8     believe the testimonies of law enforcement --

9          MS. GATELEY:  No.

10         MR. ANDREWS:  -- officers?

11         MS. GATELEY:  No.  The answer is no.  No.

12         MR. ANDREWS:  Thank you.

13         THE COURT:  Okay.  Thank you.

14         Next.

15         MS. SIEGMANN:  She didn't finish.

16         THE COURT:  Next.

17         MS. ALEXANDER:  Mary Barbara Alexander, Juror No. 22.

18         I have a cousin, who's a retired police detective.  He

19    lives in Hawaii now.

20         And I have a nephew, who's just starting at the police

21    academy in Tampa, Florida.  He's the son of my brother-in-law,

22    who's the retired Army colonel.

23         THE COURT:  Okay.  Is there anything about those

24    relationships that would affect your ability to be a fair juror

25    in this case?

1          MS. ALEXANDER:  I don't think so.

2          THE COURT:  Okay.  Any doubt at all in your mind in

3    that respect?

4          MS. ALEXANDER:  No.

5          THE COURT:  Okay.  Any follow-up, Counsel?

6          MR. ZALKIND:  No.

7          THE COURT:  Okay.  Thank you.

8          Next.

9          Next.

10          Hi.  What's your name?

11          MR. MUNSON:  Teddy Munson.  It's Juror 37.

12          THE COURT:  Thirty-seven.  Yes, sir.

13          What's your law enforcement connection?

14          MR. MUNSON:  Just knowing I had associated with a B-2

15    cop, as well as Immigrations Customs Harbor -- he deals with

16    the cruise ships.

17          THE COURT:  Okay.

18          MR. MUNSON:  It would be the second person.

19          THE COURT:  Okay.

20          MR. ZALKIND:  Who's this?

21          THE COURT:  And I'm sorry.  What was the first one?

22          MR. MUNSON:  The first one is a B-2 police officer.

23          THE COURT:  Okay.

24          MR. MUNSON:  District B-2.

25          THE COURT:  Okay.  And --

1         MR. MUNSON:  The other one's Seaport --

2         THE COURT:  Okay.

3         MR. MUNSON:  -- Corporation officer.

4         THE COURT:  And he deals with cruise ships that come

5  into the harbors?

6         MR. MUNSON:  Yeah.

7         THE COURT:  Okay.  Is there anything about those

8  relationships that would affect --

9         MR. MUNSON:  No.

10        THE COURT:  -- your service as a juror here?

11        Okay.  Any follow-up?

12        MR. ANDREWS:  Thank you.

13        THE COURT:  Okay.  Thank you.

14        MR. ZALKIND:  One follow-up, your Honor.

15        THE COURT:  I'm sorry.  Yes.

16        MR. ZALKIND:  If you had two witnesses, and you were

17  comparing them, a police officer and a civilian witness, would

18  you tend to believe police officers over the civilian ones?

19        MR. MUNSON:  I wouldn't take either side.  I'd look at

20  both sides and weigh it evenly.

21        MR. ZALKIND:  Thanks.

22        THE COURT:  Thank you.

23        Okay.  I think I already asked that question of the

24  whole panel.

25        Next.

1           MR. ANDREWS:  Your Honor, but it's -- I'm not sure

2    they'd feel comfortable raising their hand.

3           MS. BARRY:  Hi.

4           THE COURT:  Hi.  Your name again?

5           MS. BARRY:  Forty-six, Nancy Barry.

6           THE COURT:  Okay.

7           MS. BARRY:  My husband's sister was a trooper for

8    12 years.  My -- and her husband, Sean P. Sullivan, is still a

9    State Trooper --

10          THE COURT:  Okay.

11          MS. BARRY:  -- for 18 years, and he's now with the

12   arson -- the arson squad.

13          THE COURT:  Okay.  Mass. State Police?

14          MS. BARRY:  Yes.

15          THE COURT:  Both of them?

16          MS. BARRY:  Yes.

17          THE COURT:  All right.  Is there anything about those

18   relationships that would affect your ability to be a juror in

19   this case?

20          MS. BARRY:  I don't -- I don't -- no.

21          THE COURT:  You don't know?

22          MS. BARRY:  No.  I know that it probably won't.

23          THE COURT:  Okay.  It probably won't?

24          MS. BARRY:  No.  It won't period.

25          THE COURT:  Okay.

1          MS. BARRY:  End of that.

2          THE COURT:  All right.

3          All right.  Counsel, any follow-up?

4          MR. ANDREWS:  Thank you.

5          MS. BARRY:  Okay?

6          THE COURT:  Okay.  Thank you, ma'am.

7          MS. BARRY:  Okay.  Yep.

8          THE COURT:  Next.

9          MS. THOMPSON:  Hi, Julie Thompson.

10          THE COURT:  Number?

11          MS. THOMPSON:  Forty-nine.

12          THE COURT:  Forty-nine.  Okay.

13          MS. THOMPSON:  My husband is a correctional officer --

14          THE COURT:  Yes.

15          MS. THOMPSON:  -- and my sister is TSA with the

16  airport --

17          THE COURT:  Yes.

18          MS. THOMPSON:  -- and she was also a retired Deputy

19  Sheriff for the Essex County Sheriff's Department.

20          THE COURT:  Okay.  Is she at Logan?

21          MS. THOMPSON:  Yes.

22          THE COURT:  Okay.  We talked about your husband.

23          Is there anything involving your sister that would

24  affect your service as a juror?

25          MS. THOMPSON:  No.

1          THE COURT:  Okay.  The fact that she's worked

2    in -- for TSA and worked for the sheriff's office?

3          MS. THOMPSON:  Right.

4          THE COURT:  Okay.  No problems?

5          MS. THOMPSON:  No.

6          THE COURT:  Okay.  Thank you.

7          Next.

8          MR. MacARTHUR:  Hi.

9          THE COURT:  Hi.  Your name?

10         MR. MacARTHUR:  William MacArthur, No. 33.

11         THE COURT:  Okay.

12         MR. MacARTHUR:  In law enforcement, I have a nephew

13   that is a corrections officer at the Nashua State Prison.

14         I do part-time work for a company called T and M

15   Protection Agencies out of Lynnfield, Massachusetts, which I do

16   high-profile customers that come into town.

17         I also have my boss that runs that company is a

18   retired State Police Trooper, 26 years on the job.

19         THE COURT:  Okay.

20         MR. MacARTHUR:  And I have multiple friends that are

21   MBTA police that that's who I work for.  That's the outfit that

22   I work for.  I'm not --

23         THE COURT:  Okay.  Okay.  You work for a protection

24   agency.  Is that private security?

25         MR. MacARTHUR:  Yeah, just protection.  It's not

1   anything to do with police.  I'm not a police officer by any

2   means.

3           THE COURT:  Okay.  Are you keeping away paparazzi and

4   that sort of thing?

5           MR. MacARTHUR:  That's right.

6           THE COURT:  Okay.  And is there anything about these

7   relationships, whether you work for a protective agency or the

8   fact that you have friends on the MBTA police or --

9           MR. MacARTHUR:  I also have another friend that's

10  Secret Service.  He is retired from the Secret Service.

11          THE COURT:  Okay.  Is there anything about any of

12  these connections or relationships that would affect your

13  ability to be --

14          MR. MacARTHUR:  No, sir.

15          THE COURT:  -- a juror in this case?

16          Okay.  Any follow-up?

17          MR. McGINTY:  Do you have any law enforcement

18  training?

19          MR. MacARTHUR:  No, sir.

20          THE COURT:  Okay.  Thank you.

21          MR. MacARTHUR:  Okay.  Thank you.

22          MR. ZALKIND:  Your Honor, I would -- I would object

23  for cause.  Even though he says he's not biased, he is so

24  infected by the police and his work.  Every single connection

25  in his life, it seems, is connected to police, and I don't

1  think that he could be a fair and impartial juror, even though

2  he says he can be fair.  He has just too much connection with

3  the law enforcement.  It's too close to him.

4       THE COURT:  Well, I'm going to overrule the objection.

5  I don't see an objection for cause.

6       Okay.  Next.

7       MR. FAHEY:  Scott Fahey.

8       THE COURT:  Okay.  Number.

9       MR. DUNCAN:  Twenty.

10      THE COURT:  Number 20.

11      Yes, sir.

12      MR. FAHEY:  My wife's uncle is a Weymouth lieutenant.

13      THE COURT:  I'm sorry.  Wife's uncle --

14      MR. FAHEY:  My wife's uncle is a Weymouth lieutenant,

15  and my brother-in-law is an auxiliary, but he was working in

16  Sherborn, Mass.

17      THE COURT:  Okay.

18      MR. FAHEY:  He was a cop for awhile, so...

19      THE COURT:  Okay.  Is there anything about those

20  relationships that would affect your ability to be a juror in

21  this case?

22      MR. FAHEY:  No, sir.

23      THE COURT:  Okay.  Any follow-up?

24      MR. McGINTY:  Do you feel any insecurity wearing a

25  Falcon's jersey in this town based on the Red Sox?

1          MR. FAHEY:  No, because it's the Bellingham Falcons.

2          (Laughter.)

3          MR. FAHEY:  I'm an assistant coach.  That's it.

4          THE COURT:  Okay.  Thank you.

5          MS. SIEGMANN:  Your Honor -- your Honor.  I'm sorry.

6     One of the special agents used to be, a long time ago, an

7     auxiliary police in Sherborn, and he mentioned that.  It's -- I

8     don't know when, if they overlapped at all, but he didn't

9     mention he knew her, but still Special Agent Youngquist

10    actually was a Sherborn auxiliary police, I believe.

11         THE COURT:  Okay.

12         MS. SIEGMANN:  I'm almost positive she was on the

13    Sherborn Police.  I just don't know if she was auxiliary police

14    or not.

15         THE COURT:  Do you want me to call him back and ask

16    the question?

17         MS. SIEGMANN:  Yeah.

18         THE COURT:  All right.  I'm sorry.  Mr. Fahey.  Can I

19    get you back here for a second?

20         Sorry to drag you back and forth.

21         MR. FAHEY:  No problem.

22         THE COURT:  We have a potential witness named Lauren

23    Youngquist, who was a -- apparently an auxiliary in the

24    Sherborn Police Department.

25         Do you know her or have any connection with --

1          MR. FAHEY:  No.  He was an actual cop in Sherborn.  It

2    was Framingham auxiliary.

3          THE COURT:  Framingham auxiliary.  Okay.

4          MR. FAHEY:  Yeah.  I don't know --

5          THE COURT:  Okay.

6          MR. FAHEY:  I just -- I don't know anybody else that

7    he worked with or was associated with her.

8          THE COURT:  Fair enough.  Okay.  Thank you.

9          Okay.  Next.

10          MR. GENTRY:  Hello.

11          THE COURT:  Okay.  Your name?

12          MR. GENTRY:  Robert Gentry, No. 64.

13          THE COURT:  Okay.

14          MR. GENTRY:  And one of my best friends is a

15    lieutenant in the police department in Chelmsford,

16    Massachusetts.

17          THE COURT:  Okay.  And do you talk to him about his

18    work?

19          MR. GENTRY:  About his work, but not anything

20    specific.

21          THE COURT:  Okay.  Is there anything about that

22    relationship that would affect your service as a juror here

23    today?

24          MR. GENTRY:  No, sir.

25          THE COURT:  Okay.  Any follow-up?

1        MR. CABELL:  No, your Honor.

2        THE COURT:  Okay.  Thank you, sir.

3        MR. GENTRY:  Thank you.

4        THE COURT:  Okay.  Next.

5        MR. SHOENFELT:  Hi.

6        THE COURT:  Hi.  Can I have your name?

7        MR. SHOENFELT:  Brad Shoenfelt.

8        THE COURT:  Do you remember your number?

9        MR. SHOENFELT:  I think it's 29.

10       THE COURT:  Twenty-nine.

11       Yes, sir.  Okay.  Okay.

12       MR. SHOENFELT:  My stepfather is a policeman.

13       THE COURT:  Whereabouts?

14       MR. SHOENFELT:  In Windsor Locks, Connecticut.

15       THE COURT:  Okay.

16       MR. SHOENFELT:  That was 15 years before I knew him.

17       THE COURT:  Oh, he isn't that any more?  He's no

18  longer a police officer in Windsor Locks?

19       MR. SHOENFELT:  No, it was -- yeah, he stopped serving

20  right about 10, 15 years before I knew him.

21       THE COURT:  Okay.  Is there anything about that

22  relationship that would affect your ability or affect you as a

23  juror in this case?

24       MR. SHOENFELT:  No.

25       THE COURT:  Okay.  Any follow-up?

1          Okay.  Thank you.

2          Next.

3          That was 29.

4          MR. DUNCAN:  Twenty-nine.

5          MR. HUGHES:  Tim Hughes, 96.

6          THE COURT:  What's your law enforcement connection?

7          MR. HUGHES:  I've got two friends that are currently

8     cops, one in Canton, one in Newton, and my neighbor across the

9     way is a cop in Maynard.

10         THE COURT:  Okay.  And do you talk to your friends and

11    neighbor about their work?

12         MR. HUGHES:  No, not -- not normally, unless -- but if

13    we're playing hockey, and one of them happens to be -- play

14    hockey in uniform -- if he happened to be patrolling at the

15    time, he might stop in.

16         THE COURT:  Is there anything about those connections

17    or relationships that would affect you in any way as a juror in

18    this case?

19         MR. HUGHES:  No.

20         THE COURT:  Okay.  Any follow-up?

21         Okay.  Thank you.

22         Next.  Oops.

23         MR. DUNCAN:  That was 96, your Honor?

24         THE COURT:  That was 96.

25         MS. RADKE:  Hello.

1          THE COURT:  Hi.  Your name?

2          MS. RADKE:  Lisa Radke, No. 80.

3          THE COURT:  Okay.

4          MS. RADKE:  I was a Master at Arms in the Navy.

5          THE COURT:  Okay.  All right.  And I already asked you

6     this question, I think, but I'll ask it again.  Anything about

7     that service that would affect your ability to be a juror in

8     this case?

9          MS. RADKE:  No.

10          MS. SIEGMANN:  Eighty.

11          THE COURT:  Okay.  Any follow-up?

12          MS. SIEGMANN:  No.

13          THE COURT:  Okay.

14          MS. RADKE:  And we have a consensus we need bagels and

15     croissants and everything in the morning when we come back.

16          (Laughter.)

17          MS. RADKE:  While we were here in line, we took that

18     vote.  Okay?

19          THE COURT:  Okay.  I tell you what, why don't

20     you -- no, I won't say anything smart alecky.  Thanks for the

21     suggestion.

22          (Laughter.)

23          THE COURT:  Next.

24          The line keeps -- we keep getting down to one person,

25     and then the line keeps growing.

1          THE COURT:  Hi.  What's your name?

2          MR. PINKHAM:  Matt Pinkham.  I think it's 50.

3          MR. DUNCAN:  It is.

4          THE COURT:  Fifty.  Okay.

5          MR. PINKHAM:  My mother-in-law retired from the police

6    department last month after 20 years of service.

7          THE COURT:  That's your mother-in-law?

8          MR. PINKHAM:  Yep.

9          THE COURT:  All right.  Anything about that

10   relationship that would affect your ability to be a juror in

11   this case?

12         MR. PINKHAM:  No.

13         THE COURT:  Okay.  Thank you.

14         And -- next.

15         Hi.  What's your name?

16         MS. McMANUS:  Kathrynne McManus, 60.

17         THE COURT:  Sixty.  Yes, ma'am.

18         MS. McMANUS:  My father's a retired Mass. State

19   Trooper.

20         THE COURT:  Okay.  And what kind of work did he do?

21         MS. McMANUS:  General State Trooper work, I guess.

22         THE COURT:  Okay.  He wasn't in a special unit of any

23   kind?

24         Was he a highway patrolman?

25         MS. McMANUS:  Yes.

1          THE COURT:  Okay.  Is there anything about your

2    relationship with your father or his work that would affect

3    you -- affect you as a juror in this case?

4          MS. McMANUS:  No.

5          THE COURT:  Okay.  Any follow-up?

6          MS. SIEGMANN:  No.

7          MR. ANDREWS:  Your Honor --

8          THE COURT:  Yes.

9          MR. ANDREWS:  -- I have a question.  If you could ask

10   the question that you asked, or should I phrase it,

11   the -- about civilian and law enforcement witnesses.

12         THE COURT:  Go ahead.

13         MR. ANDREWS:  There are going to be both civilian and

14   law enforcement witnesses in this case, and because of your

15   relationship with your father, do you think there's any chance

16   or any probability that hearing a law enforcement witness

17   testify that you'd be more likely to believe him, because he's

18   law enforcement?

19         MS. McMANUS:  I don't think so, no.

20         MR. ANDREWS:  All right.  Thank you very much.

21         THE COURT:  Okay.  Thank you.  Okay.

22         ...end of sidebar.)

23         THE COURT:  All right.  Ladies and gentlemen, do you

24   know of any reason that I have not mentioned why you cannot sit

25   as a fair and impartial juror in the trial of this case?

1          I see no hands.

2          Is there anything that I have not asked you about that

3  you think you would like to raise with me?

4          Okay.  I see no hands.

5          Let me see counsel quickly.

6          (Sidebar as follows:

7          THE COURT:  All right.  Any objection not previously

8  interposed?

9          MS. SIEGMANN:  No, your Honor.

10          MR. CABELL:  No.

11          THE COURT:  Okay.  What I'm going to do then is I'm

12  going to send them home, and we'll start -- we'll

13  still -- we've got enough, right?  Hanging by a thread.  So,

14  we'll talk about the impanelment, but let me let them go.

15  Okay?

16          MR. ZALKIND:  What do you intend to do, your Honor,

17  about openings?

18          THE COURT:  We'll talk about that as soon as I let

19  them go.

20          ...end of sidebar.)

21          THE COURT:  All right.  Ladies and gentlemen, that is

22  it for today.  Someone suggested that tomorrow morning we

23  should provide bagels and orange juice and coffee.  It's a

24  great suggestion.  You've earned it; you deserve it; and we

25  won't pay for it, so --

1       (Laughter.)

2       THE COURT:  -- sorry to say that we can't do that.

3       I really do thank you sincerely for your patience.

4  This has been an unusually long impanelment, and -- and it's

5  great that you have been so patient and so uncomplaining.

6       What we're going to do tomorrow is I'm going to ask

7  you to report to the jury room promptly at nine o'clock.  We

8  will reconvene, and we'll start the actual impanelment process

9  of the jurors in the box.  I don't expect that that will take a

10  terribly long amount of time, and that, you know, whatever the

11  number is, two-thirds of you or so will be discharged tomorrow,

12  and the remaining 16 will be on the jury.

13       As you can tell, it's -- things work a lot faster if

14  everybody's on time; so, I ask as a courtesy to your fellow

15  jurors if you can make every effort to be here on time or even

16  a little early so we can get going and get this down to the

17  actual juror that we're going to have tomorrow -- the jury.

18       Let me caution you all.  You're still just members of

19  a jury panel.  You haven't been sworn, and normally all this

20  happens not only in one day, but in one morning, and I give

21  instructions to people about how they're to behave and comport

22  themselves.

23       Let me give you the following instruction:  Please

24  don't talk about this case with anyone; that is, you don't

25  really know anything about the case, but please don't discuss

1    it.  You can talk about the fact that you were here today,

2    obviously, and that the judge asked you a bunch of questions

3    that maybe you thought were silly or irrelevant, but all that's

4    fine, but not about the case itself, not about what the case is

5    about, not anything of that nature.  I don't want any

6    discussions at all.

7         It's possible that there will be newspaper articles,

8    radio stories, TV, things on the Internet.  Please, please,

9    please, please, please do not read them.  Okay.  If you're

10   curious about them, have a friend set aside the newspaper or

11   print out the Internet article or something.  Set it aside.

12   You can read it later, but don't do it now.  It's very, very

13   important that this trial be fair and that it be conducted

14   solely within the confines of the courtroom and according to

15   the evidence, and so I ask you -- I instruct you to disregard

16   any media coverage.

17        So, with that, I'm going to let you go.  Thank you

18   again, and I will see you hopefully tomorrow morning promptly.

19        Thank you.

20        (The jury panel was dismissed.)

21        THE COURT:  All right.  Quickly.  What I expect to

22   happen tomorrow is we will put the first 16 names on the list

23   in the box.  Just looking at the first page, jurors 1, 2, 3, 5,

24   7, 8, and so forth will go into the box.

25        As I indicated previously, peremptories will be

1    exercised by round.  The government has eight.  The defense

2    collectively has 12.  The government will go first in the first

3    round.  So that if the government strikes Juror No. 1, in seat

4    No. 1, and the defense strikes Juror No. 2, in seat No. 2, the

5    third challenge will be up to the government and so forth.

6            The defense will go first in the second round.

7            The government will go first in the third round.

8            There will be no back strikes.  Once you've had an

9    opportunity to pass on a juror and have not taken it that juror

10   will remain.  And the last four jurors impaneled, regardless of

11   what seat they're in, will constitute the alternates, although

12   I will not tell them until the end of the trial.

13           I think there is a pretty good likelihood that we're

14   going to open tomorrow.  Let me get estimates from everyone of

15   the length of your opening statements.

16           For the government, Mr. Cabell?

17           MR. CABELL:  I'm still thinking in the 30-, 35-minute

18   range --

19           THE COURT:  Okay.

20           MR. CABELL:  -- but asking for up to 45, but trying to

21   keep it at 30.

22           THE COURT:  Okay.  Defense, who's going to open

23   for -- Mr. Zalkind?

24           MR. ZALKIND:  I'm opening first.  I would ask for 45

25   as well.  I think it will probably be a little bit less, but I

1   would like to have my 45 minutes.

2            THE COURT:  Okay.  Mr. Andrews?

3            MR. ANDREWS:  Approximately 20 minutes, your Honor.

4            THE COURT:  Mr. McGinty?

5            MR. McGINTY:  A half hour on the outside.

6            THE COURT:  Okay.  Okay.  Again, it's -- it's hard to

7    know, but I would think the most likely scenario is openings

8    are tomorrow.

9            I will have some instructions for the jury after

10   they're impaneled.  They typically take about 20 minutes, and I

11   would hope the impanelment will go briskly.  You have

12   substantially more information than you would ordinarily have,

13   and you have overnight to think about it, and you know the

14   order that the people are going to be put in the box in, so

15   that is when you exercise a challenge, you know who

16   that -- who's going to replace that juror, so I would expect

17   that it will go fairly briskly.

18            Mr. Duncan.

19            MR. DUNCAN:  Your Honor, there were a couple of jurors

20   that you told were moving to the bottom of the list.

21            THE COURT:  I think only one.

22            MR. DUNCAN:  And who is she?

23            THE COURT:  And was she excused later?

24            MS. SIEGMANN:  Yes, she was.

25            MR. ANDREWS:  Yes, she was.

1          MR. ZALKIND:  No one.

2          MR. CABELL:  No one.

3          MR. DUNCAN:  It's in the order as it stands?

4          THE COURT:  Yes.

5          MR. McGINTY:  I don't have her being -- it was

6    Samantha Shostak, No. 79.  I don't have her -- was she

7    stricken?

8          MR. CABELL:  She's gone.

9          THE COURT:  She is gone.

10          MR. CABELL:  She's gone.

11          THE COURT:  She said didn't always trust law

12    enforcement, and --

13          MR. McGINTY:  Can we have her back on probation?  One

14    last chance to bring her back.

15          THE COURT:  And I certainly will not complain if some

16    of these poor jurors, whose lives are going to be unusually

17    disrupted, if anyone wanted to exercise a peremptory to get rid

18    of them, it's up to you with your peremptories.

19          All right.  Anything else we ought to talk about

20    before we break for the evening?

21          Ms. Siegmann?

22          MS. SIEGMANN:  Your Honor, do you anticipate hearing

23    any witness testimony tomorrow?  I'd ask --

24          THE COURT:  I think that's unlikely --

25          MS. SIEGMANN:  Okay.

1          THE COURT:  -- given the amount of time.  I mean, let

2     me do a mental calculation here.  I think that's highly

3     unlikely.

4          MS. SIEGMANN:  Because I would hate to have witnesses

5     sitting for all morning and then have to come back.  It's okay

6     that we have no witnesses scheduled to come tomorrow, and then

7     we'll start with witness testimony on Thursday then?

8          THE COURT:  Let me just do the math in my head here

9     and make sure of that.

10          Yes, I think that's fair.

11          MS. SIEGMANN:  Thank you, your Honor.

12          MR. ANDREWS:  Your Honor, I just -- perhaps on -- your

13     clerk could check.  I think 63, Richard Turner, may still be on

14     the list.  He was the gentleman -- I just don't want to -- I

15     think we told him -- he was the clinical therapist that was

16     working with young men in the residential --

17          THE COURT:  Yes.

18          MR. ANDREWS:  -- and I think you told him we'd move

19     him to the end of the list.

20          THE COURT:  No, I suggested it, and the defense

21     objected, and I left him right where he was.

22          MR. ANDREWS:  All right, your Honor.  Thank you.

23          I'm sorry.  I marked it down as being end of the list.

24          MS. SIEGMANN:  I did, too.

25          MR. ANDREWS:  I probably did it precipitously.

1          MR. McGINTY:  Your Honor, one last thing, which is I

2     filed a motion this morning relating to the request for

3     preliminary instructions relating to the First Amendment

4     issues.  I know no one's had a chance to read it, but I would

5     ask the Court to consider that in its preliminary instructions.

6     The First Amendment issues here are significant.  When the jury

7     hears certain evidence it should be able to put it in the

8     context of what is and is not part of the government's case.

9     So, I, frankly, would ask the Court to look at that and

10    evaluate it.

11         THE COURT:  Okay.  I will look at it, and that's all

12    I'll promise tonight.  I will read it.

13         MR. CHAKRAVARTY:  And finally, your Honor, with

14    regards to the expert witnesses, obviously, we're not going to

15    resolve the timing today, but tomorrow morning or at some point

16    during the day are we going to take up any of the legal issues

17    that we've discussed today as well as discuss that scheduling?

18         THE COURT:  Well, I think what makes sense -- Marty,

19    what is tomorrow afternoon's schedule like?

20         We have nothing on the calendar tomorrow afternoon,

21    and I think probably what we ought to do is regather at two

22    o'clock and talk about what we're going to do, and maybe with

23    some suggestions for timing of Daubert hearings from both

24    sides.

25         MR. McGINTY:  I have a three o'clock in front of Judge

1    Lindsay.

2         THE COURT:  Yes.  So, we'll go 2:00 to 3:00, I guess,

3    and get done what we can get done.

4         MR. ANDREWS:  Lastly, your Honor -- I'm sorry to bring

5    it up -- but one thing we might have missed this morning with

6    Mr. Cabell's opening is there was motions went back and forth

7    about this economic jihad business and what one of the

8    charities are doing.  I know that Mr. Chakravarty might have

9    filed something in the morning hours, late last night, and I

10   don't think we addressed that today, and I didn't want to --

11        THE COURT:  It's still up in the air, and that is to

12   what extent the experts can testify about economic jihad,

13   Muslim charities, however -- whatever label you want to put on

14   that.  It's still up in the air.  I have not resolved it, and

15   counsel ought to open with that in mind that it's an open

16   issue; that it could go either way.

17        MR. ANDREWS:  Thank you, your Honor.

18        MR. CABELL:  Your Honor, is it fair game --

19        THE COURT:  It's expert testimony.  I mean --

20        MR. CABELL:  Right.  But is it fair game to

21   comment -- I think you had said that you thought it was fair

22   that an expert could say, "I've heard of this notion before of

23   a charity being used as a fund."

24        THE COURT:  Well, that's what's up in the air.  In

25   other words, defense has objected that this is somehow

1    propensity evidence, or otherwise unfair, and I just frankly

2    haven't gotten -- it's the other charity's piece of it that

3    this is a pattern.  It's commonplace.  It's -- it fits within

4    something that -- that is appropriate for expert testimony.

5    I -- I don't think that there's a problem with the government

6    talking about what these defendants did and to the extent that

7    they, you know, use the phrase "economic jihad" or, you know,

8    something that they did, it seems to me it's appropriate.  The

9    question is -- what, if anything, have other charities done is

10   what has not been resolved, that is, is there a pattern out

11   there; and if so, is it appropriate for expert testimony?

12            MR. CABELL:  Okay.

13            THE COURT:  That's what open.

14            MR. CHAKRAVARTY:  One other thing you mentioned last

15   week, which was the Maktab al Khidmat, you know, description

16   and keeping it very general, kind of just the bare bones type

17   description.  I believe for purposes of opening, Mr. Cabell

18   will not do anything beyond talking about the fact that there

19   is this organization.  It's Maktab al Khidmat, and that Sheikh

20   Abdullah Azzam was the founder of this.  And I don't want to

21   speak for my brother, but there won't be much beyond that, but

22   if we do that, do we have to provide to the Court and the

23   counsel any specific additional type of disclosure as to what

24   precisely we expect to elicit at trial?

25            THE COURT:  I -- I'm not sure I have anything to add

1    to what I said the other day, and I think if you just say that,

2    that that's, you know, going to be fine.  I think you stray

3    beyond that at your peril.  The -- obviously, the concern is

4    Osama Bin Laden, other activities of MAK, to the extent this

5    evidence comes in at all, it's -- it's really for a fairly

6    limited purpose.  The name of it, as I understand, in Arabic

7    means --

8              MR. CHAKRAVARTY:  Human services.

9              THE COURT:  -- human services, and the government says

10   this is connected to what the defendants were doing and shows

11   continuity of some type.  I think all of that is okay.  It's

12   the 403 issues that I'm concerned about, the connections to

13   Osama Bin Laden, if any, terrorism involving the World Trade

14   Center bombing.  That's -- I don't want the jury --

15             MR. CHAKRAVARTY:  And those -- and those we concede

16   we're not going to -- the idea that they were the mechanism for

17   supporting mujahideen, you know, back in -- in Afghanistan and

18   then later in Bosnia and Chesnya, which are relevant to this

19   case, we were hoping to at least simply in those terms to give

20   an instruction.

21             THE COURT:  All right.  And bear in mind, the farther

22   back you go in history from 1993, talking about events in

23   Afghanistan, the more likely I am to give the defense free

24   rein to respond --

25             MR. CHAKRAVARTY:  That's fair.

1          THE COURT:  -- so pick your spots.

2          MR. ZALKIND:  I will -- I will be talking about this

3     Afghanistan starts in '78, your Honor, and that really does

4     flow into the whole case.

5          THE COURT:  I think the only thing I said that's off

6     limits is, at least for now, because I haven't resolved it, is

7     that the United States had a policy of supporting the

8     mujahideen, and I think --

9          MR. ZALKIND:  I'm not going to talk about the United

10    States having policies.

11         THE COURT:  But the war and the devastation, that's

12    all fair game.

13         MR. ZALKIND:  I'm going to talk about the nation

14    states, you know, providing both lethal aid and humanitarian

15    aid and buildings.

16         THE COURT:  Okay.  Mr. Andrews?

17         MR. ANDREWS:  No, your Honor.

18         THE COURT:  Okay.

19         MR. ANDREWS:  Thank you, your Honor.

20         THE COURT:  Your co-counsel is always standing up in

21    front of you.  I just want to make sure you have a chance to

22    speak.  I'm looking out for you.

23         MR. ANDREWS:  I appreciate it.

24         THE COURT:  I know you're shy.  Okay.

25         MS. SIEGMANN:  Thank you.

1          MR. ANDREWS:  All right, your Honor.

2          THE COURT:  I think what we're going to do tomorrow is

3    we're going to ask the jury to come to Courtroom 22, so I can

4    go to Judge Woodlock's courtroom, which is where we're going to

5    wind up --

6          MR. CABELL:  So we should go there.

7          THE COURT:  -- so you should report to Courtroom 22.

8    Okay.

9

10          (At 5:47 p.m., Court was adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3            I, Marianne Kusa-Ryll, Certified Realtime

4    Reporter, do hereby certify that the foregoing transcript,

5    consisting of 336 pages, is a true and accurate transcription

6    of my stenographic notes in Case No. 05-40026-FDS, United

7    States of America versus Emadeddin Muntasser and Muhamed

8    Mubayyid, before F. Dennis Saylor, IV, on November 13, 2007, to

9    the best of my skill, knowledge, and ability.

10

11                         /s/ Marianne Kusa-Ryll

12                         Marianne Kusa-Ryll, RDR, CRR

13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25